UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

```
UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )    No. 18-CR-34-DAD
                             )
vs.                          )    JURY TRIAL - DAY 1
                             )    Pages 1 through 194
CYRUS DENNIS BRASWELL,       )
                             )
        Defendant.           )
_____)
```

Fresno, California                    Tuesday, February 12, 2019


REPORTER'S TRANSCRIPT OF PROCEEDINGS


**APPEARANCES OF COUNSEL**:


For the Plaintiff:      United States Attorney's Office
                        BY: **LAURA WITHERS**
                        and **KIRK SHERRIFF**
                        2500 Tulare Street
                        Suite 4401
                        Fresno, California 93721

For the Defendant:      **CYRUS DENNIS BRASWELL**
                        In Pro Per

STANDBY COUNSEL:        Federal Defender's Office
                        BY: **MEGAN HOPKINS**
                        2300 Tulare Street
                        Suite 330
                        Fresno, California 93721

REPORTED BY:  KAREN HOOVEN, RMR, CRR, Official Court Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer aided transcription.

2

1                              INDEX

2     GOVERNMENT'S WITNESSES:

3     **PISA SUON**                                            101
      DIRECT EXAMINATION BY MS. WITHERS                   101
4     **JAMES JOHNSON**                                        126
      DIRECT EXAMINATION BY MS. WITHERS                   127
5     **QUINN HARRISON**                                       161
      DIRECT EXAMINATION BY MR. SHERRIFF                  161
6     **THOMAS VOLK**                                          176
      DIRECT EXAMINATION BY MR. SHERRIFF                  176

7

8                              * * * * *

9

10

11

12

13                             EXHIBITS

14    GOVERNMENT'S                                     Received
      1-A                                                106
15    1 (Pages 1 and 2)                                  110
      2-A                                                113
16    2-B                                                115
      2                                                  119
17    3-A                                                121
      3                                                  124
18    4                                                  130
      5                                                  134
19    1 (Pages 3 and 4)                                  141
      3 (Pages 16 and 17)                                150
20    10                                                 169

21                             * * * * *

22

23

24

25

1    Tuesday, February 12, 2019                    Fresno, California

2    8:53 a.m.

3            THE CLERK:  Court calls case 1:18-CR-34.  United

4    States versus Cyrus Dennis Braswell.  Jury trial and motion in

5    limines.

6            THE COURT:  And please state your appearances.

7            MS. WITHERS:  Laura Withers and Kirk Sherriff

8    representing the United States.

9            MR. BRASWELL:  Mr. Braswell.  And I am not waiving my

10   rights under the Sixth Amendment to present a defense or to

11   call witnesses.  I'm not doing it.

12           THE COURT:  All right.  And your appearance for the

13   record, sir.

14           MR. BRASWELL:  I just told you who I was.

15           THE COURT:  Representing yourself in this action?

16           MR. BRASWELL:  That's right.  Pro se.

17           MS. HOPKINS:  Good morning, Your Honor.  Megan

18   Hopkins of the Federal Defenders Office as standby counsel for

19   the Court.

20           THE COURT:  All right.  The matter is on calendar for

21   a jury trial this morning.  With respect to the defendant's

22   last filing, which was made at the time of the ongoing final

23   pretrial conference last Monday, the Court construed that

24   filing as a motion to continue the trial date and issued an

25   order addressing it on February 8th.

1            Did you receive that order, Mr. Braswell?

2            MR. BRASWELL:  No, I didn't.

3            THE COURT:  Ms. Hopkins, that order didn't get taken

4    over?

5            MS. HOPKINS:  Your Honor, I have not been assisting

6    with delivering any orders to Mr. Braswell.  I'm not sure if

7    he's seen it or not.

8            MR. SHERRIFF:  I have a copy of the order, Your

9    Honor.  I can provide it.

10           THE COURT:  We've got it now.  Mr. Braswell, why

11   don't you take a moment.  The Court issued that order back on

12   February 8th.

13           MR. BRASWELL:  Okay.

14           THE COURT:  So Mr. Braswell, following last Monday's

15   appearance, the Court issued that order.  And it was mailed to

16   you the day that it was issued.  But it obviously didn't

17   arrive to you.  You've had a moment to take a look at it?

18           MR. BRASWELL:  I took a look at it.

19           THE COURT:  Okay.  I tried to address the points that

20   you raised on Monday, but I denied any motion to continue the

21   trial date.  And I tried once again to address the issue that

22   you raised throughout the proceedings about wanting --

23   apparently wanting to defend against these charges of having

24   mailed threatening communications on the basis that your 1997

25   conviction and 1998 sentencing, I believe, in connection with

1   the Alaska case were flawed or unjustified.

2          And I still have -- in terms of your ability or your

3   right to present a defense to the charges, any defense that

4   you wish to present, you're entitled to present if it's

5   supported by either the facts -- if it's supported by both the

6   facts, the evidence and the law.  And the problem that I see

7   with the defense that you've always indicated you wished to

8   present is it's unsupported by the law.  It is not a legally

9   cognizable defense to these charges.

10          And I took a look at the case, the Second Circuit

11   case that you cited.  The unpublished opinion.  I addressed it

12   in the order.  It simply doesn't stand for any contrary

13   position.  In fact, it stands for the well recognized position

14   that you've got the right to present a defense that's

15   supported by the evidence and the law.  And I can't fathom any

16   way that it would be a legally cognizable defense to these

17   charges.

18          MR. BRASWELL:  I have three affidavits for recusal,

19   all three of them state that I'm being held in prison in

20   violation of the law, the rules, statutes and constitutional

21   amendment.  All three of the affidavits address false

22   imprisonment.  There is a motive for me filing the affidavits.

23   I filed the affidavits and the motive was that because of the

24   false imprisonment.  The reason I filed was to have the judge

25   recused from the case.  Recused from the case because of the

1   false imprisonment.  So that's why my defense is false arrest,

2   false imprisonment.  The affidavits clearly explain that.  All

3   three of them.

4         THE COURT:  And I've thought about that.  The longer

5   I've tried to think about how -- it's difficult for me to

6   envision the facts and the evidence the way that you do.  But

7   trying to -- trying to figure out exactly what your thought

8   process is.  It has occurred to me that it could be your

9   suggestion:  Yes, I sent those threatening communications, but

10  I didn't mean it.  Despite what the words say.  All I was

11  trying to do was to disqualify Judge Singleton from presiding

12  over my motions, seeking to set aside that conviction.  And in

13  my mind, the one way to do that would be to mail him a

14  threatening communication, thereby forcing him to recuse

15  himself.

16        MR. BRASWELL:  No.  That's not how it's done.

17        THE COURT:  Okay, well, that --

18        MR. BRASWELL:  You may want to disagree.  You may

19  want to sit there and laugh all you want, but that's not how

20  it's done.  I filed under a federal statute, 28144 and 455.

21  And I requested that he recuse.  I showed where there was an

22  interest at stake.  And that's what the law permitted me to do

23  and that's what I've done.  So --

24        THE COURT:  So the threat --

25        MR. BRASWELL:  You're sitting there and you're trying

7

1  to justify this here I'm like telling you.  I'm telling you

2  now for the third time, I am not waiving my rights under the

3  Sixth Amendment.  You're asking me to proceed with a trial

4  where you previously took away my right to present a defense.

5  If I was to agree with this trial, I would be waiving my

6  rights to present a defense and to call a witness and I'm not

7  going to do that.

8          THE COURT:  You don't have --

9          MR. BRASWELL:  As for the stay, you said no.

10          THE COURT:  I did.

11          MR. BRASWELL:  So, yeah, exactly.  So I think the

12  only alternative here is you're either going to dismiss these

13  charges or you're going to let me see the Chief District Court

14  Judge of this circuit.

15          THE COURT:  That's not going to happen.

16          MR. BRASWELL:  Okay.  Well --

17          THE COURT:  We're going --

18          MR. BRASWELL:  You going to have to come up with

19  something because I'm not waiving my rights to --

20          THE COURT:  Oh -- stop.  What we're coming up --

21          MR. BRASWELL:  -- to my defense.  What you're coming

22  up with.

23          THE COURT:  What we're coming up with is we're going

24  to trial.

25          MR. BRASWELL:  I'm not selecting no jury, I'm telling

1   you that right now.

2           THE COURT:  That's up to you.

3           MR. BRASWELL:  All right.  Ain't nobody here

4   representing me.  I'm representing myself.

5           THE COURT:  That's up to you.

6           MR. BRASWELL:  Not going to take that right away from

7   me.  I'm not going to waive my right to present a defense or

8   call witnesses.  You did that in the order of docket number

9   109.  That's what you done.  And that's appealable.  If I

10  agree to this trial, I'm waiving my right to appeal that.  And

11  I'm not going to do that.

12          THE COURT:  Let me try this.  I will state on the

13  record that, as far as I'm concerned, you have reserved your

14  right to appeal.  My --

15          MR. BRASWELL:  Look at the case that I cited.  If I

16  agree --

17          THE COURT:  Can I finish?

18          MR. BRASWELL:  No, because --

19          THE COURT:  All right.  Take him out.

20          MR. BRASWELL:  -- you're going to miss the case --

21          THE COURT:  Take him out.

22          MR. BRASWELL:  Hold on a second.  Ain't nobody

23  representing me.  I represent myself.  Grab my paperwork.

24          THE COURT:  Why don't you go back, take a deep breath

25  and see if you're ready to get going.

9

1          MR. BRASWELL:  I told you, I'm not waiving my rights.

2          THE COURT:  Are you going to listen to me?

3          MR. BRASWELL:  No.  Because you're not talking about

4    the law.  You talking -- huh-uh.  No, sir.

5      (The defendant left the courtroom.)

6          THE COURT:  Based upon Mr. Braswell's -- we're

7    outside the presence of Mr. Braswell.  His standby counsel,

8    Ms. Hopkins is present.  Based upon statements made by Mr.

9    Braswell at last Monday's trial confirmation hearing, I had a

10   premonition that this was going to be his position.  That he

11   would not go forward with the trial nor would he represent

12   him -- take any action to represent himself.

13         My feeling is that I should explain to him that if he

14   does that, he is doing so at his own choosing.  That the trial

15   is proceeding today.  Warn him that while he may choose, if he

16   wishes, not to participate in any way, that is a matter of his

17   own choosing.  What is not of his own choosing is how he

18   elects to carry out that plan.  That he must be respectful.

19   That he must comply with the Court's orders and directives.

20   That he cannot be disruptive.

21         And that if he refuses to comply with those ground

22   rules and insists on being disruptive, disrespectful -- I was

23   actually also going to talk about some of the language used in

24   the documents that are -- that he authored allegedly and warn

25   him not to repeat any of the more scandalous language

1   contained in those documents.

2          But that if he refused to comply with those

3   directives, that I would have no choice but to revoke his pro

4   se status and appoint standby counsel to proceed on his

5   behalf.  And that if he continued to be disruptive after I did

6   so, that he would have to be removed from the courtroom.  So

7   that's essentially what I was contemplating doing.

8          Is there anything that the government wants to

9   suggest or propose?

10         MR. SHERRIFF:  Just one clarification.  I think

11  it -- I don't know if this will be helpful actually, but --

12  because given his statements.  But he certainly has a right to

13  testify and present his motive and intent, as the Court was

14  explaining to him, in sending these.  And if his motive and

15  intent was the reasons he stated just a few minutes ago to the

16  Court, he's entitled to and should testify to that.  That's a

17  different issue.

18         THE COURT:  That's up to him.

19         MR. SHERRIFF:  That's up to him.  It's a different

20  issue than bringing in witnesses on completely irrelevant and

21  403 material concerning the merits or the validity of his

22  underlying conviction.

23         THE COURT:  Part of my problem is I can't figure out

24  what Mr. Braswell is even saying.  I tried to fathom what his

25  reasoning is.  Because I've been trying to think for a long

1    time, what could he be talking about?  Is he just trying to

2    attack the underlying conviction, the 1997/'98 conviction in

3    District Court in Alaska?  It has seemed, throughout the

4    proceedings, that that's what he's obsessed with.  He can't do

5    that.  Or at least he hasn't presented any legal authority

6    throughout the proceedings that would make me even think for a

7    moment that he could conceivably do that.

8         Then I started to think, okay.  Let me try to step in

9    his shoes -- which is difficult to do -- and see if I can

10   think of some other theory that he may have.  And I explained

11   to him, through that, what I came up with as to maybe what he

12   might be thinking.  He didn't like my attempt, as he just

13   expressed.  Apparently says I got it all wrong.  I'm just

14   trying to figure out what it is he's trying to say.  Or to

15   ferret out whether he's -- whether there's anything in there

16   that is conceivably a potentially relevant defense.  I don't

17   know.

18        Does anybody -- you folks have lived with the case

19   longer than I have.  Have you -- has anybody come up with a

20   notion of, hey, there's a kernel of something here that maybe

21   he could legally pursue?  Have you got anything, from the

22   prosecution point of view?

23        MR. SHERRIFF:  Not really, Your Honor, other than he

24   may want to explain his intent in sending them.  Which, from

25   our perspective, he's perfectly entitled to do.  But he sounds

1    like he's not at all willing to participate in the trial.

2              THE COURT:  And he also seems to disdain the notion

3    that it went to his intent.  That it was not his intent to

4    cause judge Singleton's recusal by sending these.  He seemed

5    to reject that notion.

6              Ms. Hopkins, as standby counsel, do you have any

7    suggestion as to how I might try to have a fruitful exchange

8    with Mr. Braswell?

9              MS. HOPKINS:  Your Honor, I would suggest that -- I

10   believe that he believes -- and this is based solely on what

11   I've observed.  I have not had in depth conversations with Mr.

12   Braswell about his theory of defense.  But my belief is that

13   he believes that the misstatement by the alleged victim

14   regarding a prior conviction for rape -- which he believes

15   occurred, he believes that this judge misstated that he had a

16   prior conviction for rape.  That that misstatement is

17   foundational to his mental state in corresponding with the

18   Court.  That is what I'm able to assess.

19             THE COURT:  Foundational in --

20             MS. HOPKINS:  Meaning that he needs to establish that

21   there was a misstatement regarding a prior conviction for rape

22   before he can proceed with a defense as to the mens rea

23   element.  Perhaps -- and again, I don't know that that is his

24   exact position.  But I -- it's what I've gathered.

25             And so it may be something the Court can resolve by

1   simply agreeing to take judicial notice of the fact that there

2   is no prior rape conviction.  And then if Mr. Braswell has

3   evidence that the Court in Alaska improperly presented that to

4   the Bureau of Prisons or in some way infringed upon his rights

5   as an inmate at the Bureau of Prisons, he could arguably

6   present that.

7          I think that he -- I think that the issue here is

8   that he believes there's a tete-a-tete between himself and the

9   Court in Alaska that needs to be presented, that it was not

10  one-sided.  And I think he is fixated on some representation

11  that he had been convicted of rape as the beginning of that

12  tete-a-tete.

13          THE COURT:  Wow.  Yes.

14          MS. WITHERS:  Your Honor, if I may.

15          THE COURT:  Ms. Withers.

16          MS. WITHERS:  It's the government's position that we

17  don't believe Mr. Braswell has a prior conviction for rape.

18  If the Court wanted to take judicial notice of that fact, we

19  have no objection to it.  As long as it's clear that, you

20  know, his prior conviction is for the drug offenses in 1997

21  and 1998.  That's what we intend to be a part of this trial

22  and we don't intend to -- our understanding is that Mr.

23  Braswell does not have a conviction for rape.

24          THE COURT:  Ms. Hopkins has suggested that Mr.

25  Braswell believes that the victim, the alleged victim of these

1   threatening communications at some point either referred to or

2   passed along information, false information, to the BOP that

3   the defendant had previously been convicted of a rape.

4   And --

5         MS. HOPKINS:  Well, to clarify, I believe that at

6   some point, either in detention or sentencing proceedings,

7   there was a reference to a rape conviction.  And Mr. Braswell

8   believes that that was then somehow transferred -- or that

9   information was transferred.  Not necessarily that the judge

10  provided that information directly.  But I believe that there

11  must have been a reference that Mr. Braswell's fixated on

12  either during detention or sentencing proceedings.  Or during

13  maybe the PSR process.

14        MS. WITHERS:  And the government's understanding is

15  that Mr. Braswell may have a prior arrest for rape and that

16  may be where that information came from.  And certainly, you

17  know, if BOP wants to handle its security proceedings based on

18  that, that's their business.

19        MR. SHERRIFF:  Actually, I do think it's reflective

20  of the discovery that there's some reference in the BOP

21  records to that rape arrest.  Or arrest for rape.  Now, I

22  don't think we've seen anything that indicates a conviction.

23        THE COURT:  But there's just no there there.  It

24  has -- why would I even let him testify, let alone produce any

25  other evidence -- testify about that as being his motive when

1    it's completely and totally irrelevant to the charge of

2    threatening communications?  I mean, why isn't the rationale

3    of the prior order still compelling?  That is, even if that

4    were true, what's the authority for the position that it's

5    then acceptable to mail threatening communications to the

6    public official?

7             MS. HOPKINS:  Well, Your Honor, I think -- and this

8    is not the Federal Defender's position that we would

9    necessarily forward at trial.  But I think that it could be

10   argued that this incident provoked Mr. Braswell's blind rage

11   and that, similar to a heat of the moment defense in a

12   domestic violence or a battery case, that his blind rage was

13   persistent to the level that it drove him to communicate these

14   threats.  And he may argue that it presented a basis for that

15   rage that the jury may determine was sufficient to address the

16   mens rea element.  That is my best interpretation of the

17   theory.

18            THE COURT:  Okay.  Well --

19            MR. SHERRIFF:  Can I respond, Your Honor?

20            THE COURT:  Yeah.

21            MR. SHERRIFF:  I don't -- I think we're being a

22   little speculative as to Mr. Braswell's actual intent or what

23   he might articulate as a defense since his intent seemed to be

24   that he was unhappy with his prior conviction and so he sent

25   threatening communications directly to the judge.  I don't

1   think there's any basis -- and not in what Ms. Hopkins just

2   articulated -- for any defense based on the grounds that she

3   just hypothetically mentioned.  Nor have we seen it from Mr.

4   Braswell.

5          But I do think that if his intent was to send threats

6   to the judge because he was unhappy with his prior -- the

7   prior sentencing, that's the government's case.  But he's also

8   entitled to testify to that if he chooses.  It would

9   essentially be admitting the government's case.  But he has a

10  right to get on the stand and admit the government's case if

11  he chooses.

12         THE COURT:  All right.  I'm going to bring Mr.

13  Braswell back in.  Ms. Hopkins, you may end up being called

14  upon.

15         MS. HOPKINS:  Your Honor, if that occurs.  I just

16  want to make sure the Court is aware.  Based on the level of

17  standby counsel I've been appointed at, I have not been

18  appointed as standby counsel for Mr. Braswell.  Simply for the

19  Court.  And that has prevented me from reviewing any

20  discovery, discussing Mr. Braswell's defense with him,

21  conducting any investigation or presenting any pretrial

22  motions.  And so I would ask for a continuance of the trial so

23  that I can ensure he has effective assistance of counsel.

24  Because at this point, I cannot even effectively cross-examine

25  witnesses in this case.

1          And I expressed this earlier to the magistrate judge.

2     The concern that the level of standby counsel I was currently

3     appointed at prevented me from taking any action in the case.

4     And Mr. Braswell was given a brief colloquy regarding whether

5     or not he would accept standby counsel for him that would

6     allow me to at least conduct some review of discovery and some

7     investigation on his behalf.  And he declined that.  And the

8     Court continued my appointment at the level I'm at, which is

9     purely as standby counsel for the Court.

10         So I -- that is just -- that's my concern.  I am not

11    prepared to proceed with trial.  Even though I've been present

12    for these hearings, I have not been allowed to conduct any of

13    the tasks necessary to be even prepared at a base level.

14         THE COURT:  All right.  Well, thank you for that

15    clarification.  So that takes one quiver out of my bow.  I

16    don't know how I'm going to proceed.  I can proceed if Mr.

17    Braswell just sticks to the notion that, no, I'm not

18    participating because you're precluding me from putting on a

19    defense.  What I'm more concerned about is what if he's

20    completely totally disrespectful, disruptive in carrying out

21    that strategy.  Then what do I do?  Do I just swallow hard and

22    let it keep going?  Even in front of the jury?  In order to

23    get the case to the jury.

24         MS. HOPKINS:  Your Honor, I wasn't present for

25    either -- or counsel on these prior trials, but I am aware

1    previously, before other district judges when defendants

2    proceeded in pro se or were otherwise unruly, the Court had

3    them view the trial outside of the courtroom to maintain order

4    in the Court.  I'm not sure if this courtroom has that

5    capability or -- and I don't know if Mr. Sherriff recalls

6    those particular instances.  But I do recall defendants being

7    removed from the courtroom and viewing the trial outside of

8    the courtroom.

9             MR. SHERRIFF:  I'm aware of that happening, Your

10   Honor.  I don't know if that was with a pro se defendant.

11            THE COURT:  That was my understanding.  That folks

12   have been removed from the courtroom, but with counsel present

13   in the courtroom.  And the conundrum is what about a pro se

14   with a standby counsel whose role has been limited and is not

15   in a position to undertake the representation.  Now there's

16   nobody in the courtroom representing the defendant if you were

17   to have the defendant removed?

18            Well, let's bring Mr. Braswell back in.

19        (The defendant returned to the courtroom.)

20            THE COURT:  Mr. Braswell has rejoined us.

21            Mr. Braswell, I want to make a couple of things

22   clear.  One, I want to do everything in my power to preserve

23   your right to appeal any decision I have made on the grounds

24   that I have denied you the right to present a defense of your

25   choosing.  You've made that objection on the record.  I've

1    rejected your position in the written order and again here.

2              I think, in my view, you've already preserved that

3    issue.  And I don't think government counsel at this point

4    disagrees.  So I do not want to, in any way, obstruct your

5    ability to appeal any conviction that might be rendered in

6    this case on the grounds that you were denied the right to

7    present a defense that you should have been allowed to

8    present.  And if there's anything else along the way that you

9    feel that you want to put on the record in this case about

10   that issue, I'll give you time to do it outside the presence

11   of the jury.  Because I in no way want to get in the way of

12   you presenting that issue on appeal.

13             And because I think you're probably skeptical, I

14   really am trying to do my best to think about the things that

15   you've said and try to conjure up an argument that you might

16   be trying to make that would entitle you to put on a defense

17   centered on some of the things that you've talked about.  And

18   that's -- when I came up with the notion, okay, this might be

19   what you're trying to argue.  That's all I was doing, was

20   trying to put myself in your shoes to try to think about what

21   it was exactly you might be trying to present.  And you

22   indicated to me, no, I wasn't characterizing it correctly.

23   You know, I apologize.  But I really am just trying to figure

24   out exactly, from a lawyer's point of view, what is the

25   defense that you are telling me you want to present.  But I'm

1   having trouble with it.  I mean --

2           MR. BRASWELL:  The only thing you can do is go back

3   and read the affidavits for recusal.

4           THE COURT:  I have.

5           MR. BRASWELL:  If you read them, they talk about me

6   being in prison in violation of the rules, statutes and the

7   constitutional amendment.  They talk about the false

8   imprisonment.  There's a reason and a motive behind me filing

9   those affidavits.  And like I stated earlier, I filed the

10  affidavits because of the false imprisonment.  The reason?  To

11  have the judge recused.  Why?  Because of the false

12  imprisonment.  So those -- the false arrests and false

13  imprisonment is centered around those affidavits.

14          I am not waiving my Sixth Amendment right to present

15  a defense or to call a witness.  I don't trust anything you

16  say in here.  Because I read case law and it states that the

17  man should have been able to present his lawsuit.  All right?

18  That's what the case law said.  Because he proceeded with

19  trial, he agreed.  The appellate court treated it as if he

20  had -- as a harmless error.  He waived his rights to that

21  appealable issue.

22          This case should have been sent up to the Ninth

23  Circuit to decide whether or not I have a right to present my

24  defense and to call a witness.  You chose not to do that.  Now

25  you asking me to proceed with trial, which would mean I would

1    be agreeing to waive my rights to present a defense and to
2    call a witness and I'm not going to do that.  I'm not
3    participating in any trial.  And no one here can represent me.
4    I represent me.  So you either send this case up to the Ninth
5    Circuit or put it before the chief judge.
6           THE COURT:  You have a -- not an unfettered right to
7    represent yourself, as you've been told throughout these
8    proceedings.  But you do have a right to represent yourself
9    and to make strategic decisions.  In my opinion, you can both
10   preserve the right to appeal any ruling I've made that you
11   believe restricts your ability to present a defense and still
12   present a defense as best you can.
13          MR. BRASWELL:  No, I can't present your defense.  I
14   can only present mine.
15          THE COURT:  That's fine.  I think you could, in fact,
16   do both.  You apparently disagree.  But that's your judgment
17   to make because you are representing yourself.  And if
18   you -- you have a right to cross-examine -- to make an opening
19   statement before the jury, to cross-examine witnesses
20   presented by the prosecution, to present relevant evidence in
21   support of a defense.  And you have a right to testify in your
22   own defense.
23          MR. BRASWELL:  I think I also have a right to a fair
24   trial.  How is that fair?
25          THE COURT:  I think --

1          MR. BRASWELL:  I mean, the prosecutor can bring in
2    witness and they can put on a defense but I can't?  How is
3    that fair to me?
4          THE COURT:  Well, in terms of putting on a defense,
5    you're talking about your pretrial motion for Rule 17(b)
6    subpoenas, I did deny that motion on the grounds that you
7    never presented any information about who it was you wanted to
8    issue --
9          MR. BRASWELL:  Yes, I did.  If you read the motions
10   that I filed, you would have seen that.  It's only obvious you
11   never read the motions.
12         THE COURT:  And what they could testify to that would
13   be relevant to your defense.
14         MR. BRASWELL:  Read the motion in docket number 61.
15   Have you ever read that one?  No, you haven't.
16         THE COURT:  I read it.
17         MR. BRASWELL:  No, you didn't.
18         THE COURT:  I ruled on it.  Please, Mr. Braswell, you
19   got to be -- you got to have at least a tiny bit of decorum.
20         MR. BRASWELL:  And I do.  I'm not waiving my rights.
21         THE COURT:  You've made that clear.  I am not
22   preventing you from putting on relevant -- witnesses who can
23   provide relevant testimony.  I've ruled on the motions.  To
24   the extent you disagree with those rulings, your remedy is to
25   appeal.  And you've preserved your appellate rights in

1    connection with those pretrial motions in my view.  But,

2    ultimately, the only thing that you can appeal from is a

3    judgment of conviction.  If you were --

4              MR. BRASWELL:  I don't mean to interrupt you, but I

5    think you should issue a stay and let the Ninth Circuit Court

6    of Appeals decide whether I have a right to present my defense

7    and call witness.

8              THE COURT:  And I've denied --

9              MR. BRASWELL:  All they need to do is review the

10   affidavits.  That's all I've been asking for.

11             THE COURT:  And I've denied the motion for stay.

12             MR. BRASWELL:  Okay.  Done talking about this.

13             THE COURT:  So I just want to make clear again,

14   however, I think you've preserved your appellate rights.  We

15   are going to proceed with the trial of this matter.  It is for

16   you to decide whether you wish to participate by, at your

17   choosing, making an opening statement, cross-examining the

18   government's witnesses, presenting evidence yourself,

19   including whether or not you testify.  Those are all decisions

20   completely up to you.  And whether you want to make a closing

21   argument at the conclusion of the case.  All those things are

22   decisions for you to make.

23             However, while all those strategic decisions are for

24   you to make and you've made very clear that you don't want

25   anyone else representing you, that standby counsel does not

1  represent you, that you are representing yourself in these

2  proceedings.  While you can make all those decisions regarding

3  your defense in this case, including how to preserve your

4  appellate rights, those are all -- and I want to emphasize

5  especially your ability to testify -- your right to testify in

6  your own defense and to explain to the jury your either

7  intent, motivation, all those things.  Whether you think that

8  should be presented to the jury or not, that is up to you to

9  decide.

10        You do have a right to testify in your own defense if

11  you wish to do so.  And to explain to the jury the

12  circumstances that you think constitute a defense to these

13  charges.  Whether you wish to invoke that right to testify is,

14  again, completely up to you.  Because you're representing

15  yourself in these proceedings.  But I want to make it also

16  clear to you the one thing you don't have a right to do is to

17  be disrespectful, not abide by the rules or to argue with me

18  in front of the jury about rulings that I've already made.

19        If you feel the need to put something on the record

20  that you think will help the record in terms of your

21  anticipated appeal, then I would ask you that you request that

22  we take it up outside the presence of the jury.  I'll send

23  them out of the room and then I'll let you put on the record

24  what you think should be -- is important for you to state on

25  the record.

25

1          Let's take up the government motions in limine first.

2     The first motion is a notice of intent to offer evidence.  The

3     government seeks to offer evidence both of the -- is it a 1997

4     or '98 conviction?

5          MR. SHERRIFF:  It's 1998 as to the judgment, Your

6     Honor.

7          MS. WITHERS:  Yes.

8          THE COURT:  The 1998 criminal conviction of Mr.

9     Braswell in the District of Alaska as inextricably intertwined

10    evidence that relates to the current charges of mailing

11    threatening communications.

12         MS. WITHERS:  And I would note, Your Honor, that as

13    represented at government's proposed Exhibit 5, we have

14    redacted out the nature of that conviction and the sentence.

15    We would only seek to introduce those under Rule 609 if the

16    defendant were to testify.  Otherwise we really only intend to

17    admit page one of Government's Exhibit 5.

18         THE COURT:  And Mr. Braswell, do you have any

19    position that you wish to take with respect to that aspect of

20    the government's motion?

21         Mr. Braswell --

22         MR. BRASWELL:  Well, listen.

23         THE COURT:  Yes.

24         MR. BRASWELL:  It sounds as if the government wants

25    to use the 1997 conviction to, I guess, enhance my time or

1   whatever.  If they're allowed to use that particular case.

2   Okay?  Why can't I use documents from that case for my

3   defense?  I mean, that's all I've been asking for.  So you

4   going to let them use what they want out of that case to argue

5   here at this trial if there was a trial and you telling me no?

6   That's why I'm saying, I'm not waiving my rights.

7               THE COURT:  And I'm not asking you to waive your

8   rights.

9               MR. BRASWELL:  Yeah, well.

10              MS. WITHERS:  And I would note, the government has

11  proposed a relevant jury instruction to curb the use that the

12  jury may have for that information.

13              THE COURT:  The government's position is that they

14  want to introduce a document that shows that you did suffer a

15  conviction in front of Judge Singleton -- not identified as

16  Judge Singleton.

17              MS. WITHERS:  It is.

18              MR. SHERRIFF:  Actually it is.

19              MS. WITHERS:  The judgment.

20              THE COURT:  Okay.  In 1998.  To explain why it is,

21  you know, how the -- what's the connection between you and

22  Judge Singleton.  The connection is this conviction back in

23  1998.  They are saying we're going to put that exhibit in

24  front of the jury, but we're going to redact, take out any

25  reference to what the conviction was for or what the sentence

1   was.

2          MR. BRASWELL:  The affidavits show what the

3   conviction were.

4          THE COURT:  Right.  But the government's not going to

5   try to --

6          MR. BRASWELL:  You're not listening.  The affidavits

7   for recusal all show what the conviction were.

8          THE COURT:  I am --

9          MR. BRASWELL:  Like I told you, my position here is

10  I'm not waiving my rights.  I'm not participating in no jury

11  trial.  No one is here to represent me.  You need to send this

12  case up to the Ninth Circuit so they can decide whether I have

13  a right to present my defense or call witness.  I'm not

14  participating.

15         THE COURT:  All right.  Given Mr. Braswell's

16  statement of non-participation, I'm going to take that that he

17  has no response to the government's request to use the

18  redacted -- Exhibit 5, is it?

19         MS. WITHERS:  Yes, Your Honor.

20         THE COURT:  To establish as inextricably intertwined

21  with the charges in this case.  And that aspect of the

22  government's motion is granted.  Then there's also a request

23  in terms of the --

24         MS. WITHERS:  Your Honor --

25         THE COURT:  -- notice of intent to use --

1          MS. WITHERS:  Your Honor, if I may.  I'm sorry.  I

2     noted that we only intended to put in page one, but Mr.

3     Sherriff has indicated that for clarity for the jury as to

4     what's going on there, that it does have multiple pages.  He

5     thought it best to introduce the whole thing.  The whole thing

6     is redacted at Government's Exhibit 5.

7          THE COURT:  Same ruling.  The government's also

8     indicated that it wishes to admit, under Federal Rule of

9     Evidence 403, five additional threatening communications sent

10    to others, other than Judge Singleton, in its case in chief.

11    Is that correct?

12         MS. WITHERS:  Your Honor, it's actually under 404(b)

13    and it's actually only four proposed exhibits.  I would note

14    that at this point the government thinks that it likely will

15    not introduce those, but it would like to reserve the option

16    if, in the course of the trial, it becomes necessary to do so

17    under 404(b).  And so that would be Government's Exhibits 6,

18    7, 8 and 9.

19         THE COURT:  All right.  If you're not telling me that

20    you intend to rule on them -- or intend to introduce them, I'm

21    not ruling on them.  And I'll point out that in your motion,

22    you did specifically rely also on 403 grounds.

23         MS. WITHERS:  I apologize, Your Honor.  Could we

24    reserve it if it becomes --

25         THE COURT:  Yes.

1          MS. WITHERS:  -- necessary later?

2          THE COURT:  I'll rule on it if it becomes necessary.

3          And then the government has filed a motion in limine,

4     docket number 153, in which it seeks admission of Judge

5     Singleton's oath of office in lieu of his trial testimony.

6     And seek to prove that he is a federal judge by way of

7     introducing his oath of office.

8          Mr. Braswell, do you have any response to that

9     government motion?

10          MR. BRASWELL:  I don't have no more response to this

11     Court and any questions.  I'm not waiving my right to present

12     a defense or call witness.  I'm not saying anything else from

13     here on out.  You have any questions for me, you refer -- you

14     can refer back to me not waiving my rights.

15          THE COURT:  In light of that -- in light of Mr.

16     Braswell's statement that doesn't address the motion, I find

17     the motion to be well taken and grant government's motion in

18     limine docket number 153 and will allow the presentation of

19     the oath of office without Judge Singleton appearing as a

20     witness.

21          MS. WITHERS:  May I ask, for the record, is that on

22     all three bases that the government put forth for its

23     admission?

24          THE COURT:  Yes.

25          MS. WITHERS:  Thank you.

1          THE COURT:  Does that resolve all pending matters?

2          MS. WITHERS:  Your Honor, we have a couple of other

3     things.  Just a couple of related items and then a couple of

4     unrelated items.

5          First, we believe that -- the Court has already ruled

6     on Exhibit 5, that there will be limited testimony.  We've

7     done our best to keep it limited that the defendant was at

8     certain times, relevant times incarcerated.  It's inescapable

9     because of the mailings from Mendota.

10         THE COURT:  And the record should reflect that Mr.

11    Braswell has also elected to appear at these trial proceedings

12    in his jail garb and has rejected any suggestion that he

13    appear in street clothes, which were made available to him.

14    And that's, again, perfectly within his right.  And certainly

15    in some civil rights cases that I've presided over, over the

16    years, plaintiffs, prisoner plaintiffs in civil rights cases

17    have oft times elected to appear in jail clothing because they

18    don't wish to contest the fact that they're in prison and, in

19    fact, from their point of view, it enhances or improves their

20    presentation of the case.  Because it's part of their case

21    that they have been imprisoned.  And that may very well be

22    what Mr. Braswell has considered as well.  But I just -- the

23    record should be clear, he is appearing in jail garb.  But

24    that too has been in his own choosing.

25         MS. WITHERS:  And I would just note for the record

1    that he does have the right to appear in other clothing if he

2    so chose.

3          THE COURT:  And we made it available to him.  But he

4    has chosen not to do so.  And that's completely his right.

5          MS. WITHERS:  Okay.  With respect to the information

6    about prior incarceration, we were discussing this after we'd

7    already submitted our proposed jury instructions.  With

8    respect -- and we think with respect to the 404(b) instruction

9    at number 17, we would propose a slight amendment where it

10   says that "You've heard testimony and seen evidence that the

11   defendant was previously convicted of a federal crime."  We

12   would add "and was in custody at certain relevant times"

13   before going into "this evidence of other acts was admitted

14   only for limited purposes."  So that the jury does not draw

15   adverse inferences from the fact that the defendant was

16   previously incarcerated.

17         MR. SHERRIFF:  And Your Honor, just to be clear,

18   based on the Court's ruling, the judgment and the fact -- the

19   prior judgment from '98 and the fact of Mr. Braswell's

20   incarceration at certain relevant times is coming in as

21   inextricably intertwined evidence --

22         THE COURT:  Yes.

23         MR. SHERRIFF:  -- of the crime charge here.  We've

24   drafted a 404(b) type notice to clarify for the jury purposes,

25   but it's not technically 404(b).  It's inextricably

1    intertwined.

2            THE COURT:  Correct.  They're still going to be

3    instructed that they can't consider it as -- for any other

4    purpose.

5            MR. SHERRIFF:  Absolutely.

6            MS. WITHERS:  Also with respect to this instruction,

7    is the Court intending to give this instruction before the

8    relevant testimony comes in, after the relevant testimony

9    comes in?

10           THE COURT:  Well, what I had pulled was the standard

11   404(b) instruction, Ninth Circuit pattern that's given -- that

12   can be given at the time of the testimony.  And I was

13   considering giving that.  So if you could give me a heads up,

14   I would give that limiting instruction at the time you were

15   about to introduce.

16           MS. WITHERS:  Okay.  So beforehand?

17           MR. SHERRIFF:  And Your Honor, we have -- that

18   instruction is at government's proposed instruction 17.  Which

19   is actually somewhat tailored from the Ninth Circuit model

20   instruction to the facts specific to this case.

21           THE COURT:  So you think I should just give 17(b)?

22   Did you say 17(b)?

23           MR. SHERRIFF:  I think it's 17.

24           MS. WITHERS:  17.

25           THE COURT:  As -- both give it at the time and in the

1   closing instructions?

2           MR. SHERRIFF:  Well, if the Court's -- I would give

3   it once, I suppose.  There's no harm in giving it twice.

4   But --

5           THE COURT:  I'll give it twice.

6           MR. SHERRIFF:  Okay.

7           MS. WITHERS:  This may be a moot point at this point.

8   But we were going to raise the question of sidebars.  I know

9   that Judge O'Neill has, in the past, done sidebars at defense

10  table when a defendant was secured.  And we didn't know if

11  that's how the Court wanted to proceed or ask the jury to

12  leave the room.

13          THE COURT:  I'm going -- if Mr. Braswell -- and I've

14  invited him to.  That if at any point during the trial

15  proceeding he feels the necessity to make an argument or place

16  a statement on the record that he thinks is important in order

17  to preserve his right to appeal, that he should indicate that

18  he wishes to do so and I'll excuse the jury and allow him to

19  do that outside the presence.  That I don't want extensive

20  argument in front of the jury on issues like that.  But I'm

21  happy to recess the jury and take it on the record.

22          MS. WITHERS:  And then the only other thing we have,

23  Your Honor, is we do have at counsel table an FBI special

24  agent.  She was not actually the agent assigned to this case.

25  The agent assigned to this case is Special Agent Thomas Volk.

1   He is a witness and we were planning on having him in the back

2   of the courtroom to aid the prosecution team.  That's the only

3   witness we intend to have in the room.

4          THE COURT:  All right.  The Court will grant that

5   request.

6          MS. HOPKINS:  Your Honor, just for my records.  Can

7   the government state the name of the special agent that's at

8   counsel table?

9          MS. WITHERS:  I'm sorry.  What --

10         MR. SHERRIFF:  Special Agent Deanna Goodman, Your

11  Honor, with the FBI.

12         THE COURT:  Anything else?

13         MS. WITHERS:  And then Mr. Sherriff has asked me to

14  note that we did have two additional pages, one additional

15  page of Jencks discovery that we provided to the defendant

16  this morning.

17         MR. SHERRIFF:  One additional page, it's Bates number

18  1039.  It was provided to standby counsel and I believe I saw

19  her hand it to the defendant.

20         And in addition, there's an Exhibit 10 that was

21  previously provided to Mr. Braswell.  And it's a two-page

22  excerpt of a business record that was previously provided in

23  the full copy to Mr. Braswell in discovery.

24         THE COURT:  All right.

25         MS. WITHERS:  That's all the government has.

1        THE COURT:  Mr. Braswell, anything else that you wish

2   to raise before we bring up the prospective jurors?

3        MR. BRASWELL:  I'm not waiving my rights to present a

4   defense or call witness.

5        THE COURT:  All right.  And as I've indicated before,

6   representing yourself in this case, whether you make an

7   opening statement, participate in jury selection, present

8   evidence, including testifying yourself on your own behalf,

9   make a closing argument.  All of those decisions are decisions

10  for you to make.

11       If I understand you correctly, you believe that the

12  law requires you to make the statement you've made here that

13  you're not waiving your right to present a defense.  That you

14  believe that making that statement and doing nothing else is

15  critical to your preservation of your right to appeal any

16  order I may have made that, in your view, restricts your

17  presentation of a defense.  I think you're not correct in that

18  regard.  I think you can both present a defense here and

19  preserve the issue that you've indicated you wish to take up

20  to the Ninth Circuit.

21       But once again, you've been adamant that you wish to

22  represent yourself, that no one else represents you in these

23  proceedings.  And so that decision about how you wish to

24  proceed and how -- what actions you wish to take in your

25  defense at this trial are decisions that are entirely up to

1   you.  And it is your right to make those decisions on your own

2   behalf.  Whether I think they're correct decisions or not.

3          All right.  One second off the record.

4   (Off the record.)

5   (Recess.)

6   (The jury panel entered the courtroom.)

7   (Jurors are identified by number only.  Any reference to

8    personal identifiers regarding jurors has been redacted.

9    Personal information requires a motion and Court order.)

10         THE COURT:  Good morning, ladies and gentlemen, and

11  welcome to the United States District Court for the Eastern

12  District of California.  Let the record reflect that all of

13  the prospective jurors have previously been administered the

14  oath in the jury lounge before coming to the courtroom this

15  morning.

16         You have been summoned here today for the trial of a

17  criminal case entitled United States of America versus Cyrus

18  Dennis Braswell.  My name is Dale A. Drozd.  I'm the United

19  States District Judge who will be presiding over this trial.

20  The Court staff who will be assisting me during the trial

21  include my courtroom deputies -- I'm sorry.  Was that a

22  prospective juror?  Yes?  Let me start over then.

23         Good morning, ladies and gentlemen.  And welcome to

24  the United States District Court for the Eastern District of

25  California.  Let the record reflect that all of the

1    prospective jurors have previously been administered the oath

2    in the jury lounge before coming to the courtroom this

3    morning.

4          You have been summoned here today for the trial of a

5    criminal case entitled United States of America versus Cyrus

6    Dennis Braswell.  My name is Dale A. Drozd.  I'm the United

7    States District Judge who will be presiding over this trial.

8    The Court staff who will be assisting me include my courtroom

9    deputies Jami and Victoria, seated below me to my left.  My

10   court reporter Karen, below me to my right.  And my law clerk

11   Sam at the far left up against the wall.  My far left.

12         The government, the United States of America is

13   represented in this case by Assistant United States Attorneys

14   Laura Withers and Kirk Sherriff.  And seated with them at

15   counsel table is Special Agent of the Federal Bureau of

16   Investigation?  I'm sorry.  Your name, ma'am?

17         AGENT GOODMAN:  Deanna Goodman.

18         THE COURT:  And Mr. Braswell is representing himself

19   in this case.  And he is seated at defense table.  And his

20   court standby counsel is Assistant Federal Defender Megan

21   Hopkins, who's also seated at the defense table.

22         The defendant, Mr. Braswell, is charged with three

23   counts of mailing threatening communications in violation of

24   Title 18, United States Code, Section 876(c).  The superseding

25   indictment in this case charges that on three separate

1    occasions the defendant knowingly mailed or arranged to have

2    mailed a communication addressed to the Federal District

3    Court, Clerk of Court in Anchorage, Alaska containing threats

4    to injure James K. Singleton, a federal judge in Anchorage,

5    Alaska.  It is charged that the three communications were

6    mailed on or about October 27th, 2015, December 15th, 2015 and

7    August 28th, 2016.

8         To these charges, the defendant, Mr. Braswell, has

9    pled not guilty, which puts at issue each and every element of

10   the offenses charged.  And it is the prosecution's burden to

11   prove each and every element of the offenses charged beyond a

12   reasonable doubt.

13        The defendant is presumed innocent.  And that

14   presumption of innocence remains with him throughout the trial

15   and during the jury's deliberations until and unless it is

16   dispelled by proof of guilt beyond a reasonable doubt.

17        In addition, as I indicated previously, Mr. Braswell

18   has exercised his constitutional right to represent himself in

19   this action.  And that is his constitutional right to do so.

20   You should not draw any adverse inference or in any way hold

21   it against Mr. Braswell that he has elected to represent

22   himself in this matter.

23        Now, we are about to begin the process of selecting a

24   jury to hear this case.  Let me first advise you that each

25   side in this matter is entitled to have a fair, unbiased and

1    unprejudiced jury.  If there is any fact or any reason why any

2    of you might be biased or prejudiced in any way, you must

3    disclose that fact or the reasons for it when you are asked to

4    do so.  It is your duty to make this disclosure based upon the

5    oath of prospective jurors, which you have just taken.

6          Our purpose in conducting this questioning is not to

7    embarrass you or to pry inappropriately into your personal

8    lives.  Our purpose is merely to determine whether you can be

9    a fair and impartial juror in this particular case.

10          Jurors will be selected as the judges of the facts in

11    this case.  As judges, you must be fair and impartial to both

12    sides.  If there are matters in your personal history that

13    would prevent you from being fair and impartial, then it would

14    be inappropriate to have you sit as jurors in this matter,

15    just as it would be inappropriate for me to sit as a judge of

16    the law in this case if for some reason I could not be fair

17    and impartial to both sides.

18          Please remember that your oath as prospective jurors

19    requires you to answer all questions truthfully and

20    completely.

21          Madam clerk, please fill the jury box.  And the seats

22    in front.

23          THE CLERK:  Juror 001.  If I could have you come

24    through the doors right there.  And then you'll go into the

25    very top row and all the way down to the end.  Thank you.

1          Juror 002.  If I could have you sit next to -- thank

2     you.

3          Juror 003.  Juror 004.  Juror 005.  Juror 006.  Juror

4     007.  Juror 008.  Juror 007, if I could please have you take

5     that last seat in the top row.  Thank you.  And Juror 008, if

6     I could have you go to the second row and then all the way

7     down to the end.  Juror 009.  Juror 010.  Juror 011.  Juror

8     012.  Juror 013.  Juror 014.

9          Juror 015.  And Juror 015, if I could have you take

10    the chair closest to you in the front row.  Thank you.  Juror

11    016.  Juror 017.  Juror 018.  Juror 019.  Juror 020.  And

12    Juror 021.

13         THE COURT:  Now, for those of you who have been

14    seated, first of all don't worry about those sheets just yet.

15    That will actually be the last thing we get to.  If you

16    are -- if you do leave us at any point during jury selection,

17    if you could make sure you leave those sheets on the chair

18    when you do leave.

19         Now, for those of you in the audience, your job is

20    actually much more difficult than those who have been seated.

21    I'm going to start asking a series of questions and I'll be

22    taking the answers of the folks that are seated.  But if at

23    some point during the jury selection process any of those

24    people who are seated leave us, one of you will be called to

25    take their place.  And when you do take their place, the

1   question that I'm going to ask you is:  You've heard all the

2   questions that I asked the people that were seated, do you

3   have any answers to any of those questions?

4        So you need to really be paying attention and to be

5   making a mental check list of all the questions that you might

6   have responses to.  And as I said at the outset, it's

7   important that you're open, forthcoming and completely

8   truthful with us so that we can make sure that we end up

9   selecting a jury in this case that can be fair and impartial

10  to both sides in this particular case.  All right?  So please

11  pay close attention.

12       First, is there anyone who is seated who is having

13  trouble hearing, seeing or understanding me?

14       No response.

15       Is there anyone that suffers from a physical

16  disability that would make it difficult, if not impossible,

17  for them to serve on a jury no matter what the length of the

18  proceedings were to be?

19       Anybody suffer from a physical disability?  Can we

20  get the microphone up to Juror 007.  Yes, ma'am.

21       PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yes, sir.  I'm

22  still sick for asthma and blood pressure for almost two months

23  already.  Yeah, it's just like on and off for my asthma.

24       THE COURT:  All right.  And are you under -- you can

25  be seated.  Are you under the treatment of a doctor for asthma

1    and blood pressure?

2        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yeah, uh-huh.

3        THE COURT:  And have you been found to be disabled,

4    for instance, as a result?

5        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I'm fine, sir.

6    But my asthma is like on and off.  But I'm sick, still sick.

7        THE COURT:  Okay.  And when you have an asthma

8    attack, do you have an inhaler for use?

9        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yeah.

10       THE COURT:  And when you do have to use the inhaler,

11   how long thereafter are you able to proceed?

12       PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I'm better for

13   a while.  But I'm using this for like two times a day or three

14   times a day.

15       THE COURT:  All right.  Thank you, ma'am.  Anyone

16   else?

17       All right.  If at any time anyone who's seated as a

18   juror -- no, ma'am.  I haven't excused you.  If at any time

19   there -- anyone in the jury box is having trouble hearing the

20   proceedings, please let me know immediately so that we can

21   correct the problem.

22       Prior to beginning this morning, I've consulted with

23   the parties regarding the estimated length of trial.  And I do

24   think this trial is a relatively short one.  I believe the

25   jury will be given this case for deliberations no later than

43

1   some time tomorrow.  All right?  So today and tomorrow.

2           My schedule is that I normally -- and I did this

3   morning, with other matters.  I begin at 8:30 in the morning.

4   And we go to about 4:30 in the afternoon.  If we can get a

5   witness completed by staying a little bit longer than 4:30,

6   I'll go up to almost five o'clock.  But that's pretty much the

7   latest.  All right?  And that would be my schedule both

8   through the rest of the day today and tomorrow.  8:30 to 4:30

9   or five.

10          Given what I've said about the length of the trial

11  and the schedule -- well, under certain very narrow

12  circumstances, the law does allow me to dismiss you from

13  serving as -- on this jury if serving on the jury would create

14  an undue hardship on you as defined under the law.  Now, we

15  recognize that we cause you some degree of inconvenience by

16  just having you come here today.  You'd be doing something

17  else if you weren't here in federal court.  You'd be working

18  or with your families or taking care of other members of your

19  family.  Doing all the things that we all do on a daily basis.

20  And you couldn't do that today because we called you here to

21  jury duty.

22          First, I want to tell you we appreciate it.  Second,

23  I want to emphasize to you just how important it is.  Jury

24  service is one of the very few ways in our constitutional form

25  of democracy that we actually participate in our system of

1    government.  And it is critical to both the civil and the

2    criminal justice system that citizens, such as you, respond to

3    jury summons and come to court and serve as jurors giving both

4    sides, in all cases, the fair and impartial jury that they are

5    entitled to.  Couldn't be done without you.  Absolutely

6    critical to our system of justice.  So we thank you for being

7    here.

8            Based upon my experience with juries over many, many

9    years, everyone I've ever talked to after the case is over,

10   the vast, vast majority of people feel like they learned

11   something and they're proud of their jury service.  And feel

12   good about the fact that they've made some contribution to our

13   system of justice.  I think you'll end up feeling the same way

14   if you're selected to serve.

15           So with that pep talk, is there anyone who, by

16   serving on this jury, believes it would cause them an undue

17   hardship?

18           Let's get the microphone to Juror 011.  Yes, ma'am.

19           PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  It's

20   just -- it's not a big thing, but we're having our house

21   remodeled.  And like today, we had to leave the workers there

22   and nobody's there.  And my husband was able to take off today

23   and bring me.  But -- and I'm not -- because we're in

24   Bakersfield.  And I just -- I wouldn't like it.  I just would

25   not like to have to be up here by myself and make it up here

1   by myself and leave our house unattended with different

2   workers in there.

3         THE COURT:  And he's unable to take tomorrow off?

4         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  He is.  He

5   took off yesterday and today because we weren't sure if it was

6   going to be yesterday or today.

7         THE COURT:  But this --

8         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  And he has to

9   be back at work tomorrow.

10        THE COURT:  You realize that if I excuse you, that

11  I'm going to tell you to call the 800 number after five

12  o'clock on Friday and you could be recalled.  Because this

13  situation sounds like a short-term situation?

14        PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  The house

15  deal?

16        THE COURT:  Yeah.

17        PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  It's not real

18  short.  It will go through the month.  I mean, it will go

19  through the month.  I called yesterday to see if I could

20  postpone, but they told me no.  So anyway.  And it's just -- I

21  just don't see myself driving -- I don't see myself staying up

22  here by myself and I don't see myself driving all the way up

23  here every morning either.  So --

24        THE COURT:  All right.  Juror 016.

25        PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  So the

1   timelines you had stated would probably work for me.  My only

2   concern is if it goes longer.  I fly out of LAX Thursday

3   morning early morning for a business trip.

4           THE COURT:  Anybody else capable of taking that trip

5   for you?

6           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.  It's

7   something that I -- my work has required me to be at.

8           THE COURT:  And how long would that be?

9           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  So it's for

10  the weekend.  I have two trips scheduled this next weekend and

11  the weekend after.  Those are the two trips I have already

12  scheduled and flights.

13          THE COURT:  Is this a constant in your job?

14          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.  No.

15  Just this weekend -- I have a couple different occupations.

16  And so this weekend is one job and the next weekend is

17  another.

18          THE COURT:  Any objection to Juror 016 being excused?

19          MS. WITHERS:  Not from the government.

20          THE COURT:  Mr. Braswell?  Same position that you've

21  previously taken, sir?

22          Mr. Braswell has elected not to respond to the

23  Court's inquiry.

24          Juror 016, I will excuse you.  Please call the 800

25  number after five o'clock on Friday.  All right?  To get

1   instructions.

2           And Juror 011, here's the problem I'm having with

3   your request.

4           PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I understand.

5           THE COURT:  If you could hand the mic back.  It

6   sounds like what you're saying is, judge, there would never be

7   a good time.

8           PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Well, as far

9   as our house goes, it would be through February I would think.

10          THE COURT:  Right.  But --

11          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Oh, as far as

12  me like being --

13          THE COURT:  Coming here.

14          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Being here by

15  myself.  Right, that's exactly true.

16          THE COURT:  And see --

17          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  That won't go;

18  huh?

19          THE COURT:  That's just not an undue hardship.  I

20  agree with the jury --

21          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Okay.

22          THE COURT:  -- that, no, that -- that is more of an

23  inconvenience or personal preference as opposed to good cause.

24          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I understand.

25          THE COURT:  All right.  Juror 016, you can go.

1          Juror 017, did you have a response?

2          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes, I did.

3    I would not mind serving.  Unfortunately, my mother is 85 and

4    she takes care of my father, who's 96.  And she just fell last

5    night and broke her collar bone.

6          THE COURT:  Any objection?

7          MS. WITHERS:  Not from the government.

8          THE COURT:  And Mr. Braswell?

9          Mr. Braswell has elected not to respond.

10         Juror 017, you're excused.  Call the 800 number after

11   five o'clock on Friday.  I hope that your mother is doing

12   better soon.

13         PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Me too.

14   Six weeks in a sling.

15         THE COURT:  And let's pass it up to Juror 002.

16         PROSPECTIVE JUROR SEAT NUMBER TWO:  I don't have a

17   problem serving if it doesn't go beyond Friday.  I fly out of

18   state on Saturday.

19         THE COURT:  I have no concerns.

20         PROSPECTIVE JUROR SEAT NUMBER TWO:  Okay.

21         THE COURT:  Madam clerk, please fill seats 16 and 17.

22         THE CLERK:  Juror 022.  Please take the first empty

23   seat closest to you.  Juror 023.

24         THE COURT:  And Juror 022, Juror 023, any answers to

25   my questions so far?

1          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I do.

2          THE COURT:  If you could take the mic, Juror 023.

3          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  My sister's

4    getting married on Friday.  I'd be happy to call the number

5    back Friday.  I'm traveling to Mississippi Thursday.

6          THE COURT:  For the wedding?

7          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

8          THE COURT:  Any objection?

9          MS. WITHERS:  Not from the government.

10          THE COURT:  Mr. Braswell?

11          And let the record reflect Mr. Braswell has elected

12    not to respond.

13          Juror 023, you're excused.  Call the 800 number

14    Friday after five.

15          THE CLERK:  Juror 024.

16          THE COURT:  And Juror 024, any response to any of my

17    questions so far?

18          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No, sir.

19          THE COURT:  And Juror 007, I saw you raise your hand.

20    Was there something else you wanted to say?  We can get the

21    microphone up to the top.  Yes, ma'am.

22          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yes, sir.

23    Today my husband give me a ride and then he's not excused from

24    work.  So I don't know if they will fire him when he's going

25    back to work.

1       THE COURT:  All right.  And how far away from here do

2  you live, ma'am?

3       PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Reedley, sir.

4       THE COURT:  Reedley.  Okay.  Thank you, ma'am.

5       Does anyone who is seated know me, any of the

6  courtroom personnel that I've introduced, the attorneys or the

7  parties or the agent seated at counsel table?  Does anyone

8  know anyone that has been introduced so far?

9       No response.

10      Do any of you know each other?

11      No.

12      During the trial of this case, the following people

13  may be called as witnesses.  FBI Agent Thomas Volk.  James

14  Johnson of the United States Marshals Service in Alaska.  Pisa

15  Suon, United States District Court in Alaska.  Quinn Harrison

16  of the Federal Bureau of Prisons at FCI Mendota.

17      Does anyone recognize the names of any of the

18  witnesses that I've just identified?

19      No response.

20      You should note that the parties are not required to

21  and might not end up calling all of those witnesses.  Or they

22  might find it necessary later to call some other witnesses

23  that I haven't identified.

24      As we sit here right now, having heard nothing but my

25  brief summary of the case, do any of you have any belief or

1   feeling towards any of the parties, attorneys or witnesses

2   that would make it difficult or impossible for you to serve

3   fairly and impartially as a juror to both sides in this case?

4          No response.

5          Other than what I've told you here already today,

6   have any of you heard of or do any of you have any prior

7   knowledge of the facts or events in this case?

8          No response.

9          Have any of you formed or expressed any opinion about

10  any aspect of this case?  Do any of you -- no response.

11         Do any of you have any financial interest in the

12  outcome -- any interest in the outcome of this case, financial

13  or otherwise?

14         Have any of you, any family member of yours or close

15  friend ever been employed by law enforcement?

16         And if we could get the microphone first up at the

17  top row, Juror 003.

18         PROSPECTIVE JUROR SEAT NUMBER THREE:  I have a cousin

19  that was retired Highway Patrol and then a cousin that just

20  got sworn in in Sacramento as a deputy.

21         THE COURT:  All right.  The Highway Patrol officer

22  cousin, talk to him or her a great deal about what they do?

23         PROSPECTIVE JUROR SEAT NUMBER THREE:  No, not

24  necessarily.

25         THE COURT:  Anything about those relationships with

1    those family members in law enforcement that you think would

2    make it difficult or impossible for you to serve as a fair and

3    impartial juror in a case like the one I described to you?

4              PROSPECTIVE JUROR SEAT NUMBER THREE:  No.

5              THE COURT:  Juror 011.

6              PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I have a

7    nephew that just started in Sacramento as a -- he was just

8    promoted to sergeant for internal affairs.

9              THE COURT:  Sacramento --

10             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  He's working

11   in Sacramento, uh-huh.

12             THE COURT:  PD or --

13             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Highway

14   Patrol.  Highway Patrol.  Uh-huh.

15             THE COURT:  Talk to that nephew a great deal about

16   what he does?

17             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I see him,

18   what, maybe -- he's home every weekend and I see him probably

19   two or three weekends out of the month.

20             THE COURT:  Do you talk to him a lot about what he

21   does?

22             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I do.  I talk

23   to him when he talks to me.  Yes.

24             THE COURT:  All right.  Do you think that because of

25   that relationship, that it would be difficult for you to be a

1   fair and impartial juror in a criminal case?

2            PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Well, I know

3   what he's gone through, you know, on a few things.  He doesn't

4   talk about it a lot.  But, yeah, it could.  It could, I think.

5            THE COURT:  So I usually give this talk somewhere

6   early on in jury selection.  We all come with baggage.  We all

7   have life experiences.  Our life experiences do have an impact

8   on the way we see things.  Facts.  Evidence.  It just does.

9   There's really no denying it.  So when you're called to jury

10  service, no one, neither I nor the parties, can ask that you

11  rid yourself of that baggage.  Because it's not possible.

12  We're all a product of our life experiences, along with

13  probably a lot of other things.  But we're definitely

14  influenced by our own life experiences.

15           The question as to whether one can serve as a fair

16  and impartial juror comes down to this.  In my view.  Yes, I

17  have my own life experiences, including people who I'm close

18  to, who I've heard information from.  And all the other

19  sources of information in my life and my own experiences.  And

20  yes, they do influence the way I see the world.  But are my

21  experiences the type that I can identify them, that I'm aware

22  of them and that I can say to myself, as a juror, yes, I

23  understand that's my life experience.

24           But when I take an oath as a juror, what I'm taking

25  the oath to do is to decide a case and a dispute based solely

1    on the evidence that I hear in the courtroom.  And based upon

2    the instructions regarding the law that the judge gives to me,

3    can I do that?  Or are my life experiences so strong and the

4    emotion that that life experience creates in me, is that

5    emotion so strong that my immediate reaction is always going

6    to be influenced by that life experience and the reaction is

7    so strong that I'm never going to be able to get over it?

8    Regardless of what the evidence is I hear, I'm always going to

9    react the same way and I won't be able to get it out of my

10   mind.  It's just too strong of an emotion.  The experience I

11   had is too strong.  I want to say I can be fair, but I know

12   that my emotional reaction is always going to take me in one

13   direction and I also know I can't get over it.  And therefore,

14   I really truly in my heart of hearts, I can't be a fair and

15   impartial juror.

16          Now that's a pretty serious conclusion to come to.

17   It takes some real soul searching.  Soul searching that we're

18   not in our normal day-to-day life called upon to make.  And

19   it's a pretty serious admission to say, no, my reaction is so

20   strong in this particular area I can't get over it.  But if it

21   really truly is your belief, truly, not because you'd rather

22   not serve, but truly.  If it truly is your belief that you

23   can't be fair and unbiased and unprejudiced to both sides in a

24   case, then you got to tell us.  And I can't question that.

25          So there, I gave you a lot of -- that was more of a

1   filibuster than it was a -- so I gave you, Juror 011, a lot of

2   time to mull over which side of this you fall on.  So I'll

3   just ask you the more straightforward question.  Do you think

4   you could be a fair and impartial juror in a case like this?

5           PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I can't say

6   for sure.

7           THE COURT:  All right.  Any objection?

8           MS. WITHERS:  No, Your Honor.

9           THE COURT:  Mr. Braswell?

10          And Mr. Braswell has elected not to respond.

11          Juror 011, you're excused.  Please call the 800

12  number after five o'clock on Friday.

13          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Thank you.

14          THE CLERK:  Juror 025.

15          THE COURT:  Juror 025, any answers to my questions so

16  far?

17          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Yes, sir.  I

18  have bladder cancer.  And I urinate frequently.

19          THE COURT:  Undergoing treatment?

20          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Not at the

21  moment.

22          THE COURT:  Feel like -- are you in pain?

23          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Sometimes.

24          THE COURT:  Feel like it would be difficult for you

25  to serve on any jury?

56

1          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Yes, sir.

2          THE COURT:  Any objection?

3          MS. WITHERS:  None, Your Honor.

4          THE COURT:  Mr. Braswell?

5          Same election.

6          Thank you, sir.  I'm going to excuse you from the

7   summons.

8          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Thank you.

9          THE COURT:  You're free to go.

10         THE CLERK:  Juror 026.

11         THE COURT:  Juror 026, any answers to my questions so

12  far?

13         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I have a

14  stepbrother who works in law enforcement in the state of

15  Oregon.

16         THE COURT:  Do you talk to your stepbrother about

17  what he does a great deal?

18         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I've only had

19  a handful of conversations with him over the last ten years so

20  I don't have much contact with him at all.

21         THE COURT:  Do you think that relationship would make

22  it difficult for you to be a fair and impartial juror in a

23  criminal case?

24         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Not at all.

25  No.

1        THE COURT:  Did we have other law enforcement

2    friends, family, relatives?  Juror 013.

3        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.  My

4    cousin and brother-in-law and my friend are all correctional

5    officers.

6        THE COURT:  Correctional officers.

7        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Uh-huh.

8        THE COURT:  Do you talk to them a great deal about

9    what they do for a living?

10        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

11        THE COURT:  Or their experiences?

12        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

13        THE COURT:  They're experiences, yes?

14        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

15        THE COURT:  You've heard my description of this case.

16    And it does involve mailings from a federal correctional

17    institution.  Your friends, family, they're CDCR,

18    California --

19        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

20        THE COURT:  -- correctional officers?

21        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

22        THE COURT:  Anything about that fact that, hey, this

23    case involves alleged mailings sent from a correctional

24    in -- a federal correctional institution given your

25    relationships with people who work for California corrections

1   that you think would have any impact on your ability to be

2   fair and impartial?

3            PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

4            THE COURT:  Anyone else?

5            Have any of you ever been a victim -- well, a victim,

6   a defendant or a witness in any criminal prosecution?

7            No response.

8            Have any of you ever been a party or a witness in a

9   civil case?  A civil case in court.

10           No response.

11           Do any of you have strong feelings one way or another

12  about our criminal justice system?

13           No response.

14           Have any of you been involved in organizations which

15  advocate positions regarding the criminal justice system?

16  I'll just use, as examples on different ends of the spectrum,

17  Mothers Against Drunk Driving, organizations like that.  And

18  maybe on the other end of the spectrum, Families Against

19  Mandatory Minimums.  On the other end of the spectrum.

20  Anybody been involved in any criminal justice interested

21  organizations?

22           Do any of you have any moral or religious beliefs

23  that would make it impossible for you to sit in judgment of

24  another human being?

25           No response.

1          Do any of you have any legal training?  Paralegal.
2  Law school.  Even criminal justice courses during your
3  education.
4          No response.  Oh, I got a response.  Mr. --
5          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Juror 026.
6          THE COURT:  Thank you, Juror 026.
7          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I just took a
8  civil rights course as an undergraduate 20 years ago.  I don't
9  know if that qualifies or not in the scope of your question.
10          THE COURT:  Pretty far afield, but thanks for
11  offering.
12          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Didn't know
13  what you meant by education.
14          THE COURT:  You're right.  Yeah.  We'll get to
15  education later more specifically on those sheets.  But thank
16  you.  Always important to disclose if you have any doubt.
17          How about any contact with the federal judiciary, the
18  US Attorney's Office?  And I'm talking about in any district,
19  this district or anywhere else.  Anybody have any contact with
20  federal prosecutors, US Attorney's, Federal Defenders, federal
21  judiciary at any level?  Court of Appeals, District Court
22  Judges, Magistrate Judges.  Or federal law enforcement.  FBI
23  or any other federal law enforcement.  Anybody have any
24  contact with any of those kind of organizations?
25          Juror 003, let's go to you first and then we'll come

1  down to Juror 010.

2          PROSPECTIVE JUROR SEAT NUMBER THREE:  Not sure if

3  this qualifies or not.  I work with the school district and I

4  work with the DA with attendance issues.

5          THE COURT:  District attorney's office in?

6          PROSPECTIVE JUROR SEAT NUMBER THREE:  In Merced

7  County.

8          THE COURT:  Regarding school attendance.

9          PROSPECTIVE JUROR SEAT NUMBER THREE:  Correct.

10          THE COURT:  All right.  Juror 010.

11          PROSPECTIVE JUROR SEAT NUMBER TEN:  My son-in-law

12  worked for the district attorney's office here for several

13  years.  He's no longer.  He went to practice somewhere else.

14  But last time that did make a difference, so I'm just not sure

15  if it still does.

16          THE COURT:  He was a deputy District Attorney?

17          PROSPECTIVE JUROR SEAT NUMBER TEN:  Yes.

18          THE COURT:  So he's a lawyer?

19          PROSPECTIVE JUROR SEAT NUMBER TEN:  Yes.

20          THE COURT:  We'll get more about that.  But anything

21  about that relationship and the fact that -- it's your son?

22          PROSPECTIVE JUROR SEAT NUMBER TEN:  Son-in-law.

23          THE COURT:  Son-in-law was a Deputy District Attorney

24  that you think would affect your ability to be fair and

25  impartial in any way?

1          PROSPECTIVE JUROR SEAT NUMBER TEN:  No, sir.

2          THE COURT:  He was a prosecutor.  Although over in

3     state court, not in federal court.

4          PROSPECTIVE JUROR SEAT NUMBER TEN:  That's correct.

5          THE COURT:  Let me ask it this way.  I sometimes do.

6     Let's say you serve on a jury in this case.  And you're a

7     member of the jury and the jury comes to the conclusion that

8     the defendant, Mr. Braswell, should be found not guilty on all

9     counts.  Would you be embarrassed the next time you see your

10    son-in-law to tell him, yeah, I sat on a jury and we returned

11    not guilty verdicts on all counts.  Would you be embarrassed

12    to tell him that?

13         PROSPECTIVE JUROR SEAT NUMBER TEN:  No, I would not.

14         THE COURT:  Wouldn't bother you at all?

15         PROSPECTIVE JUROR SEAT NUMBER TEN:  No, it wouldn't

16    bother me if I felt that was the way I should vote.  No.

17         THE COURT:  Okay.  Juror 003, anything about the fact

18    that you work sometimes with district attorneys in your job

19    that would cause you to answer any of those questions

20    differently?

21         PROSPECTIVE JUROR SEAT NUMBER THREE:  No.

22         THE COURT:  Think you could be fair and impartial in

23    a case like this?

24         PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes.

25         THE COURT:  Anyone else?  Federal agents of any kind.

1 | Or court or law enforcement.  Or lawyers.  Juror 009.

2 | PROSPECTIVE JUROR SEAT NUMBER NINE:  Hi.  Yes.  I

3 | work in a restaurant in my town and I have a regular who is a

4 | lawyer.  And he's a defense attorney.  And so -- in my town in

5 | Modesto.  So he's -- not federal, but he is a lawyer.  And he

6 | speaks not in detail, but about his cases sometimes and how

7 | they go.  So --

8 | THE COURT:  Okay.  So you've been exposed to that

9 | information from a defense lawyer, from his perspective?

10 | PROSPECTIVE JUROR SEAT NUMBER NINE:  Yes.

11 | THE COURT:  Do you think that that experience, having

12 | a regular customer who you exchange conversation with, do you

13 | think that it would in any way cause you to be biased or

14 | prejudiced in a criminal case such as this one?

15 | PROSPECTIVE JUROR SEAT NUMBER NINE:  No.

16 | THE COURT:  All right.  You think you could decide

17 | this case based solely on the evidence that you're presented

18 | in open court and based upon my instructions?

19 | PROSPECTIVE JUROR SEAT NUMBER NINE:  I can keep those

20 | two separated, yes.

21 | THE COURT:  All right.  Juror 008.

22 | PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Hi.  Good

23 | morning.  My son-in-law is a lawyer.  He's been at the federal

24 | level on defense.  Here locally in Fresno.  I believe my

25 | daughter assists him once in a while.

1          THE COURT:  I'm sorry.  Your daughter?

2          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  My daughter

3    also might assist him once in a while too.  She's also a

4    lawyer.

5          THE COURT:  Might assist him.  Okay.  And you say he

6    has -- he appears in federal court as a criminal defense

7    lawyer?

8          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Uh-huh.

9          THE COURT:  But he's not an Assistant Federal

10   Defender like Ms. Hopkins.

11         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Uh-huh.

12         THE COURT:  He's a private lawyer, but who sometimes

13   appears in federal court?

14         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Uh-huh.

15         THE COURT:  And do you talk to him and your daughter

16   a great deal about their work as defense attorneys?

17         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Talk to them

18   daily, but not about their work.

19         THE COURT:  All right.  Do you -- anything about that

20   exposure and those relationships that you think would make it

21   hard for you to be a fair and impartial juror in a criminal

22   case?

23         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  No.

24         THE COURT:  Do you think that you'd have any feeling

25   of being biased against the prosecution in a criminal case

1    just because of what your son-in-law and daughter do for a

2    living?

3              PROSPECTIVE JUROR SEAT NUMBER EIGHT:  No.

4              THE COURT:  Any doubt about your ability to be fair

5    and impartial?

6              PROSPECTIVE JUROR SEAT NUMBER EIGHT:  No.

7              THE COURT:  All right.  Anyone else?

8         Have any of you, any relative or close friend of

9    yours ever been arrested or charged with a criminal offense?

10   Arrested or charged.

11        No response.

12        Do any of you feel that you could not follow the law

13   as given to you by me at the close of the case because

14   you -- if you disagreed with the law that I gave you?  Put the

15   other way, is everyone of the mind that you could follow my

16   instructions and apply the law as I give it to you?  Anyone

17   feel that they can't do that?

18        Have any of you had notably good or notably bad

19   experiences with law enforcement?  Of any kind.

20        No response.

21        Do any of you know any inmate at Mendota Federal

22   Correctional Institution?

23        No response.

24        How about anyone who works at Mendota Federal

25   Correctional Institution?

1          Do any of you know any employees of the United States

2     Attorney's Office for the Eastern District of California,

3     Mendota Federal Correctional Institution, the Bureau of

4     Prisons, the United States Marshal Service, the Federal Bureau

5     of Investigation or the United States District Court in the

6     District of Alaska?  Anybody know anybody that works at any of

7     those places?

8          No response.

9          Do any of you know Senior United States District

10    Judge James K. Singleton?

11         No response.

12         Do any of you have any negative feelings about

13    judges?  And I promise I won't take offense.

14         No response.

15         You've heard me describe the charges in this case of

16    mailing threatening communications.  And more specifically in

17    this case mailing threatening communications in this case

18    intending that they be directed to United States District

19    Judge James Singleton.  Does the nature of the charge cause

20    any of you to feel that you could not be a fair and impartial

21    juror in this case?

22         No response.

23         The jury in this case will be instructed the

24    government bears the burden of proof as to each and every

25    element of the charged offenses by proof beyond a reasonable

1   doubt.  And there's a jury instruction that will be given at

2   the end of the case defining what a reasonable doubt is.

3           Is there anyone that is seated who feels that they

4   would have difficulty applying the Court's instructions with

5   respect to reasonable doubt?  Even without hearing the

6   instruction itself.  Just, no, I've got a problem with the

7   entire concept of reasonable doubt.  I'm not going to be able

8   to apply that.

9           The jury in this case is going to be instructed

10  regarding the elements of the offense of mailing a threatening

11  communication in violation of the federal statute.  Is there

12  anyone that has a feeling that, look, I don't think that

13  mailing a threatening communication should be against the law

14  so if you instruct me that it is, I can't follow the

15  instruction?  Anybody that feels that way?

16          Is there any reason why any of you feel that you

17  could not serve as a fair and impartial juror in this case

18  that I haven't already asked about?

19          All right.  Let's turn to those sheets.  And if we

20  could get the microphone up in the far corner to Juror 001.

21  If you would just take us through the answers to those

22  questions.

23          PROSPECTIVE JUROR SEAT NUMBER ONE:  My name is Juror

24  001.  I live in Fresno.  I am a third grade teacher for Fresno

25  Unified.  And I have done that for the last nine years.  I

have a BA and a teaching credential.  No military service.  No

military background.  Single.  No children.  And no prior jury

experience.

THE COURT:  And where's your bachelors degree from?

PROSPECTIVE JUROR SEAT NUMBER ONE:  Fresno State.

THE COURT:  In what?

PROSPECTIVE JUROR SEAT NUMBER ONE:  Liberal studies.

THE COURT:  Thank you.  Juror 002.

PROSPECTIVE JUROR SEAT NUMBER TWO:  My name is Juror

002.  I live in Fresno.  I'm a homemaker.  I was a nurse

practitioner 25 years ago.  I have an RN degree, a bachelors

in health science and a masters in health science.  No

military service.  I'm married.  My husband works for Fresno

City College.  My -- I have two children, one is a junior at

Cal Berkeley.  The other one is a TV reporter for a station,

news station in Oregon.  And I have had prior jury experience.

THE COURT:  And don't tell me what the verdict was in

any prior jury experience.  And that goes for everybody when

we get to this question.  How long ago was that prior jury

experience?

PROSPECTIVE JUROR SEAT NUMBER TWO:  Oh, over five

years ago.  Six years ago.

THE COURT:  State or federal court?

PROSPECTIVE JUROR SEAT NUMBER TWO:  State.

THE COURT:  And was it a civil or criminal case?

1          PROSPECTIVE JUROR SEAT NUMBER TWO:  I don't know.

2    Can you explain the difference?

3          THE COURT:  A criminal prosecution is prosecuted by

4    either a District Attorney's Office or the U.S. Attorney in

5    federal court against a defendant who's charged with a crime.

6          PROSPECTIVE JUROR SEAT NUMBER TWO:  Okay.  That's

7    what it was.

8          THE COURT:  A civil case is a dispute between two

9    parties.  Usually over money.

10          PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

11          THE COURT:  Could involve the government sometimes.

12          PROSPECTIVE JUROR SEAT NUMBER TWO:  No, it was the

13    first one.

14          THE COURT:  All right.  So a criminal case.

15          PROSPECTIVE JUROR SEAT NUMBER TWO:  Yes.

16          THE COURT:  And did that jury reach a verdict.

17          PROSPECTIVE JUROR SEAT NUMBER TWO:  Yes.

18          THE COURT:  Don't tell me what it was.

19          PROSPECTIVE JUROR SEAT NUMBER TWO:  I know.  I'm not.

20          THE COURT:  And did you serve as the foreperson?

21          PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

22          THE COURT:  All right.  Juror 003.

23          PROSPECTIVE JUROR SEAT NUMBER THREE:  My name is

24    Juror 003.  I live in Turlock, California.  I'm an assistant

25    principal at a middle school currently.  Previously I was a

1   teacher many years ago.  Educational background, I have -- my
2   highest degree is a masters in education through Stanislaus
3   State.  No military service.
4           I'm married.  And my husband has a -- he's
5   self-employed, small business.  I have two children, both in
6   college.  One at Modesto and one at Fresno State.  And I've
7   been on -- not selected for a jury, been to jury duty, got to
8   that part but not up here.
9           THE COURT:  All right.  Juror 004.
10          PROSPECTIVE JUROR SEAT NUMBER FOUR:  My name is Juror
11  004.  I live in Hilmar.  I've been a cemetery
12  welding -- cemetery fabricator for the past 13 years now.  I
13  don't have any military service.  I'm single.  I have just a
14  general high school education.  I have one child.  He's still
15  in grade school.  And I have no prior jury experience.
16          THE COURT:  Thank you.
17          PROSPECTIVE JUROR SEAT NUMBER FIVE:  My name is Juror
18  005.  I live here in Fresno.  I'm a loan processor at a local
19  company, Realty Concepts.  Before that, I was a student at
20  Fresno State where I got my bachelors in real estate and urban
21  development.  Single.  No kids.  No jury duty experience.
22          THE COURT:  Thank you.
23          PROSPECTIVE JUROR SEAT NUMBER SIX:  My name is Juror
24  006.  I live in Hilmar.  I'm currently an instructional aide
25  in an elementary school.  I currently attend college at

1   Stanislaus State in the liberal studies department.  No

2   military.  I have been in a long term relationship.  I do have

3   children and no prior jury experience.

4           THE COURT:  And your partner, what does your partner

5   do?  You referred to a long term relationship.

6           PROSPECTIVE JUROR SEAT NUMBER SIX:  Yes.

7           THE COURT:  What does your partner do?

8           PROSPECTIVE JUROR SEAT NUMBER SIX:  He is currently

9   disabled.

10          THE COURT:  Juror 007.

11          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I'm Juror 007.

12  I live in Reedley.  My occupation is I'm a nurse's aide.  I

13  have no current military service.  I'm married.  My husband is

14  a nurse's aide.  And no children.  I have no prior jury

15  experience.

16          THE COURT:  Thank you.  Juror 014.

17          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  My name is

18  Juror 014.  I live in Fresno, California.  I am a homemaker.

19  I am a retired RN.  I graduated from Fresno State with a BS

20  degree in bachelor of science degree.  No military service.

21  I'm married.  My husband owns his own software business.

22  Three grown children.  Nine grandchildren.  Two own their own

23  businesses and one's in construction management.  And, yes, I

24  have served for the State on a couple of juries.

25          THE COURT:  And what was the most recent jury

1  service?

2          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  It was

3  criminal.

4          THE COURT:  How long ago?

5          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Last year.

6          THE COURT:  And how about before that?

7          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Before that

8  was --

9          THE COURT:  Approximately.

10          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Six or seven

11  years ago and it was also criminal.

12          THE COURT:  And was there any before that?

13          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  I don't

14  think so.

15          THE COURT:  All right.  Both of those were in state

16  court, you said.

17          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Yes.

18          THE COURT:  Both criminal cases.

19          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Yes.

20          THE COURT:  Did both juries reach verdicts?

21          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Yes.

22          THE COURT:  And were you the foreperson of either

23  jury?

24          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  No.

25          THE COURT:  Thank you.  Juror 013.

1              PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  My name is

2     Juror 013.  I live in Fresno.  I currently work at a bank as a

3     call center rep.  I have a high school education.  No military

4     service.  I am married.  My husband works for a shipping

5     company.  I have three children and no prior jury experience.

6              THE COURT:  Thank you.  Juror 012.

7              PROSPECTIVE JUROR SEAT NUMBER TWELVE:  My name is

8     Juror 012.  I live in Sanger.  I am a night stocker at the 99

9     Cent Store.  No military service.  I did graduate high school.

10    I am single.  No kids.  And I have no prior jury experience.

11             THE COURT:  And Juror 026.

12             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  My name is

13    Juror 026.  I live in Modesto, California.  I am a high school

14    teacher.  I have a masters degree.  I've never been in the

15    military.  I'm currently married.  My wife is also a teacher.

16    She teaches Spanish.  I have a small child.  And I've never

17    been on a jury.

18             THE COURT:  What do you teach?

19             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I teach

20    English.

21             THE COURT:  And what's your masters in and where did

22    you get it at?

23             PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  My masters is

24    in -- give me a moment.  I'm sorry.  Shakespeare,

25    Stratford-upon-Avon and the cultural history of Renaissance

1   England.  I got that at the Shakespeare Institute in a joint

2   program with the University of Birmingham in England.  And I

3   have an undergraduate English degree from Columbia.

4          THE COURT:  Very good.  Juror 010.

5          PROSPECTIVE JUROR SEAT NUMBER TEN:  My name is Juror

6   010.  I reside in Fresno.  I work in retail.  And prior to

7   that I stayed home with my children.  As for education, I

8   graduated from high school and attended Fresno City College.

9   I served in the International Guard for three years.  I'm

10  married.  My spouse works in retail.  And prior to that he

11  owned his own business.  My children, one is a teacher and one

12  is a nurse.  And I do not have prior jury experience.

13         THE COURT:  Juror 009.

14         PROSPECTIVE JUROR SEAT NUMBER NINE:  I am Juror 009.

15  I live in Modesto.  I am a manager at a restaurant.  Before

16  that I was a waitress.  I am currently attending my junior

17  college in town.  No military service.  I am single.  No

18  children.  And I have had jury duty last year.

19         THE COURT:  Did you --

20         PROSPECTIVE JUROR SEAT NUMBER NINE:  It was a

21  criminal case but I was never called to be a juror.

22         THE COURT:  So you didn't actually serve on the jury?

23         PROSPECTIVE JUROR SEAT NUMBER NINE:  (Shakes head.)

24         THE COURT:  Juror 008.

25         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  My name is

1   Juror 008.  I reside in Fresno.  Import from eastern
2   Washington about eight years ago.  Work as a registered nurse
3   at Community Home Health.  I have worked in the medical field
4   since 1991.  Education, got my RN here at Fresno City.  No
5   military experience.  Divorced.  Two children.  Both adults.
6   Oldest one is a lawyer.  The youngest one is in construction.
7   And no prior jury experience.
8          THE COURT:  Your former spouse, what did --
9          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  He's a
10   registered nurse as well.
11          THE COURT:  All right.  And your -- it's your son or
12   son --
13          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  My son-in-law.
14          THE COURT:  Is the former district -- no.  Is a
15   defense attorney?
16          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Right.
17          THE COURT:  And still is?
18          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Right.
19          THE COURT:  All right.  And your daughter is also a
20   lawyer?
21          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Uh-huh.
22          THE COURT:  What -- she sometimes assists your
23   son-in-law, but does she practice in other areas as well?
24          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Mostly family.
25          THE COURT:  All right.  Thank you.

1              Juror 015.

2              PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  My name is

3    Juror 015.  I live in Visalia.  My husband and I own oranges

4    and vineyard in Oregon.  Been a homemaker prior to that.  Just

5    high school education.  No military service.  Married.  My

6    husband also owns the ranches with me.  And he's also an

7    agronomist.  I have two kids.  One is also in the ag industry,

8    he's an agronomist as well.  And my daughter is a scribe in

9    the emergency room.  And I've had jury experience about 11

10   years ago.  And it was a civil case.  And I was not the

11   foreman.

12             THE COURT:  State court, correct?

13             PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Yes.

14             THE COURT:  And did that jury reach a verdict?

15             PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Yes.

16             THE COURT:  Thank you.  Juror 022.

17             PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  My name is

18   Juror 022.  I live in Taft, California.  My previous job was a

19   material handler at Goodwill.  I don't have any military

20   experience.  I'm single and I don't have any prior jury

21   experience.

22             THE COURT:  All right.  Juror 024.

23             PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Hi.  My

24   name is Juror 024.  I live in Modesto.  I'm a health and

25   wellness director in the bay area working in Alzheimer's and

1  dementia care.  And my education is BS in nursing from India.

2  No military service.  And I have three children, they're in

3  college in Modesto.  And one jury service about five years ago

4  in the state court.

5      THE COURT:  Five years ago.  And was it a civil or

6  criminal case?

7      PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Criminal

8  case.

9      THE COURT:  And did that jury reach a verdict?

10     PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

11     THE COURT:  And were you the foreperson of that jury?

12     PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

13     THE COURT:  How about spouse?

14     PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  He has his

15  own trucking company.

16     THE COURT:  Owns a trucking company?

17     PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

18     THE COURT:  All right.  Thank you.  Juror 018.

19     PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  My name is

20  Juror 018.  I live in Fresno.  I don't have a current job, but

21  I never had a job.  I am a college student.  No military

22  service.  I'm single.  No children and no prior jury

23  experience.

24     THE COURT:  Where are you attending college?

25     PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Fresno City.

1    I'm transferring to Fresno State soon.

2              THE COURT:  And what's your current focus of studies?

3              PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I'm

4    pre-dental.  I'm pursuing a bachelors in science.

5              THE COURT:  Thank you.  Juror 019.

6              PROSPECTIVE JUROR SEAT NUMBER NINETEEN:  My name is

7    Juror 019.  I live in Dinuba.  I'm a Starbucks employee.  No

8    previous occupation.  I went to cosmetology school at Paul

9    Mitchell here in Fresno.  No military service.  Single.  And

10   no prior jury experience.

11             THE COURT:  Thank you.  Juror 020.

12             PROSPECTIVE JUROR SEAT NUMBER TWENTY:  My name is

13   Juror 020.  I live in Fresno.  I've been an office

14   administrator for the last 40 years.  I have a high school

15   diploma.  No military service.  I'm single.  No children.  And

16   I did serve on a jury about ten years ago.  It was a criminal

17   case.

18             THE COURT:  In state court?

19             PROSPECTIVE JUROR SEAT NUMBER TWENTY:  In state

20   court.

21             THE COURT:  And did that jury reach a verdict?

22             PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I don't know.

23   I was dismissed before they reached a verdict.

24             THE COURT:  So were you an alternate?  Or were you

25   just dismissed from the jury?

1          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I was

2    dismissed from the jury.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  For -- when

5    they were doing the qualifying.

6          THE COURT:  All right.  So you never were actually

7    selected to sit on the jury.  You were in the panel, but you

8    were excused.

9          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  Yes.

10          THE COURT:  Thank you.  And Juror 021.

11          PROSPECTIVE JUROR SEAT NUMBER TWENTY-ONE:  My name is

12    Juror 021.  I live in Visalia.  I'm a registered nurse.  I do

13    acute care at a hospital in Visalia.  I've got an AS degree

14    from College of the Sequoias.  No military service.  I'm

15    single.  I have no children and no prior jury experience.

16          THE COURT:  All right.  Does either party wish the

17    Court -- because I'm conducting the entire voir dire in this

18    case.  Does either party desire the Court to ask any followup

19    questions or additional questions that they'd like to discuss

20    with me?

21          MS. WITHERS:  Not on behalf of the government.

22          THE COURT:  Mr. Braswell?

23          Mr. Braswell has not responded.

24          My inclination at this point would be to excuse the

25    jurors and for us to reconvene if the parties believe

1    that -- and we can give you new seating charts with the

2    present names of everybody that's seated.  But if you feel

3    that you have sufficient information to exercise challenges

4    with the jury not seated under -- in this case, it would be my

5    inclination to ask the jurors to take a break and bring them

6    back.

7             MS. WITHERS:  That's fine with the government.

8             THE COURT:  And Mr. Braswell, is that acceptable to

9    you?

10            No response from Mr. Braswell.

11            So folks, I'm going to suggest that at this point we

12   take a -- let's take a 15-minute break.  Reconvene at 11:30.

13   When you come back in the courtroom, do not resume your seats.

14   Instead remain -- unless I give you different instructions at

15   that point, remain in the audience and we'll call up the names

16   at that point of those that have been chosen to serve.  All

17   right.  So we'll reconvene at 11:30.  And counsel and the

18   parties, I suggest we reconvene in five minutes.  Take a quick

19   break.

20      (The jury left the courtroom.)

21            THE COURT:  Let the record reflect we're outside the

22   presence of the prospective jurors.  I'm going to take a

23   bathroom break.  If Mr. Braswell wishes to take a bathroom

24   break, please accommodate that.  We'll reconvene in just a few

25   minutes outside the presence of the prospective jurors.

1       (Recess.)

2              THE COURT:  All right.  We're outside the presence of

3       the prospective jurors.  And the Court is going to pass the

4       strike sheet.  Well, let me back up.  Does either party have

5       any challenge for cause as to any of the 21 prospective jurors

6       currently seated?  Counsel for the government?

7              MS. WITHERS:  Nothing from the government.

8              THE COURT:  Mr. Braswell?

9              Mr. Braswell has elected not to respond.  And the

10      Court can only take that as no challenge for cause.

11             The Court's now going to pass the strike sheet for

12      exercise of peremptory challenges.

13             MS. WITHERS:  Your Honor.

14             THE COURT:  Yes.

15             MS. WITHERS:  The government does not intend to

16      exercise any peremptory challenges.

17             THE COURT:  Hold on one second.  Mr. Braswell, under

18      Rule 24 of Federal Rules of Criminal Procedure, the government

19      has six peremptory challenges in selecting this jury.  The

20      government has indicated it doesn't wish to exercise any

21      peremptory challenges.

22             The defendant in a federal criminal case has ten

23      peremptory challenges in a case where the charged offense or

24      offenses are punishable by imprisonment of more than one year,

25      which is what this case is.  So you have ten peremptory

1    challenges if you wish to exercise them to excuse any of the

2    21 members who are currently seated.

3          Given the fact the government has indicated that they

4    don't wish to exercise any peremptory challenges, if you do

5    not exercise any -- if you too elect not to exercise any

6    peremptory challenges, then the Court's intention would be to

7    keep jurors currently in seats one through twelve and make

8    juror number 13, Juror 013, as the alternate juror and to let

9    14 through 21 go.

10         So, Mr. Braswell, my question for you is do you wish

11   to exercise any peremptory -- any of your ten peremptory

12   challenges to any of the members of the jury panel currently

13   seated?

14         And Mr. Braswell has elected not to respond.  And so

15   the Court can only interpret that as an indication that he

16   does not wish to exercise any peremptory challenges at this

17   time.  Accordingly, when we reconvene here in a minute or two,

18   I will have the jury box filled with jurors one through twelve

19   beginning with Juror 001, ending with Juror 012.  And the 13th

20   alternate juror will be Juror 013.  I will excuse the

21   remainder of the panel.

22         Anything anybody wishes to put on the record at this

23   time?

24         MR. SHERRIFF:  No, Your Honor.  Just a clarification.

25   I assume at that point we would go into preliminary jury

1   instructions.  And did the Court envision doing the openings

2   before lunch, after lunch?

3        THE COURT:  I can do it either way.  It will probably

4   take me 10 to 15 minutes to read the preliminary instructions.

5   If you want to make the opening statement before lunch, I'm

6   happy to accommodate.  If you'd rather wait until after lunch,

7   that's fine too.  I'll just reconvene a little earlier.

8        MR. SHERRIFF:  Well, I guess our preference would be

9   to do it right after lunch before we go into the witnesses.

10        THE COURT:  Right after lunch?  Okay.

11        MR. SHERRIFF:  Thank you, Your Honor.

12        THE COURT:  Given the fact that both parties have

13   elected not to exercise any peremptory challenges, at this

14   time I would direct and order both sides to return to my

15   courtroom deputy Jami all identifying information regarding

16   the jurors.  There's a list of prospective jurors.

17        MR. SHERRIFF:  Does that include notes?  Do you care

18   about notes, Your Honor?

19        THE COURT:  No, I don't.

20        All right.  If you can go ahead and unlock the doors

21   and let them back in.  And then fill the box.

22     (The jury panel entered the courtroom.)

23        THE COURT:  And madam clerk, if you'd please call the

24   names of the jurors as selected.

25        THE CLERK:  Juror 001.  Please take the same seat

1  that you were in.  Thank you.

2          Juror 002.  Juror 003.  Juror 004.  Juror 005.  Juror

3  006.  Juror 007.  Juror 008.  Juror 009.  Juror 010.  Juror

4  026.  Juror 012.  And Juror 013.

5          THE COURT:  Madam clerk, please swear the jury.

6      (The jury was sworn.)

7          THE COURT:  All of the rest of you who are seated in

8  the audience, I want to thank you for your attendance here

9  this morning.  You are free to leave.  Please call the 1-800

10  number after five o'clock on Friday to get any additional

11  instructions.  Thank you again very much.

12      (The jury panel left the courtroom.) *  panel *  * .

13          THE COURT:  And Juror 007, if at any time you are not

14  feeling well due to your asthma condition, please just get my

15  attention or my courtroom deputy's attention if we need to

16  take a recess.  All right?

17          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yes, sir.

18  Thank you.

19          THE COURT:  Okay.  Ladies and gentlemen, you are now

20  the jury in this case.  And I want to take a few minutes to

21  tell you something about your duties as jurors and to give you

22  some preliminary instructions.  At the end of the trial, I

23  will give you more detailed instructions that will control

24  your deliberations.

25          When you deliberate, it will be your duty to weigh

1    and to evaluate all the evidence received in the case and, in

2    that process, to decide the facts.  To the facts as you find

3    them, you will apply the law as I give it to you.  Whether you

4    agree with the law or not.  You must decide the case solely on

5    the evidence and the law before you.

6          Perform these duties fairly and impartially.  Do not

7    allow personal likes or dislikes, sympathy, prejudice, fear or

8    public opinion to influence you.  You should also not be

9    influenced by any person's race, color, religion, national

10   ancestry, gender, sexual orientation, profession, occupation,

11   celebrity, economic circumstances or position in life or in

12   the community.

13         This is a criminal case brought by the United States

14   government.  The government charges the defendant with three

15   counts of mailing threatening communications in violation of

16   Section 876(c) of Title 18 of the United States Code.  The

17   charges against the defendant are contained in the superseding

18   indictment.  The superseding indictment simply describes the

19   charges the government brings against the defendant.  The

20   indictment is not evidence and does not prove anything.

21         The defendant has pleaded not guilty to the charges

22   and is presumed innocent unless and until the government

23   proves the defendant guilty beyond a reasonable doubt.  In

24   addition, the defendant has the right to remain silent and

25   never has to prove innocence or to present any evidence.

1          The evidence you are to consider in deciding what the

2     facts are consists of:  One, the sworn testimony of any

3     witness.  Two, the exhibits which are received in evidence.

4     And three, any facts to which the parties agree.

5          The following things are not evidence and you must

6     not consider them as evidence in deciding the facts of this

7     case.  One, statements and arguments of the parties or

8     attorneys unless made under oath.  Two, questions and

9     objections of the parties or attorneys.  Three, testimony that

10    I instruct you to disregard.  And four, anything you may see

11    or hear when court is not in session even if what you see or

12    hear is done or said by one of the parties or by one of the

13    witnesses.

14         Evidence may be direct or circumstantial.  Direct

15    evidence is direct proof of a fact, such as testimony by a

16    witness about what that witness personally saw or heard or

17    did.  Circumstantial evidence is indirect evidence.  That is,

18    it is proof of one or more facts from which one can find

19    another fact.

20         You are to consider both direct and circumstantial

21    evidence.  Either can be used to prove any fact.  The law

22    makes no distinction between the weight to be given either

23    direct or circumstantial evidence.  It is for you to decide

24    how much weight to give to any evidence.

25         There are rules of evidence that control what can be

received in evidence.  When a lawyer or party asks a question

or offers an exhibit in evidence and a lawyer or party on the

other side thinks that it is not permitted by the rules of

evidence, that lawyer or party may object.  If I overrule the

objection, the question may be answered or the exhibit

received.  If I sustain the objection, the question cannot be

answered or the exhibit cannot be received.  Whenever I

sustain an objection to a question, you must ignore the

question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from

the record and that you disregard or ignore the evidence.

That means that when you are deciding the case, you must not

consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to

decide which testimony to believe and which testimony not to

believe.  You may believe everything a witness says or part of

it or none of it.

In considering the testimony of any witness, you may

take into account:  One, the witness' opportunity and ability

to see or hear or know the things testified to.  Two, the

witness' memory.  Three, the witness' manner while testifying.

Four, the witness' interest in the outcome of the case, if

any.  Five, the witness' bias or prejudice, if any.  Six,

whether other evidence contradicted the witness' testimony.

Seven, the reasonableness of the witness' testimony in light

1    of all the evidence.  And eight, any other factors that bear

2    on believability.

3          The weight of the evidence as to a fact does not

4    necessarily depend on the number of witnesses who testify

5    about it.  What is important is how believable the witnesses

6    are and how much weight you think their testimony deserves.

7          I will now say a few words about your conduct as

8    jurors.  First, keep an open mind throughout the trial and do

9    not decide what the verdict should be until you and your

10   fellow jurors have completed your deliberations at the end of

11   the case.

12         Second, because you must decide this case based only

13   on the evidence received in the case and on my instructions as

14   to the law that applies, you must not be exposed to any other

15   information about the case or to the issues it involves during

16   the course of your jury duty.  Thus, until the end of the case

17   or unless I tell you otherwise, do not communicate with anyone

18   in any way and do not let anyone else communicate with you in

19   any way about the merits of the case or anything to do with

20   it.

21         This includes discussing the case in person, in

22   writing, by phone or electronic means, via email, via text

23   messaging or any internet chatroom, blog, website or other

24   application including but not limited to Facebook, YouTube,

25   Twitter, Instagram, Linkden, Snapchat or any other forms of

1    social media.

2           This applies to communicating with your fellow jurors

3    until I give you the case for deliberation.  And it applies to

4    communicating with everyone else, including your family

5    members, your employer, the media or press and the people

6    involved in the trial.  Although you may notify your family

7    and your employer that you've been seated as a juror in the

8    case and how long you expect the trial to last.  But if you

9    are asked or approached in any way about your jury service or

10   anything about this case, you must respond that you have been

11   ordered not to discuss the matter and to report the contact to

12   the Court.

13          Because you will receive all the evidence and legal

14   instruction you properly may consider to return a verdict, do

15   not read, watch or listen to any news or media accounts or

16   commentary about the case or anything to do with it.  Although

17   I have no information that there will be news reports about

18   this case.

19          Do not do any research, such as consulting

20   dictionaries, using the internet or using other reference

21   materials and do not make any investigation or in any other

22   way try to learn about the case on your own.  Do not visit or

23   view any place discussed in this case.  And do not use

24   internet programs or other devices to search for or view any

25   place discussed during the trial.

1          Also, do not do any research about this case, the law

2    or the people involved, including the parties, the witnesses

3    or the lawyers until you have been excused as jurors.  If you

4    happen to read or hear anything touching on this case in the

5    media, turn away and report it to me as soon as possible.

6          Though it is a normal human tendency to converse with

7    people with whom one is thrown in contact, please do not

8    converse with any of the parties or their attorneys or any

9    witness during the time you serve on this jury.  Whether

10   inside or outside of the courtroom.  By this, I mean not only

11   do not converse about the case, but do not converse at all,

12   even to pass the time of day.  In no other way can all the

13   parties be assured of the absolute impartiality they are

14   entitled to expect from you as jurors.

15         There may be occasions when you come upon one of the

16   attorneys or parties in this case outside the courtroom.  The

17   attorneys and parties have been instructed not to communicate

18   with you.  Their failure to acknowledge you should not be

19   interpreted as being impolite, but merely as following the

20   Court's order.  These rules protect each parties' right to

21   have this case decided only on the evidence that's been

22   presented here in court.

23         Witnesses here in court take an oath to tell the

24   truth.  And the accuracy of their testimony is tested through

25   the trial process.  If you do any research or investigation

1   outside the courtroom or gain any information through improper

2   communications, then your verdict may be influenced by

3   inaccurate, incomplete or misleading information that has not

4   been tested by the trial process.

5           Each of the parties is entitled to a fair trial by

6   impartial jury.  And if you decide the case based on

7   information not presented in court, you will have denied the

8   parties a fair trial.  Remember, you have taken an oath to

9   follow the rules and it is very important that you follow

10  these rules.  A juror who violates these restrictions

11  jeopardizes the fairness of these proceedings and a mistrial

12  would result that would require the entire trial process to

13  start over.

14          If any juror is exposed to any outside information,

15  please notify the Court immediately.  If you need to

16  communicate with me during the course of the trial, simply

17  give a signed note to my courtroom deputies Jami or Victoria

18  or to my law clerk Sam to give to me and I will respond to it

19  as promptly as possible.

20          At the end of the trial, you will have to make your

21  decision based on what you recall of the evidence.  You will

22  not have a written transcript of the trial.  I urge you to pay

23  close attention to the testimony as it is given.  If you wish,

24  you may take notes to help you remember the evidence.  If you

25  do take notes, please keep them to yourself until the

1    end -- until you and your fellow jurors go to the jury room to

2    decide the case.  Do not let note taking distract you from

3    being attentive.  When you leave court for recesses, your

4    notes should be left in the courtroom.  No one will read your

5    notes.

6            Whether or not you take notes, you should rely on

7    your own memory of the evidence.  Notes are only to assist

8    your memory.  You should not be overly influenced by your

9    notes or those of your fellow jurors.

10           The next phase of the trial will now begin.  First,

11   each side may make an opening statement.  An opening statement

12   is not evidence.  It is simply an outline to help you

13   understand what that party expects the evidence will show.  A

14   party is not required to make an opening statement.  The

15   government will then present evidence and the defendant may

16   cross-examine.  Then if the defendant chooses to offer

17   evidence, counsel for the government may cross-examine.  After

18   the evidence has been presented, the parties may make closing

19   arguments.  And I will instruct you on the law that applies to

20   the case.  After that, you will go to the jury room to

21   deliberate on your verdict.

22           And ladies and gentlemen, we're going to take our

23   lunch recess at this time.  We will reconvene at one p.m. I

24   anticipate at that time that the government will make their

25   opening statement.  And we will then proceed as I just

1    instructed you.

2          Please heed the Court's admonition that I just gave

3    regarding not discussing the case or anything to do with it.

4    And who's going to -- Sam's going to be getting you your

5    badges so that you can get in and out of the courtroom

6    as -- or out of the courthouse as designated jurors.  And Sam

7    will take you back to the jury deliberation room now, get

8    those distributed and we'll reconvene at one.  Just report

9    back to the jury deliberation room and be there by one and

10   we'll get started.  All right?  Have a nice lunch.

11         Sam will be taking you through that door and getting

12   you back to that room.  Oh, wait a second.  We're going to a

13   different room.  I've got another jury out deliberating.

14   They're in my jury deliberation room.  And so there may also

15   come a point in the trial where I have to take a break to

16   communicate with my jury that's deliberating in the other

17   case.

18              THE CLERK:  Which is right now.

19              THE COURT:  Right now we got a note?  Okay.  All

20   right.  So Sam is going to take you.  Do you know where to go?

21              THE CLERK:  Jami does.

22              THE COURT:  They're going to take you to the jury

23   deliberation room that you should report to at one o'clock.

24       (The jury left the courtroom.)

25              THE COURT:  And let the record reflect we're outside

1   the presence of the jury.  Anything we need to take up outside

2   the presence at this time?  From the government?

3          MS. WITHERS:  No, Your Honor.

4          THE COURT:  Mr. Braswell, anything you wanted to

5   discuss?

6          Mr. Braswell has chosen not to respond.  All right.

7   We'll see you at one.

8      (Lunch Recess.)

9          THE COURT:  All right.  Let the record reflect we're

10   outside the presence of the jury.  Just some planning

11   questions.  The government intends to make an opening

12   statement?

13          MR. SHERRIFF:  Yes, Your Honor.

14          THE COURT:  And what do you anticipate in terms of

15   the presentation of evidence, in terms of the schedule?  How

16   long you think it's likely to take?

17          MS. WITHERS:  We have four witnesses.  Most of them

18   are relatively short, in our opinion.  I think, if things

19   proceed as they have been, we could close today.

20          THE COURT:  Do you think we would get to the point of

21   closing argument and jury instruction today?

22          MR. SHERRIFF:  Potentially.

23          MS. WITHERS:  Possibly.  Assuming things proceed as

24   they have been.

25          THE COURT:  Then with respect to the government's

1    proposed instructions.  Your proposed instruction 11.  Parties

2    have agreed.  I don't understand why that instruction is

3    proposed.

4            MR. SHERRIFF:  Which proposed -- instruction 11 in

5    which docket number?

6            THE COURT:  Well, I'm sorry.  It's -- maybe we've

7    re-numbered as a result.  It's your proposed model instruction

8    2.3.  Let me see if I can find it.

9            MR. SHERRIFF:  When we submitted that, Your Honor, it

10   was if needed.  It is not needed.  We agree.  It should be

11   struck.

12           THE COURT:  2.4.  Parties have agreed to certain

13   facts.

14           MR. SHERRIFF:  Yeah.  There's been no agreement as to

15   any facts.

16           THE COURT:  2.5.

17           MR. SHERRIFF:  I don't think there's going to be any

18   issue with 2.5 either, Your Honor.  I think we probably don't

19   need that.

20           THE COURT:  Is there any evidence to be presented

21   that the defendant made a statement?

22           MR. SHERRIFF:  Yes.

23           THE COURT:  Okay.

24       (Off the record.)

25           THE COURT:  4.6, we're going to give the longer

1    limiting instruction.  And I'm going to give it both before

2    the evidence regarding previous conviction of a federal crime

3    and at the close of the case.  I just -- I'm going through

4    this now because if you're going to conclude that quickly, I'm

5    putting together the final packet.

6            MR. SHERRIFF:  Oh, I understand, Your Honor.  On that

7    instruction, the longer one, Your Honor, just wanted to be

8    clear.  Ms. Withers made the point earlier that it's not only

9    that he was previously convicted of a federal crime, but that

10   he was in custody at certain relevant times.  Is that in --

11           THE COURT:  Yeah, that's in what I've got.

12           MR. SHERRIFF:  Okay.  Perfect.

13           Mr. Braswell, it's come to my attention that Ms.

14   Hopkins, as standby counsel, exclusively on behalf of the

15   Court, that Ms. Hopkins has provided a letter to you not as

16   legal advice, but in her capacity as standby counsel pursuant

17   to appointment of the Court.  In light of Ms. Hopkins' letter,

18   do you have any position with respect to the final jury

19   instructions that the government has proposed?

20           Mr. Braswell has chosen not to respond to the Court's

21   inquiry.  And given that lack of response, the Court, with the

22   exceptions that I've noted here, will base its final

23   instruction packet both on its own instructions, Ninth Circuit

24   model instructions, and the government's proposed final jury

25   instructions.  And we'll get that package finalized so that

1    copies of it can be distributed to the parties sometime during

2    the afternoon before the end of the day.  I'll take final

3    objections to any of the jury instructions as proposed at that

4    time.

5                MS. WITHERS:  Does that include the government's

6    proposed verdict form?

7                THE COURT:  It does.  Ms. Hopkins, the letter that

8    you delivered to Mr. Braswell, has that been made part of the

9    record of these proceedings?

10               MS. HOPKINS:  No, Your Honor.  I did not file the

11   letter.  But I did provide the government and the Court with a

12   courtesy copy of the letter, which could be filed if the Court

13   deems it necessary.

14               THE COURT:  Mr. Braswell, I think to make the record

15   complete, it would be appropriate for the Court to file the

16   letter from Ms. Hopkins on the Court's docket.  Do you have

17   any objection to me filing that letter?

18               The record will reflect that Mr. Braswell has elected

19   to remain silent and not respond to the Court's inquiry.  And

20   accordingly, the Court will direct that the February 12th,

21   2019 letter by standby counsel Ms. Hopkins to Mr. Braswell be

22   entered on the Court's docket and filed.

23               We've got a communication -- how long do you think

24   your opening statement is, Ms. Withers?  I'm trying to make

25   good use of all of our time.

1        MR. SHERRIFF:  She's delegated that to me, Your

2   Honor.  And about three minutes.

3        THE COURT:  Then we'll bring the jury in, take the

4   opening statement and once I have counsel in the other case

5   present, we'll recess so that I can deal with that and then

6   recommence.

7        My law clerk, Sam, is going to hand out the limiting

8   instruction that Court intends to give prior to, just prior to

9   the eliciting of any testimony or evidence regarding Mr.

10  Braswell's prior conviction and the fact that he was in

11  custody.  And then the Court will give that same instruction

12  in the final instructions.

13     (The jury entered the courtroom.)

14        THE COURT:  Let the record reflect that we're back in

15  the presence of the jury.  Folks, give me one second.

16        And does the government -- first, well, does the

17  government wish to make an opening statement at this time?

18        MR. SHERRIFF:  Yes, Your Honor.

19        THE COURT:  You may proceed.

20        MR. SHERRIFF:  Thank you, Your Honor.

21        Good afternoon, ladies and gentlemen.  My name,

22  again, is Kirk Sherriff and with my colleague, Laura Withers,

23  we represent the United States in this case.  And I'm going to

24  give you a brief overview of the evidence and testimony you'll

25  see and hear in this case.

1          This case concerns threats by the defendant, Cyrus

2    Braswell, to kill a United States Federal Judge, Judge James

3    Keith Singleton, who is based in Anchorage, Alaska.  The

4    defendant's charged with mailing three separate

5    communications.  These were filings in a case in Alaska before

6    Judge Singleton.  Each one of those mailings was mailed from

7    Mendota, California where the defendant was located at the

8    time, you'll see.  And those mailings were mailed to the Clerk

9    of the Court at the Federal Court in Alaska where Judge

10   Singleton is a Senior United States District Judge.

11         And each one of those mailings was to be filed in a

12   case, as I said, before Judge Singleton.  And you may be

13   asking yourself why would the defendant threaten to murder

14   Judge Singleton and file something in a case before Judge

15   Singleton?  You will hear that the defendant had a prior case

16   before Judge Singleton and he was not happy with the outcome

17   of that case.  And, in fact, these three mailings, these

18   communications, were sent to be filed in that case before

19   Judge Singleton.

20         They had the defendant's name on them, they were

21   signed by the defendant under penalty of perjury.  And, in

22   fact, defendant signed a certificate of service on at least

23   two of them indicating that they were being mailed.  And he

24   signed that under penalty of perjury.  You'll also see other

25   evidence that these were mailed from Mendota and the defendant

1  | caused them to be mailed.

2  |        Each one of those communications had very explicit

3  | threats to murder Judge Singleton.  In addition, in each one

4  | of the communications, Judge Singleton's address or what the

5  | defendant believed, apparently, was Judge Singleton's personal

6  | residence address was listed.  In two of the communications at

7  | least, that address was right there in close proximity to the

8  | threat to murder Judge Singleton.  Conveying from the

9  | defendant that he knew or believed he knew where Judge

10 | Singleton resided.

11 |        And, in fact, you'll hear that it was a personal

12 | residence for Judge Singleton.  It happened to be a prior

13 | personal residence that apparently the defendant did not

14 | realize was a prior residence as opposed to the current

15 | personal residence.

16 |        So this case is essentially those facts.  And those

17 | facts, and the evidence you will hear in the case, will show

18 | that the defendant intended to send these threatening

19 | communications, which had threats to injure Judge Singleton

20 | and, in fact, threats to murder Judge Singleton.  And that the

21 | defendant intended that those be perceived as threats by those

22 | that received them.

23 |        The -- one point I wanted to make is that those

24 | communications were mailed to the Clerk of the Court in Alaska

25 | to be filed in his case before Judge Singleton.  The Clerk of

1   the Court, you will hear, is a federal officer or employee and

2   Judge Singleton is a United States Judge.

3        And based on that evidence and those facts, the

4   evidence will show beyond a reasonable doubt the defendant is

5   guilty on each of the three counts with which he's charged of

6   mailing threatening communications.  And those are on three

7   dates between October 2015 and August of 2016.  Thank you.

8        THE COURT:  And Mr. Braswell, would you like to make

9   an opening statement at this time?

10       And let the record reflect Mr. Braswell has not

11  responded to the Court's inquiry.  At this time I'm going to

12  interpret that lack of response as reserving the defendant's

13  right to make an opening statement if he wishes.  And we'll

14  revisit that subject.

15       And does the government wish to call its first

16  witness at this time?  Before we bring that witness in, the

17  government has requested permission for Agent Volk to remain

18  in the courtroom.  Correct?

19       MR. SHERRIFF:  Correct, Your Honor.

20       THE COURT:  And I've granted that request.  Is there

21  any other request to exclude witnesses?  From the government?

22       MR. SHERRIFF:  No, Your Honor.

23       MS. WITHERS:  No, Your Honor.

24       THE COURT:  Mr. Braswell, do you wish to move to

25  exclude witnesses from the courtroom while other witnesses are

1  testifying?

2         And Mr. Braswell has elected not to respond to the

3  Court's inquiry.  Therefore, there will be no order excluding

4  witnesses.

5         Government's first witness.

6         MS. WITHERS:  The government calls to the stand Pisa

7  Suon.

8         THE COURT:  Ma'am, please come up all the way to the

9  steps and behind the chair.  Remain standing and raise your

10  right hand.

11                         **PISA SUON**,

12  called as a witness on behalf of the Government, having been

13  first duly sworn, testified as follows:

14         THE CLERK:  Please be seated.  Will you please state

15  your name and spell your first and last name for the record.

16         THE WITNESS:  My name is Pisa Suon.  First name

17  P-I-S-A.  Suon, S-U-O-N.

18                    DIRECT EXAMINATION

19  BY MS. WITHERS:

20  Q.  Good afternoon.

21  A.  Good afternoon.

22  Q.  Would you please tell the jury where you work.

23  A.  I work for the US District Court in Alaska.  Anchorage.

24  Q.  And do you work for a specific department in the US Court

25  in Anchorage?

1   A.   Yes.   In the clerk's office.

2   Q.   How long have you been employed at the clerk's office in

3   Anchorage?

4   A.   19 years.

5   Q.   What positions have you held in the clerk's office over

6   the last 19 years?

7   A.   I've been a student trainee, data quality analyst and now

8   a case administrator.

9   Q.   What does it mean to be a case administrator in the

10  clerk's office?

11  A.   I handle filings from pro se, from attorneys, from the

12  public.

13  Q.   You indicated in particular that you handle filings by pro

14  se individuals.   In fact, do you almost exclusively handle

15  those filings?   You are the main person for that?

16  A.   Yes.

17  Q.   Okay.   Given your 19 years experience with the clerk's

18  office, are you familiar with the process for filing documents

19  that arrive in the office?

20  A.   Yes.

21  Q.   Would you please describe that process to the jury?

22  A.   Well, someone else brings up the mail.   They open it.   And

23  then they bring me the documents to review to make sure

24  everything's correct.   I scan them and I docket them into ECF.

25  Q.   And what's ECF?

1    A.   Electronic case filing system.

2    Q.   Is there a way, in particular, that when items are

3    received in the clerk's office, they're -- is there any way

4    that's indicated what date they arrived in the clerk's office?

5    A.   Yes.  Once we receive them, we date stamp them.  That's

6    the date that we receive the filing.  And that's when we

7    use -- if it's a day later, that's the same day that we use to

8    file the documents.

9    Q.   So there's both a stamp on the document when you receive

10   them and then you also subsequently file them on the docket?

11   A.   Yes.

12   Q.   Who's responsible for stamping received documents?

13   A.   Either myself or another person who opens the mail.

14   Q.   Are there times when a received document contains

15   something improper?

16   A.   Yes.

17   Q.   Is there a procedure for handling any improper

18   communications?

19   A.   Yes.

20   Q.   And what would that procedure be?

21   A.   If we review them, everything doesn't look the way it

22   should.  We take them to our supervisor and then they tell us

23   to send an email to the judge and the judge direct us.

24   Q.   What to do with the filing?

25   A.   Yes.

1    Q.   Okay.  Do you know the name Cyrus Braswell?

2    A.   Yes.

3    Q.   How do you know that name?

4    A.   I've received his documents.

5    Q.   Received your documents in your capacity in the clerk's

6    office?

7    A.   Yes.

8    Q.   And when you say "documents," are you referring to

9    filings?

10   A.   Filings.

11   Q.   Was there a time when you were directed to preserve the

12   communications from Mr. Braswell?

13   A.   Yes.

14   Q.   And how were you directed -- what were you directed to do

15   with those filings?

16   A.   I was told to scan a copy of it to the judge and send the

17   original to the marshals.

18   Q.   And did you ultimately docket those communications as

19   well?

20   A.   At the direction of the judge, yes.

21   Q.   You indicated that you sent the originals to the Marshal

22   Service?

23   A.   Yes.

24   Q.   Was there a particular marshal that you sent them to?

25   A.   Yes.

1    Q.   What was his name?

2    A.   Jimmy Johnson.

3    Q.   You have an exhibit binder in front of you.  And also a

4    projector screen in front of you.  I'd like to turn your

5    attention to what has been marked for identification purposes

6    as Government's Exhibit 1-A.  Alpha.

7              Do you have it in front of you?

8    A.   Yes.

9    Q.   Do you recognize this document?

10   A.   I do.

11   Q.   Where do you recognize it from?

12   A.   I received them.

13   Q.   I'm going to direct your attention to the bottom

14   right-hand corner of this document.  Is Government's Exhibit

15   1-A certified as a true and correct copy of a document that

16   was filed in your office?

17   A.   Yes.

18   Q.   Who did the actual certification?

19   A.   That would be me.

20   Q.   And you indicated that you recognize it because it was, in

21   fact, filed in your office?

22   A.   Yes.

23        MS. WITHERS:  At this time the government would move

24   to admit Government's Exhibit 1-A under Rules 902 and 1005.

25        THE COURT:  Any objection to the admission of 1-A,

106

1    Mr. Braswell?

2          And Mr. Braswell has elected not to respond.  1-A

3    will be received into evidence without objection.

4       (Government's Exhibit 1-A was received.)

5          MS. WITHERS:  And I would ask to publish for the

6    jury.

7          THE COURT:  You may.

8    BY MS. WITHERS:

9    Q.  What court was this document filed in?

10   A.  The US District Court, Alaska.

11   Q.  What case was it filed in?

12   A.  A 97-00068-CR(JKS).

13   Q.  What do the letters "JKS" at the end of that --

14   A.  The judge's initials.

15   Q.  Which judge's initials?

16   A.  Judge K. Singleton.

17   Q.  Do you know Judge Singleton?

18   A.  Yes.

19   Q.  Is he a judge in your court?

20   A.  Yes.

21   Q.  A federal court?

22   A.  Yes.

23   Q.  And that's in the District of Alaska?

24   A.  Yes.

25   Q.  What are the parties' names in this case?

1   A.   USA versus Cyrus Braswell.

2   Q.   And that's Cyrus D.A. Braswell?

3   A.   Cyrus D.A. Braswell.

4   Q.   What date was this document received in the clerk's

5   office?

6   A.   November 2nd, 2015.

7   Q.   How do you know that?

8   A.   Because of the received stamp on the top right.

9   Q.   That one?

10  A.   Yes.

11  Q.   Okay.  I'm also going to direct your attention to the

12  bottom.  This set of numbers at the bottom.  What is

13  3:97-CR-00068?

14  A.   That is our new case number format.

15  Q.   Okay.  And that also indicates that it was filed on

16  November 2nd of 2015?

17  A.   Yes.

18  Q.   And that matches the date at the top where it was received

19  in the clerk's office?

20  A.   Yes.

21           THE COURT:  Ms. Withers, I do need to take a recess.

22  Would this be a convenient time?  Or are you right in the

23  middle of this document?

24           MS. WITHERS:  Let's do it now.  Let's take a break

25  now.

1    THE COURT:  All right.  Ladies and gentlemen,
2  I -- before I sent you out at lunch, I told you I had another
3  jury deliberating.  They've now sent out a communication.  I
4  need to take a break from this proceeding so that I can
5  consult with them and respond to the note that they've sent
6  out.  So please heed the Court's previous admonition that I
7  just read to you this morning regarding communication with
8  anyone about the case.  And I don't think the break should be
9  any longer than 15 minutes or so.  All right?  We'll get back
10  to you as soon as we can.  Thank you.
11    (Recess.)
12    THE COURT:  We are back in the presence of the jury.
13  And Ms. Withers, you may continue your direct examination.
14    MS. WITHERS:  Thank you, Your Honor.
15  Q.  Ms. Suon, is that -- am I saying it right?
16  A.  Yes.
17  Q.  We were talking about Government's Exhibit 1-A.  Madam
18  courtroom deputy, if we could republish this to the jury.
19    THE CLERK:  It's on.
20  BY MS. WITHERS:
21  Q.  We were talking about 1-A and I believe you testified this
22  was a copy of a true and correct copy of a document that was
23  filed in your office?
24  A.  Yes.
25  Q.  And that you did the certification?

1    A.   Yes.

2    Q.   Okay.  I'd now like to draw your attention to what has

3    been marked for identification purposes as Government's

4    Exhibit 1.  You have it in front of you and also projected.

5    Do you have it?

6    A.   Yes.

7    Q.   Did you have a chance, before coming to court today, to

8    review pages one and two of Government's Exhibit 1 and compare

9    it to Government's Exhibit 1-A that we just discussed?

10   A.   Yes.

11   Q.   And in that review, did you determine that Government's

12   Exhibit 1-A is a true and correct copy of pages 1 and 2 of

13   Government's Exhibit 1?

14   A.   Yes.

15   Q.   Does that mean that Government's Exhibit 1 would have been

16   the original received document that you scanned and filed?

17   A.   Yes.

18   Q.   And that ultimately became Government's Exhibit 1-A when

19   it was docketed?

20   A.   Correct.

21   Q.   I'm going to direct your attention to page two of

22   Government's Exhibit 1.  What is the name that appears on the

23   signature block there?

24   A.   Mr. Cyrus D.A. Braswell.

25   Q.   Would you please read out the return address?

1    A.   Registration number 13356-006, FCI Mendota, P.O. Box

2    Number 9, Mendota, California.

3    Q.   And then lower down, it indicates "pro se"?

4    A.   Yes.

5    Q.   And so you testified earlier that you're responsible for

6    handling, largely handling the pro se filings?

7    A.   Correct.

8    Q.   So when this came in and it was pro se, are you the person

9    that would have handled it?

10   A.   Correct.

11   Q.   What's the date that's noted on page 2 of Government's

12   Exhibit 1?  The "executed on" date.

13   A.   October 27, 2015.

14        MS. WITHERS:  Your Honor, at this time the government

15   moves to admit pages 1 and 2 of Government's Exhibit 1.

16        THE COURT:  Not the third page?

17        MS. WITHERS:  Not yet.

18        THE COURT:  Any objection, Mr. Braswell?

19        And Mr. Braswell has chosen not to respond.  Pages 1

20   and 2 of Exhibit 1 will be admitted without objection.

21     (Government's Exhibit 1 (Pages 1 and 2) was received.)

22        MS. WITHERS:  And permission to publish?

23        THE COURT:  You may.

24   BY MS. WITHERS:

25   Q.   So just for the record, this is page one of Government's

1   Exhibit 1.  And it has that "received" stamp at the top?

2   A.  Yes.

3   Q.  And then a moment ago we were talking about the date and

4   the signature line on page two.  I'm going to direct -- is

5   that right?

6   A.  Correct.

7   Q.  I'm going to direct your attention to the top of

8   page -- actually bottom of page one.  The last line.  It says,

9         "After my release from federal prison, I'm going to

10        murder Federal District Court Judge James Klansman

11        Singleton."

12        Is that correct?

13  A.  Yes.

14  Q.  You indicated earlier that you are familiar with a Judge

15  Singleton in Alaska?

16  A.  Yes.

17  Q.  Is that the same judge?

18  A.  That is the same judge.

19  Q.  Is that the JKS that you were referring to as the judge

20  assigned to the case?

21  A.  Yes.

22  Q.  I'm now going to draw your attention to page three of

23  Government's Exhibit 1.  On its face, what does this appear to

24  be?

25  A.  The envelope that the letter came in.

1  Q.  Where is this envelope addressed?  To whom is it

2  addressed?

3  A.  To the Federal District Court, Clerk of the Court.

4  Q.  In what location?

5  A.  In Anchorage, Alaska.

6  Q.  In your role as an employee for the clerk's office in

7  Alaska, are you familiar with the clerk of court?

8  A.  Yes.

9  Q.  Is that a person?

10  A.  Yes.

11  Q.  Are you personally familiar with that person?

12  A.  Yes.

13  Q.  Is that person a federal officer or employee?

14  A.  Yes.

15  Q.  Are you?

16  A.  Yes.

17  Q.  And to be clear, is the clerk of court a position?

18  A.  Yes.

19  Q.  And different people can hold that position?

20  A.  Yes.

21  Q.  But only one person at a time?

22  A.  Yes.

23  Q.  I'd like to turn your attention to what has been marked

24  for identification purposes as Government's Exhibit 2-A.  Do

25  you have it in front of you?

1    A.  Yes.

2    Q.  Do you recognize this document?

3    A.  I do.

4    Q.  What do you recognize it to be?

5    A.  A document from a pro se filer.

6    Q.  I'm going to draw your attention to the bottom right-hand

7    corner of the first page.  Is Government's Exhibit 2-A

8    certified as a true and correct copy of a document filed in

9    your office?

10   A.  Yes.

11   Q.  Who did the certification?

12   A.  Me.

13        MS. WITHERS:  Your Honor, at this time I would move

14   to admit Government's Exhibit 2-A.

15        THE COURT:  Mr. Braswell, any objection to the

16   admission of Exhibit 2-A?

17        Mr. Braswell has elected not to respond.  2-A will be

18   admitted without objection.

19      (Government's Exhibit 2-A was received.)

20        MS. WITHERS:  And permission to publish.

21        THE COURT:  You may.

22   BY MS. WITHERS:

23   Q.  Ms. Suon, what court was this document filed in?

24   A.  The US District Court, Alaska.

25   Q.  What case was it filed in?

114

1   A.   In 3:97-CR-00068(JKS), US versus Cyrus D.A. Braswell.

2   Q.   And again, who do the initials "JKS" stand for?

3   A.   That's James K. Singleton.

4   Q.   What date was this document received in the clerk's

5   office?

6   A.   December 28, 2015.

7   Q.   And how do you know that?

8   A.   Because of the received stamp on the top.

9   Q.   I'm going to direct your attention to the bottom of the

10  document.  And again, we see a case number at the bottom?

11  A.   Yes.

12  Q.   And filed date of December 28th of 2015?

13  A.   Yes.

14  Q.   That date matches the date on the stamp at the top?

15  A.   Yes.

16  Q.   I'd like to turn your attention to what has been marked

17  for identification purposes as Government's Exhibit 2-B.  Do

18  you have it in front of you?

19  A.   Yes.

20  Q.   Do you recognize this document?

21  A.   I do.

22  Q.   What do you recognize it to be?

23  A.   A pro se filing.

24  Q.   I'm going to direct your attention to the bottom

25  right-hand corner of the page.  Is Government's Exhibit 2-B

1    certified as a true and correct copy of a document filed in

2    your office?

3    A.   Yes.

4    Q.   Who did the certification?

5    A.   Me.

6         MS. WITHERS:  Your Honor, at this time I would move

7    to admit Government's Exhibit 2-B.

8         THE COURT:  Any objection from Mr. Braswell?

9         Mr. Braswell has elected not to respond.  2-B will be

10   admitted without objection.

11      (Government's Exhibit 2-B was received.)

12        MS. WITHERS:  Permission to publish?

13        THE COURT:  You may.

14   BY MS. WITHERS:

15   Q.   Ms. Suon, what court was this document filed in?

16   A.   In the US District Court, Alaska.

17   Q.   What case was it filed in?

18   A.   In 3:97-CR-00068(JKS).

19   Q.   And again, the initials "JKS" stand for judge --

20   A.   Judge James K. Singleton.

21   Q.   What date was this document received in the clerk's

22   office?

23   A.   December 28, 2015.

24   Q.   How do you know that?

25   A.   The date that was stamped on top.

1   Q.   Directing your attention to the bottom of the page.  Again
2   we see that same case number?
3   A.   Yes.
4   Q.   And a filed date of December 28 of 2015?
5   A.   Yes.
6   Q.   Does that match the received date at the top of the page?
7   A.   Yes.
8   Q.   I'm going to turn your attention to what has been marked
9   for identification purposes as Government's Exhibit 2.  Do you
10  have it?
11  A.   Yes.
12  Q.   Did you have a chance, before coming to court today, to
13  review this document and compare it to Government's Exhibits
14  2-A and 2-B?
15  A.   Yes.
16  Q.   Are Government's Exhibits 2-A and 2-B correct -- true and
17  correct copies of Government's Exhibit 2?
18  A.   Yes.
19  Q.   Does that mean that Government's Exhibit 2 would have been
20  the original received document that you scanned and filed?
21  A.   Yes.
22  Q.   And that it would have been docketed as -- when it was
23  docketed, it then became Government's Exhibits 2-A and 2-B?
24  A.   Yes.
25  Q.   I'm going to turn your attention to page 3 of Government's

1   Exhibit 2.  What name appears there?  In the signature line at
2   the bottom.
3   A.   Braswell D.A. Braswell.  I'm sorry.  Cyrus D.A. Braswell.
4   Q.   What's the date on that page?
5   A.   December 28, 2015.
6   Q.   Are you on --
7   A.   Page two.
8         THE COURT:  The received date.
9   BY MS. WITHERS:
10  Q.   It's the notice of proof of service.
11  A.   The proof of service date is December 15, 2005, it looks
12  like.
13  Q.   Look on the one that's -- it might be better quality on
14  the screen.  The one behind your microphone.  Is it on your
15  screen behind your microphone?
16        THE COURT:  On the screen.  Over my way.  Is that
17  document not appearing on the screen?
18        THE WITNESS:  Oh, it's not on my screen.  I've been
19  looking at that one.
20        THE CLERK:  Not coming on, judge.  It's telling me
21  that it's out of range, whatever that means.
22        THE COURT:  No?
23        THE CLERK:  It's not even letting me turn it on.
24        THE COURT:  Call IT.
25        MS. WITHERS:  Approach the witness with the document?

118

1          THE COURT:  You may approach the witness.

2     BY MS. WITHERS:

3     Q.  I believe you now have page three, the notice of proof of

4     service of Government's Exhibit 2?

5     A.  Yes.

6     Q.  And what date does it appear to be dated as having been

7     written?

8     A.  December 15, 2015.

9     Q.  And what's the received date at the top of the page?

10    A.  December 28, 2015.

11         MS. WITHERS:  May I approach the witness?

12         THE COURT:  You may.

13    BY MS. WITHERS:

14    Q.  I'm going to turn your attention to page seven of

15    Government's Exhibit 2.  There's a "4" written at the bottom

16    of the page though, but it's page 7 of the exhibit.  Are you

17    there?

18    A.  Yes.

19    Q.  Okay.  What name appears to be signed at the bottom of the

20    page?

21    A.  Mr. Cyrus D.A. Braswell.

22    Q.  And what's the date on that signature?

23    A.  December 15, 2015.

24         MS. WITHERS:  Your Honor, at this time the government

25    would move to admit Government's Exhibit 2 in its entirety.

1       THE COURT:  Any objection, Mr. Braswell?

2       Mr. Braswell has elected not to respond.

3  Government's Exhibit 2 will be admitted without objection.

4     (Government's Exhibit 2 was received.)

5       MS. WITHERS:  Permission to publish.

6       THE COURT:  You may.

7  BY MS. WITHERS:

8  Q.  Still on the same page.  I'm going to draw your attention

9  to the top of page 7, the middle of the first full paragraph.

10 Do you see where it says, "After my release from federal

11       prison, I am going to murder Federal District Court

12       Judge James Klansman Singleton"?

13 A.  Can you repeat where it's at, please?

14 Q.  Yes.  First full paragraph.  Starting one, two, three,

15 four lines in.  Do you see where it says that?  It says,

16       "After my release from federal prison, I am going to

17       murder Federal District Court Judge James Klansman

18       Singleton."

19 A.  Yes.

20 Q.  Is that the same Judge Singleton that you know from the

21 Court in Alaska?

22 A.  Yes.

23 Q.  "JKS" on the initials in the case number?

24 A.  Yes.

25 Q.  And that's the JKS assigned to the matter of Cyrus D.A.

1    Braswell versus United States?

2    A.   Yes.

3    Q.   I'm going to direct your attention to page three of

4    Government's Exhibit 2.  You have it?

5    A.   Page 3?

6    Q.   Uh-huh.  Not the one that's noted as page 3 at the bottom,

7    but the actual third page of the exhibit.  May I approach?

8              THE COURT:  You may.  Are we in 2?

9              MS. WITHERS:  Yes, Your Honor.  Page 3 of the

10   exhibit.

11             THE COURT:  Page 3 of the exhibit is the notice of

12   proof of service.

13             MS. WITHERS:  Page 4 of Government's Exhibit 2.  I

14   apologize, Your Honor.  That might be why the witness was

15   confused.

16   Q.   Ms. Suon, what does this appear to be on its face?

17   A.   It's the envelope.

18   Q.   Where is this envelope addressed?

19   A.   To the Federal District Court, Clerk of the Court.

20   Q.   And again, the clerk of court is a position held by a

21   person --

22   A.   Yes.

23   Q.   -- in the clerk's office in Anchorage, Alaska?

24   A.   Yes.

25   Q.   And is that a person with whom you are familiar?

121

1    A.   Yes.

2    Q.   Is that person a federal officer or employee?

3    A.   Yes.

4    Q.   I'm going to turn your attention to what has been marked

5    for identification purposes as Government's Exhibit 3-A.   Do

6    you have it?

7    A.   Yes.

8    Q.   Do you recognize this document?

9    A.   I do.

10   Q.   What do you recognize it to be?

11   A.   A pro se filing.

12   Q.   I'm going to turn your attention to the bottom right-hand

13   corner of the page.   Is this document certified as a true and

14   correct copy of a document filed in your office?

15   A.   Yes.

16   Q.   Who did the certification?

17   A.   Me.

18        MS. WITHERS:   Government moves to admit Government's

19   Exhibit 3-A.

20        THE COURT:   Any objection, Mr. Braswell?

21        Mr. Braswell has elected not to respond.   Exhibit 3-A

22   will be admitted into evidence without objection.   And may be

23   published.

24        (Government's Exhibit 3-A was received.)

25        MS. WITHERS:   Thank you.

1      THE COURT:  You may proceed.

2  BY MS. WITHERS:

3  Q.  Ms. Suon, what court was this document filed in?

4  A.  US District Court in Alaska.

5  Q.  What case was it filed in?

6  A.  In 3:97-CR-00068-JKS.

7  Q.  And that 3 came from the bottom?

8  A.  Yes.

9  Q.  JKS.  Would you remind the jury what those initials stand

10 for?

11 A.  That's for Judge James K. Singleton.

12 Q.  And that's the judge assigned to that case?

13 A.  Yes.

14 Q.  And what's the name of that case?

15 A.  USA versus Cyrus D.A. Braswell.

16      THE COURT:  Give me one moment here.  Just to see if

17 a quick touch might fix the screen.  If not, we'll take it up

18 at a break.

19      All right.  We'll revisit it at a break.  We'll have

20 to go the old fashioned way with the witness until we hit a

21 break and see if we can't get that fixed.  You may proceed.

22 BY MS. WITHERS:

23 Q.  What date was this document received in the clerk's

24 office?

25 A.  September 2nd, 2016.

1   Q.   How do you know that?

2   A.   The date stamp on the top.

3   Q.   Directing your attention to the bottom of the page.  We

4   have a case number?

5   A.   Yes.

6   Q.   And also a file date of September 2nd of 2016?

7   A.   Yes.

8   Q.   Is that date consistent with the date that this was

9   received in the clerk's office?

10   A.   Yes.

11   Q.   Turning your attention to what has been marked for

12   identification purposes as Government's Exhibit 3.  Did you

13   have a chance, before coming to court today, to review pages 1

14   through 15 of Government's Exhibit 3 and compare it to

15   Government's Exhibit 3-A?

16   A.   Yes.

17   Q.   Are pages 1 through 15 of Government's Exhibit 3 a

18   true -- of Government's Exhibit 3-A a true and correct copy of

19   Government's Exhibit 3?

20   A.   True.

21   Q.   Does that mean that Government's Exhibit 3 would have been

22   the original received document that you scanned and filed?

23   A.   Yes.

24   Q.   And once it was filed, then it became Government's Exhibit

25   3-A?

1    A.   Yes.

2    Q.   I'm going to turn your attention to page 14 of

3    Government's Exhibit 3.  And it is the one with the number at

4    the bottom.

5    A.   Yes.

6    Q.   What signature appears there?

7    A.   Cyrus D.A. Braswell.

8    Q.   What date appears there?

9    A.   August 28, 2016.

10   Q.   I'm going to direct your attention to the next page.  Very

11   bottom.  What signature appears there?

12   A.   Cyrus Braswell.

13   Q.   And what date appears there?

14   A.   August 28, 2016.

15        MS. WITHERS:  Your Honor, at this time the government

16   moves to admit pages one through 15 of Government's Exhibit 3.

17        THE COURT:  Any objection, Mr. Braswell?

18        Mr. Braswell has elected not to respond.  Exhibit 3,

19   pages 1 through 15, will be admitted.  And may be published.

20        MS. WITHERS:  Thank you.

21      (Government's Exhibit 3 was received.)

22   BY MS. WITHERS:

23   Q.   I'm going to direct your attention to page 3 of

24   Government's Exhibit 3.  You have it in front of you?

25   A.   Yes.

125

1   Q.  I'm going to direct your attention to the language at

2   paragraph, numbered paragraph 2, second from the bottom.  Do

3   you see where it says, "After my release from federal prison,

4           I will take the life of Federal District Court Judge

5           James Klansman Singleton, Junior"?

6   A.  Yes.

7   Q.  Is that the same James K. Singleton that you know from

8   Alaska?

9   A.  Yes.

10  Q.  The JKS assigned to the matter of Cyrus D.A. Braswell

11  versus United States?

12  A.  Yes.

13  Q.  To be clear, do you know Judge Singleton's middle name?

14  A.  No.

15  Q.  But you don't know it to be Klansman?

16  A.  Correct.

17  Q.  But you do know his first name is James?

18  A.  Yes.

19  Q.  And his last name is Singleton?

20  A.  Yes.

21  Q.  And his middle initial is K.?

22  A.  Yes.

23  Q.  I'm going to turn your attention to the next to last page

24  of Government's Exhibit 3.  What does this appear to be on its

25  face?

1    A.   The address on an envelope.

2    Q.   Where is the envelope addressed?

3    A.   To the Federal District Court, Clerk of the Court.

4    Q.   And again, I believe you indicated earlier is the clerk of

5    court a position held by a person?

6    A.   Yes.

7    Q.   And that's a person in the clerk's office?

8    A.   Yes.

9    Q.   Is that person a federal officer or employee?

10   A.   Yes.

11          MS. WITHERS:  No further questions.

12          THE COURT:  Mr. Braswell, do you have any

13   cross-examination for this witness?

14          Mr. Braswell has elected not to respond.  I interpret

15   that as an indication that he does not wish to cross-examine

16   this witness.  May this witness be excused?

17          MS. WITHERS:  Yes, Your Honor.

18          THE COURT:  Thank you, ma'am.  You're free to go.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  The government's next witness.

21          MS. WITHERS:  The government calls to the stand James

22   Johnson.

23                        **JAMES JOHNSON**,

24   called as a witness on behalf of the Government, having been

25   first duly sworn, testified as follows:

1      THE CLERK:  Please be seated.  Will you please state

2  your full name and spell your first and last name for the

3  record.

4      THE WITNESS:  James Johnson.  J-A-M-E-S

5  J-O-H-N-S-O-N.

6                    DIRECT EXAMINATION

7  BY MS. WITHERS:

8  Q.  Good afternoon.

9  A.  Good afternoon.

10  Q.  Would you please tell the jury where you work.

11  A.  I work for the United States Marshals Service in

12  Anchorage, Alaska.

13  Q.  How long have you been employed with the United States

14  Marshals Service in Anchorage Alaska?

15  A.  In Anchorage Alaska, for about ten and a half years.

16  Q.  What positions have you held with the United States

17  Marshals Office?

18  A.  Operational deputy, task force team leader, canine handler

19  and most recently the judicial security inspector.

20  Q.  How long have you been a judicial security inspector?

21  A.  Approximately the last five years.

22  Q.  Do you have law enforcement experience prior to your time

23  with the Marshals Service?

24  A.  I do.  I've got experience with the Sheriff's Department

25  back home in Montana as well as state prison system in North

Johnson - D.

128

1 Dakota.

2 Q.  In the scope of your current duties with United States

3 Marshals Office, what do they entail?

4 A.  Current duties of judicial security inspector, I oversee

5 the physical security for all the federal courthouses in

6 Alaska, District of Alaska.  I also oversee the personal and

7 physical security for what we refer to as our protectees.  So

8 the judiciary, the courts in general and any member of that

9 family.

10 Q.  When you say "judiciary," does that include judges?

11 A.  It does.

12 Q.  Do your protective duties provide threat assessment

13 training?

14 A.  Absolutely.

15 Q.  Would you briefly describe that training to the jury?

16 A.  Some threat assessment training is covered in judicial

17 service basic, which is a two-week program.  There's also

18 additional add-on training I've been to to include train a

19 trainer.  I'm now a judicial security inspector trainer, so I

20 help train new judicial security inspectors.  But it covers a

21 very large gamut of inappropriate communications or threats

22 and mitigation.

23 Q.  Are you familiar with someone by the name of James K.

24 Singleton?

25 A.  I am.

1  Q.  How do you know that person?

2  A.  He's one of my protectees as a judge in Alaska.

3  Q.  What kind of a judge in Alaska?

4  A.  He's a Senior Federal District Judge.

5  Q.  Are you familiar with his middle name?

6  A.  I am.

7  Q.  What does the K. Stand for?

8  A.  Keith.

9  Q.  How do you know that James Keith Singleton is a federal

10 judge?

11 A.  I've interacted with him professionally, both as an in

12 courtroom deputy when he's presided on the bench.  But also as

13 a judicial security inspector, I debrief and train with him at

14 least once a year.  I've been in his chambers.  Interact with

15 him in his official capacity as a judge.

16 Q.  I want to turn your attention to what has been marked for

17 identification purposes as Government's Exhibit 4.  You should

18 have a binder in front of you.  Are you there?

19 A.  I am.  Sorry.

20 Q.  By any chance is the screen in front of you working?

21 A.  It is not.

22 Q.  What is the apparent title of Government's Exhibit 4?

23 A.  Oath of Office for United States judges.

24 Q.  Who is this oath of office for?

25 A.  Appears to be for James K. Singleton.

1    Q.  In the scope of your duties, are you generally familiar

2    with similar documents to this?

3    A.  I am.  I've had several judges that go through their

4    investiture while I was their judicial security inspector, and

5    this is documentation I'm familiar with.

6    Q.  Okay.  And is the document in front of you consistent with

7    other oaths of office that you've seen?

8    A.  It is.

9           MS. WITHERS:  Your Honor, at this time the government

10   would move to admit Government's Exhibit 4.

11          THE COURT:  This was the subject of a pretrial ruling

12   as well.  Any objection for the record, Mr. Braswell?

13          Mr. Braswell has elected not to respond.  Exhibit 4

14   will be admitted into evidence without objection.  May be

15   published.

16          MS. WITHERS:  Thank you.

17      (Government's Exhibit 4 was received.)

18   BY MS. WITHERS:

19   Q.  You indicated that this oath of office appears to be for

20   James K. Singleton?

21   A.  Correct.

22   Q.  He's being -- what kind of judge is he being invested as?

23   A.  A United States District Judge.

24   Q.  Where is he located?

25   A.  In Anchorage, Alaska.

1  Q.  And based upon your personal knowledge, I believe you

2  indicated earlier that James K. Singleton is still a United

3  States District Judge in Anchorage, Alaska?

4  A.  Yes, he is.

5  Q.  Are you familiar with Judge Singleton's signature?

6  A.  I am, yes.

7  Q.  How are you familiar with that signature?

8  A.  Again, through almost ten years of filings and dealing

9  with the judge himself.  I've seen and handled documents and

10 filings with his signature on it.

11 Q.  Taking a look at Government's Exhibit 4.  Based upon your

12 familiarity with Judge Singleton's signature, does that

13 signature appear to be consistent?

14 A.  It does, yes.

15 Q.  And just to be clear.  What's the date on this document?

16 A.  It says August 1st, 1990.

17 Q.  Are you familiar with an individual by the name of Cyrus

18 Braswell?

19 A.  I am.

20 Q.  How are you familiar with that person?

21 A.  I'm familiar with him regarding some filings that he has

22 sent to Judge Singleton.

23 Q.  In your role as an individual assigned to protect Judge

24 Singleton, are you familiar with the connection between Cyrus

25 Braswell and Judge Singleton?

1   A.  Yes.

2           MS. WITHERS:  Your Honor, at this time it might be

3   appropriate to give the jury an instruction.

4           THE COURT:  Ladies and gentlemen, you are about to

5   hear testimony and/or see evidence that the defendant was

6   previously convicted of a federal crime and was in custody at

7   certain relevant times.  This evidence will be admitted only

8   for limited purposes.

9           You may consider this evidence only for the purpose

10  of deciding whether the defendant:  One, had the state of

11  mind, knowledge or intent necessary to commit the crimes

12  charged in the superseding indictment.  Two, had a motive or

13  the opportunity to commit the acts charged in the superseding

14  indictment.  And three, is the person who committed the crimes

15  charged in the superseding indictment.

16          You may consider this evidence to help you decide

17  whether the defendant mailed or arranged to have mailed the

18  charged communications.  Do not consider this evidence for any

19  other purpose.

20          Of course, it is for you to determine whether you

21  believe this evidence.  And if you do believe it, whether you

22  accept it for the purpose offered.  You may give it such

23  weight as you feel it deserves.  But only for the limited

24  purpose that I have described to you.  The defendant is not on

25  trial for committing these other acts.

1          You may not consider the evidence of these other acts

2     as a substitute for proof that the defendant committed the

3     crimes charged.  You may not consider this evidence as proof

4     that the defendant has a bad character or any propensity to

5     commit crimes.  Specifically, you may not use this evidence to

6     conclude that because the defendant may have acted -- may have

7     committed the other acts, he must have also committed the acts

8     charged in the superseding indictment.

9          Remember that the defendant is on trial here only for

10    violations of Section 876(c) of Title 18 of the United States

11    Code, mailing threatening communications on or about the dates

12    charged in the superseding indictment.  Not for these other

13    acts.  Do not return a guilty verdict unless the government

14    proves the crimes charged in the superseding indictment beyond

15    a reasonable doubt.

16         You may proceed.

17         MS. WITHERS:  Thank you.

18    Q.  I believe you indicated that you are familiar with the

19    connection between Cyrus Braswell and Judge Singleton?

20    A.  I am.

21    Q.  Would you briefly tell the jury what that is.

22    A.  I understand that Mr. Braswell was eventually sentenced by

23    Judge Singleton in a federal matter in Anchorage, Alaska.

24    Q.  I'm turning your attention to what has been marked for

25    identification purposes as Government's Exhibit 5.  What does

Johnson - D

134

1  this document appear to be on its face?

2  A.  It looks like my 5 might be different than what's on the

3  monitor.

4         MS. WITHERS:  May I approach?

5         THE COURT:  You may.

6  BY MS. WITHERS:

7  Q.  What does Government's Exhibit 5 appear to be on its face?

8  A.  This is a judgment and commitment.  What we refer to as a

9  J & C.

10  Q.  Okay.  Have you ever seen the original unredacted version

11  of this document?

12  A.  I have.

13  Q.  Where?

14  A.  I maintain a copy of this in my case file.

15         MS. WITHERS:  Your Honor, at this time the government

16  moves to admit Government's Exhibit 5?

17         THE COURT:  Any objection, Mr. Braswell?

18         Mr. Braswell has elected not to respond.  Therefore,

19  Exhibit 5 is admitted without objection and may be published.

20     (Government's Exhibit 5 was received.)

21         MS. WITHERS:  Thank you.

22  Q.  You indicated that you keep a copy of the unredacted

23  version of this document in your investigative file.

24  Government's Exhibit 5 appears consistent?

25  A.  Yes, it does.

1    Q.   What court is this document from?

2    A.   United States District Court, District of Alaska.

3    Q.   In what case?

4    A.   The United States of America versus Cyrus D.A. Braswell.

5    Q.   Who is the presiding judge?

6    A.   That would be Judge James K. Singleton.

7    Q.   And that's the James K. Singleton that you know personally

8    as a judge in Anchorage?

9    A.   The same.

10   Q.   You indicated earlier you have familiarity with Judge

11   Singleton's signature?

12   A.   I do.

13   Q.   Does the signature that appears on the first page of

14   Government's Exhibit 5 appear consistent with what you know to

15   be Judge Singleton's signature?

16   A.   It does.

17   Q.   I'm going to direct your attention to kind of the middle

18   of the page.  It reads, "Defendant's USM number."  Would you

19   please read that number out to the jury?

20   A.   The number is 13356-006.

21   Q.   What is that number?

22   A.   That is Mr. Braswell's United States Marshals Service

23   number.

24   Q.   Is it a unique identifier?

25   A.   It is.

1   Q.   Is there any way to tell from this number where the

2   defendant's case originated?

3   A.   Yes.  So the last three digits of any USM number

4   represents the originating marshal service office.  And I know

5   that 006 stands for the District of Alaska.

6   Q.   Did there come a time, in the scope of your protection of

7   Judge Singleton, that you received documents from the clerk's

8   office apparently authored by Cyrus Braswell?

9   A.   Yes.

10  Q.   Was there a particular clerk who generally sent those to

11  you?

12  A.   Yes.

13  Q.   What was that clerk's name?

14  A.   Pisa.  Pisa Suon.

15  Q.   What did you do with those documents that you received

16  from the clerk's office?

17  A.   Any originals received would be scanned into the database

18  and then the originals would be retained in the case file, my

19  investigative case file.

20  Q.   The versions that you scanned in to your system at the

21  time you received them, did you have an opportunity to review

22  those scanned versions in your system before coming to court

23  today?

24  A.   Yes.

25  Q.   And to compare them to Government's Exhibits 1, 2 and 3?

1    A.   I did.

2    Q.   I'm turning your attention to Government's Exhibit 1.   I

3    believe pages one and two are already in, so I would ask to

4    publish them.

5              Do you recognize this document?

6    A.   I do.

7    Q.   How do you recognize it?

8    A.   Again, from my investigation, having received them and

9    loading them into my system.   I recognize these from my

10   investigative case file.

11   Q.   What is it specifically?

12   A.   Exhibit 1, it appears -- or is labeled as Affidavit for

13   Recusal.   Document sent from Cyrus to the District Court in

14   Alaska.

15   Q.   Did you compare this document to the records in your

16   electronic file before coming to court today?

17   A.   I did.

18   Q.   And it's consistent?

19   A.   It is.

20   Q.   What court was this document to be filed in?

21   A.   District Court for the District of Alaska.

22   Q.   And in what case was it to be filed?

23   A.   Cyrus Braswell versus United States of America.

24   Q.   I'm going to direct your attention to the case number on

25   the right-hand side.   What do the letters "JKS" at the end of

1  that case number mean?

2  A.  Those represent the initials of Judge Singleton.

3  Q.  Is he the judge assigned to that case?

4  A.  He is.

5  Q.  I'm going to turn your attention to page two.  What name

6  appears in the signature block?

7  A.  Mr. Cyrus D.A. Braswell.

8  Q.  I'm going to direct your attention to that registration

9  number.  Is that number consistent with Mr. Braswell's USMS

10  number from the judgment and commitment?

11  A.  Yes, it is.

12  Q.  I'm also going to direct your attention to the bottom of

13  page 1, beginning with "after."  The very last line.  "After

14  my release."

15  A.  Okay.

16  Q.  Would you please read that to the top of the next page.

17  A.  The top line of the next page?

18  Q.  Yes.

19  A.  Okay.  "After my release from federal prison, I am going

20      to murder Federal District Court Judge James Klansman

21      Singleton."

22  Q.  What was your reaction upon reading that line and the

23  subsequent paragraphs that appear below it?

24  A.  This is -- my training and experience tells me this is an

25  obvious and outward threat towards my judge.

1  Q.  I'm going to draw your attention to the last sentence of

2  that first incomplete paragraph.  It lists the name James

3  Klansman Singleton.

4  A.  Yes.

5  Q.  And then an address appears there.

6  A.  Correct.

7  Q.  That's 11531 Rockridge Drive in Anchorage, Alaska.

8  A.  Correct.

9  Q.  Upon reading this address, did you take any protective

10 measures with respect to that address?

11 A.  I did.

12 Q.  What were those measures?

13 A.  I verified to ensure that the judge no longer resided

14 there.  Furthermore, made sure that none of the judge's

15 immediate family or friends resided at that address.

16 Q.  So at the time that this was written, the judge no longer

17 resided --

18 A.  Correct.

19 Q.  -- at that address.

20         Okay.  I'm going to draw your attention to the next

21 page.  What does this appear to be on its face?

22 A.  Appears to be the outside of an envelope.

23 Q.  Are you familiar with that envelope?

24 A.  I am.

25 Q.  How are you familiar with that envelope?

1   A.  Familiarity with the documents in my case file.  It has

2   some very recognizable characteristics to me.

3   Q.  Where did you get it?  You said it's in your case file.

4   How did it end up in your case file?

5   A.  This would have come down from the clerk's office along

6   with the original documentation.

7   Q.  And that's the document that we were just discussing?

8   A.  Correct.

9   Q.  Where's this envelope addressed?

10  A.  It's addressed to Federal District Court, Clerk of Court.

11  Q.  Where did it come from?  What's the return address on it?

12  A.  Return address is from Mr. Cyrus D.A. Braswell.

13  Q.  And there's a registration number there.  Is that

14  consistent with Mr. Braswell's USMS number from the judgment

15  and conviction?

16  A.  Yes, it is.

17  Q.  What would you have done with this envelope when you

18  received it?

19  A.  This envelope would have been scanned in along with the

20  original documents.  And then kept with the original documents

21  in my investigative file.

22       MS. WITHERS:  Your Honor, at this time the government

23  moves to admit the envelope associated with Government Exhibit

24  1, which in the copy version would be 3 and 4.  But it's one

25  envelope.

Johnson - D

141

1    THE COURT:  Didn't follow that.  What exhibit page
2    are you moving to admit?
3    MS. WITHERS:  Government's Exhibit 1, pages 3 and 4
4    are the front and back.
5    THE COURT:  Mr. Braswell, any objection?
6    Mr. Braswell has elected not to respond.
7    Government's Exhibit 1, pages 3 and 4 will be admitted without
8    objection and may be published.
9    (Government's Exhibit 1 (Pages 3 and 4) was received.)
10   MS. WITHERS:  Thank you.
11   Q.  You indicated that this -- did you indicate where this
12   envelope is addressed?
13   A.  I did.
14   Q.  And where is it addressed?
15   A.  Federal District Court, Clerk of Court.
16   Q.  And that's in Anchorage, Alaska?
17   A.  Yes.
18   Q.  In your role as a United States Deputy Marshal in the
19   District Court in Anchorage Alaska, do you know the clerk of
20   court?
21   A.  Yes, I do.
22   Q.  Is that a person --
23   A.  Yes.
24   Q.  -- who holds a particular position?
25   A.  Yes.

1  Q.  Do you know that person?

2  A.  I do.

3  Q.  Is that person a federal officer or employee?

4  A.  Yes.

5  Q.  You indicated earlier that your protective duties

6  essentially include the judiciary as a whole.

7  A.  Correct.

8  Q.  Does the clerk of court fall within your protective scope?

9  A.  Absolutely.

10 Q.  Turning your attention to Government's Exhibit 2.  Do you

11 recognize this document?

12 A.  I do.

13 Q.  How do you recognize it?

14 A.  Again, this appears to be a representation of what I

15 maintain in my case file.  It was a filing from Mr. Braswell.

16 Q.  Did you compare it with the records in that electronic

17 file before coming to court today?

18 A.  I did.

19 Q.  And that's consistent?

20 A.  It is.

21 Q.  What court was this document to be filed in?

22 A.  United States District Court, District of Alaska.

23 Q.  And in what case?

24 A.  Cyrus Braswell versus United States of America.

25 Q.  Again referring you to the case number.  What do the

1    letters "JKS" at the end of the case number stand for?

2    A.   The initials of Judge Singleton.

3    Q.   Who is assigned to the case?

4    A.   Correct.

5    Q.   Turning your attention to page three.  And at this point

6    I'm going to approach if that's okay.

7              THE COURT:  You may.

8    BY MS. WITHERS:

9    Q.   What name appears -- what names appears in the signature

10   line at the bottom of that page?

11   A.   Mr. Cyrus D.A. Braswell.

12   Q.   Towards the middle of the page, do you see where it says

13   Certificate of Service Rule 32-B-4 or E-4?

14   A.   I do.

15   Q.   Would you please -- where does Mr. Braswell swear under

16   penalty of perjury that he's mailing this from?

17   A.   According to this document, he does that underneath the

18   certificate of service rule.

19   Q.   Where does he swear that he's sending it from?

20   A.   Oh, I'm sorry.  From FCI Mendota.

21   Q.   I'm going to direct your attention to the very last page

22   of that exhibit.  What name --

23   A.   Okay.

24   Q.   What name appears in the signature block there?

25   A.   Mr. Cyrus D.A. Braswell.

1    Q.   And what's the date on that?

2    A.   December 15th, 2015.

3    Q.   I'm going to direct your attention to the top of that

4    page, that's page 4.  Beginning with the first full paragraph.

5    Would you please start the third line at the end, "After my

6    release" for the next two lines.  If you would.

7    A.   Okay.  It says, "After my release from federal prison, I'm

8             going to" quote, unquote "murder Federal District

9             Court Judge James Klansman Singleton."  All -- okay.

10   Q.   That's enough.  And what was your reaction upon reading

11   that language and then the paragraphs that follow?

12   A.   This is a -- in my experience, this is a very plain threat

13   towards Judge Singleton.

14   Q.   I think we covered this earlier.  But the residential

15   address that's listed at the bottom of that first full

16   paragraph.

17   A.   Yes.

18   Q.   You took certain protective measures with respect to that

19   address.

20   A.   Right away, yes.

21   Q.   I believe you testified earlier that that was a former

22   address for Judge Singleton?

23   A.   It is.

24   Q.   I'm going to direct your attention to -- I believe it's

25   page 3 of that exhibit.  The front of an envelope.  Oh, it's

1   page 4.  We just went over that.  Sorry.

2   A.  Okay.  Yes.

3   Q.  Where is this envelope addressed?

4   A.  It is addressed to Federal District Court, Clerk of Court,

5   Anchorage, Alaska.

6   Q.  And again, you testified that the clerk of court is a

7   person in the clerk's office in Anchorage?

8   A.  Yes.

9   Q.  And it's a federal officer or employee?

10  A.  Yes.

11  Q.  With respect to the return address, whose name appears

12  there?

13  A.  Mr. Cyrus D.A. Braswell.

14  Q.  Registration number, is that the registration number

15  consistent with the USMS number for Mr. Braswell on his

16  judgment and commitment?

17  A.  Yes, it is.

18        MS. WITHERS:  May I approach and retrieve that

19  document?

20        THE COURT:  You may.

21  BY MS. WITHERS:

22  Q.  I'm turning your attention to Government's Exhibit 3.  Do

23  you recognize this document?

24  A.  I do.

25  Q.  How do you recognize it?

1  A.  This is another filing I'm familiar with as one that I

2  maintain in my case file.

3  Q.  Did you compare it to the records in your electronic case

4  file before coming to court today?

5  A.  I did.

6  Q.  Is it consistent with what you scanned in at the time of

7  receipt?

8  A.  Yes, it is.

9  Q.  What court was this document to be filed in?

10  A.  United States District Court for the District of Alaska.

11  Q.  In what case?

12  A.  Cyrus D.A. Braswell versus the United States of America.

13  Q.  Referring to the case number at the top right-hand, what

14  do the letters "JKS" at the end of the case number mean?

15  A.  Those are Judge Singleton's initials.

16  Q.  The judge assigned to that case?

17  A.  Correct.

18  Q.  Turning your attention to page 14 of this exhibit.

19  A.  Okay.

20  Q.  What name appears in the signature block?

21  A.  Cyrus D.A. Braswell.

22  Q.  And what's the date?

23  A.  It says it's executed on the 28th day of August, 2016.

24  Q.  Directing your attention to the next page.  Whose name

25  appears at the bottom -- at the signature block at the bottom?

1    A.   Cyrus Braswell.

2    Q.   And what date?

3    A.   August 28th, 2016.

4    Q.   Again, I'm going to refer your attention to the middle.

5    If your copy isn't good enough, I can hand you the original.

6    Where it says Certificate of Service Rule 32-E-4.

7    A.   Yes.

8    Q.   From where does Cyrus Braswell swear under penalty of

9    perjury that he is mailing this document from?

10   A.   FCI Mendota.

11   Q.   And where is that located?

12   A.   It gives a P.O. Box in Mendota, California.

13   Q.   Referring back to page 3.  Specifically the last three

14   numbered paragraphs.

15   A.   Okay.

16   Q.   I'm going to refer your attention specifically to numbered

17   paragraph two.  Do you see that paragraph?

18   A.   I do.

19   Q.   Would you please read that aloud for the jury.

20   A.   Number two.  "Petitioner avers after my release from

21            federal prison, I will take the life of Federal

22            District Court Judge James Klansman Singleton, Junior

23            for the false imprisonment imposed against me."

24   Q.   To be clear, "Klansman" is not the judge's middle name?

25   A.   It is not.

148

1    Q.   Page 11.   Numbered paragraph 1, the second from the

2    bottom.   Is that language also consistent with the language

3    you just read from page three?

4    A.   It is consistent.

5    Q.   "After my release from federal prison, I will murder

6              Federal District Court Judge James Klansman

7              Singleton, Junior."

8    A.   Correct.

9    Q.   And the next page, numbered paragraph four.   Again you see

10   that address we've been talking about, 11531 Rockridge Drive?

11   A.   Yes.

12   Q.   Upon reading these specific paragraphs, what was your

13   reaction?

14   A.   That these are continued and blatant threats against Judge

15   Singleton.

16   Q.   With respect to that address, you indicated you took

17   certain protective measures?

18   A.   Yes.

19   Q.   But the judge no longer lived there.

20   A.   Correct.

21   Q.   I'm directing your attention to the next to last page of

22   Government's Exhibit 3.   What is this document?   Or what does

23   this appear to be on its face?

24   A.   Appears to be a large manila envelope.

25   Q.   Are you familiar with this envelope?

1   A.   I am.

2   Q.   How are you familiar with it?

3   A.   It's something that I retained in my investigative case

4   file, the original.

5   Q.   Why did you maintain it in your case file?

6   A.   After I scanned it into our system, I maintained it as

7   further correspondence from Mr. Braswell.

8   Q.   So this is an envelope that correspondence from Mr.

9   Braswell came in?

10  A.   Correct.

11  Q.   From the clerk's office?

12  A.   Correct.

13  Q.   Where is this envelope addressed?

14  A.   Federal District Court, Clerk of the Court.

15  Q.   And in which city and state?

16  A.   Anchorage, Alaska.

17  Q.   You indicated you maintained this in your case file?

18  A.   I did.

19        MS. WITHERS:  Your Honor, at this time the government

20  would move to admit pages 16 and 17 of Government's Exhibit 3,

21  the front and back of this envelope.

22        THE COURT:  Any objection, Mr. Braswell?

23        Mr. Braswell has elected not to respond.  Exhibit 3,

24  pages 16 and 17, will be admitted without objection and may be

25  published.

1       (Government's Exhibit 3 (Pages 16 and 17) was received.)

2   BY MS. WITHERS:

3   Q.   You indicated that this is addressed to the clerk of

4   court?

5   A.   Yes.

6   Q.   Again, you indicated that the clerk of court is a person

7   in the clerk's office in Anchorage?

8   A.   Yes.

9   Q.   A person you're familiar with?

10  A.   Yes.

11  Q.   That person is a federal officer or employee?

12  A.   Yes.

13  Q.   Turning your attention to the return address.  Whose name

14  appears in the return address?

15  A.   Mr. Cyrus D.A. Braswell.

16  Q.   The registration number below the name, is that

17  registration number consistent with the USMS number noted on

18  Mr. Braswell's judgment and commitment?

19  A.   Yes, it is.

20  Q.   You indicated that you received these mailings from the

21  clerk's office; you scanned them; you kept the originals in

22  your case file.  Did there come a time when you took

23  additional action with respect to these documents?

24  A.   Yes.

25  Q.   Did you initiate any kind of broader investigation?

1    A.  I did.

2    Q.  What did you do?

3    A.  At some point during receiving these filings, I reached

4    out and shared my findings with Mendota.

5    Q.  Why Mendota?

6    A.  Some open source research showed that that's where these

7    were coming from.

8    Q.  You indicated you scanned these in.  When you contacted

9    Mendota, did you also followup with -- did you provide them

10   with copies of these items?

11   A.  I did.  I provided them with scanned copies for content.

12   Q.  How did you do that?

13   A.  Scanned them in my office and emailed them to them.

14   Q.  What about the originals, how did they come to be in court

15   today?

16   A.  The originals, my entire case file was at some point

17   packaged up and sent to the FBI.

18   Q.  In Fresno?

19   A.  In Fresno.

20        MS. WITHERS:  No further questions.

21        THE COURT:  Any cross-examination of this witness,

22   Mr. Braswell?

23        Mr. Braswell has elected not to respond.

24        The witness is free to go and is excused.  Thank you,

25   sir.

1          THE WITNESS:  Thank you.

2          THE COURT:  Let's take our afternoon recess at this

3    time.  Remember, ladies and gentlemen, until this trial is

4    over, do not discuss this case with anyone including your

5    fellow jurors, members of your family, people involved in the

6    trial or anyone else and do not allow others to discuss the

7    case with you.  This includes discussing the case in person,

8    in writing, by phone or electronic means, via email, via text

9    messaging or any internet chatroom, blog, website or other

10   application, including but not limited to Facebook, YouTube,

11   Twitter, Instagram, LinkedIn, Snapchat or any other forms of

12   social media.

13          If anyone tries to communicate with you about the

14   case, please let me know about it immediately.  Do not read,

15   watch or listen to any news reports or other accounts about

16   the trial or anyone associated with it, including any

17   information appearing online.  Do not do any research, such as

18   consulting dictionaries, searching the internet or using other

19   reference materials.  And do not make any investigation about

20   the case on your own.

21          Finally, keep an open mind until all the evidence has

22   been presented, you've heard any arguments of counsel or the

23   parties, my instructions on the law and the views of your

24   fellow jurors.  If you need to speak with me about anything,

25   simply give a signed note to my courtroom deputy Jami or my

1   law clerk Sam.  We will reconvene at 3:30.

2        (The jury left the courtroom.)

3        THE COURT:  Let the record reflect that we're outside

4   the presence of the jury.  I think, based upon this schedule,

5   that we're likely to break for the evening either at the close

6   of the government's case in chief, or maybe it won't even be

7   all the way in.  But I do want to try to get this jury

8   instruction packet as final as I can get.

9        And I've given the long version limiting instruction.

10  Now, there's also -- and I said originally that I was just

11  going to give it twice.  Although it would have to be modified

12  a bit to give them a final packet.  And the other option there

13  is Ninth Circuit model instruction 4.6, which is a shorter

14  instruction that the government proposed, but also suggested

15  be modified to be broadened.  And I'm just -- I think that's

16  the last instruction that we've got a question in our mind

17  about.

18       MR. SHERRIFF:  So would the Court like us to address

19  that now?

20       THE COURT:  Yeah.

21       MR. SHERRIFF:  Okay.  So the intent behind that, Your

22  Honor, was that this instruction, the first prong of it is

23  actually intended to address the 609 situation where the

24  defendant testifies and the --

25       THE COURT:  Which instruction are you talking about?

1    MR. SHERRIFF:  I'm talking about the instruction you

2  just were referring to, Ninth Circuit model instruction 4.6.

3    THE COURT:  Right.

4    MR. SHERRIFF:  So the first prong in the government's

5  proposal is actually straight out of the instruction because

6  that instruction is actually -- at least my understanding is,

7  is intended to address the situation where the defendant

8  testifies and the prior conviction is coming in for

9  impeachment.  We don't have that -- well, we're not there yet

10 so I don't want to speak too soon.  But I expect we won't have

11 that situation.

12    And so the only relevant part would be the second

13 prong, which is really captured by the instruction the Court's

14 already read.  We just -- it -- if the Ninth Circuit model

15 instruction had -- if the defendant were to testify and the

16 entire conviction came in to impeach credibility of the

17 testimony, then the Ninth Circuit instruction on that would be

18 somewhat misleading if we didn't add the second part of the

19 language because it had already come in for another purpose.

20 And so that was the intent behind that instruction.  But

21 since -- if we don't have testimony that really doesn't

22 require that instruction.

23    THE COURT:  You --

24    MR. SHERRIFF:  Lost you?

25    THE COURT:  -- confused me and lost me in your

1 │ reference to "that instruction."  I don't know which
2 │ instruction you're referring to.
3 │       MR. SHERRIFF:  Okay.
4 │       THE COURT:  What's the governments view of what I
5 │ should give if Mr. Braswell elects not to testify?
6 │       MR. SHERRIFF:  If he elects not to testify, then I
7 │ think model instruction 4.6 doesn't apply.  However, it -- the
8 │ Court, I guess at the Court's discretion, could give
9 │ a -- could reiterate the 404(b) instruction, 404(b) like
10 │ instruction that was already previously given.  But I don't
11 │ think that's necessary.  And it may highlight the issue again.
12 │ I don't have a view on that.  Normally I would defer to the
13 │ defense as to whether they want the instruction read twice or
14 │ just the one time.
15 │       THE COURT:  All right.  Now, one other matter.  Ms.
16 │ Hopkins has indicated to my courtroom deputy that she wishes
17 │ to raise another issue as the Court appointed standby counsel.
18 │ Limited standby counsel.
19 │       MS. HOPKINS:  Yes, Your Honor.  I'm just -- at this
20 │ point, I certainly have questions in my mind about Mr.
21 │ Braswell's competency.  I just wanted to take an opportunity
22 │ to address that with the Court.  If the Court has any concern
23 │ regarding competency whatsoever, it's obligated sua sponte to
24 │ order that Mr. Braswell's competency be assessed.  And at this
25 │ point, I don't know if Mr. Braswell understands the trial

1  rights that he actively waives in remaining silent throughout

2  this trial.  Or if there's something further going on related

3  to his competency more generally.  But I have concerns given

4  what's happened so far in trial.  And I just wanted to make

5  sure the Court took an opportunity to address that.

6          THE COURT:  Ms. Hopkins, do you have any basis for

7  the concern, other than the actions that -- the strategic

8  actions, I might add, that Mr. Braswell has taken here during

9  the course of the trial?

10         MS. HOPKINS:  Well, Your Honor, in reviewing the

11 motions that have been filed by Mr. Braswell, many of them do

12 not appear to grasp the core issues at trial.  And as the

13 Court indicated earlier, it's difficult at times to understand

14 his attempts to articulate his defense theory.  Largely

15 because his defense theory is not based on facts relevant to

16 this trial.  It's based on a fixation of facts that are

17 superfluous.  And so that also gives me concern.  But mostly I

18 wanted to remind the Court that if it has any concern

19 whatsoever, apart from my concern, that it needs to be

20 assessed before we proceed.

21         THE COURT:  Personally, I don't now nor have I ever

22 had any concern regarding Mr. Braswell's competency.  And I

23 can only believe that Magistrate Judge McAuliffe, before whom

24 Mr. Braswell appeared several times, had no concerns as well.

25 I have not had any concerns.

1          Because, from my point of view, I think Mr. Braswell,

2     two final pretrial conferences, today, I think one prior

3     motions hearing.  I think he's appeared in front of me at

4     least four times, maybe five.  Mr. Braswell to me has always

5     seemed quite competent, quite articulate, intelligent.  I

6     disagree with his views regarding the law and I've rejected

7     the arguments that he's made regarding the law and how he

8     believes it applies in his case consistently, because I don't

9     find his positions -- haven't found his positions to be

10    supported by the law.  But the same can be said for a lot of

11    lawyers that appear in front of me.

12         Mr. Braswell, though at times, testing the bounds of

13    appropriate courtroom conduct, has not acted out or disrupted

14    these proceedings.  And certainly not in front of the jury.

15    When he's become unhappy with me, it's almost always, in my

16    experience, been when I've tried to engage him in some

17    conversation regarding the basis for his legal theories.  And

18    I think he becomes frustrated with me because he believes that

19    I either haven't read his materials or that I don't understand

20    him.

21         I have always read his materials.  He's right that I

22    don't -- I often haven't understood the basis for his claims.

23    And I've tried to really put my imagination to work in trying

24    to cobble together a way to understand the points that he

25    thinks are important to make.  And I haven't found him to be

1    persuasive.  But they've never suggested to me that he's not

2    competent.

3         I think Mr. Braswell knows exactly what he's doing.

4    That he's making a strategic choice.  I think it's the wrong

5    choice.  I've tried to -- in my view, the wrong choice even

6    under the law.  I tried very much to advise Mr. Braswell that

7    I felt that he could both preserve his right to appeal from my

8    adverse decisions that he disagrees with, while at the same

9    time participating in the trial.

10        He has convinced himself, based upon a case that he's

11   focused on, that if he were to cooperate and participate in

12   this trial, that somehow he believes that, as a matter of law,

13   that would be a waiver of his right to present a defense and

14   would, therefore, forfeit the issue on appeal.  I've told him

15   several different ways, every way I can, that I think he's

16   wrong about that as a matter of law.  I've tried as best I can

17   to lay it out.

18        But I don't think it's a lack of competence.  I think

19   Mr. Braswell can be pretty stubborn.  And once he's got his

20   teeth sunk in, he's not letting go of what he thinks is right.

21   He believes he's right and that I'm wrong.  And that the way

22   that he's proceeding is the best way to take the case up to

23   the Ninth Circuit Court of Appeal on appeal and have my

24   decisions reviewed and argue to the higher court whether I've

25   erred.

1           I think it would be presumptuous of me to say that

2     that's some sign of incompetence.  It is a sign of a strong

3     stubborn streak.  And I think an incorrect assessment of what

4     the law is.  But I don't think it's a sign of incompetence.  I

5     think he knows what he's doing, fully appreciates it and he's

6     an articulate smart guy.  So he's got a right to represent

7     himself.  He's been adamant he wants to do so.  He doesn't

8     want your assistance or help.  He's been real clear about

9     that.  And that only -- as he says, only I can represent me.

10    And he's made that very clear.

11          And he's got a right to do that.  And he's got a

12    right to make the strategic decisions that goes along with it

13    and he's made it.  So I have no sua -- no feeling sua sponte

14    that I should make any inquiry as to competence at all.

15    There's nothing in front of me that would suggest that that's

16    necessary or appropriate.

17          Does the government have anything they wish to put on

18    the record?

19          MR. SHERRIFF:  Your Honor, we agree with that.  And

20    certainly based on the discussion this morning before the jury

21    came in, it was quite clear that Mr. Braswell was making a

22    strategic decision for the reasons he fairly clearly laid out,

23    rationally laid out from his perspective.

24          I would just note that, as I understand it, Ms.

25    Hopkins' observations are based only on matters -- on things

1  that are fully before the Court.  Either filings that were

2  made to the Court or the fact that Mr. Braswell has made a

3  strategic decision to not speak before the jury even though he

4  very clearly could speak and disagree with the Court and argue

5  his position this morning.

6          He's made the decision not to speak before the jury.

7  That's his decision.  And it's not based on any -- Ms.

8  Hopkins' comment is not based on any other observations

9  outside the presence of the Court or anything else concerning

10  Mr. Braswell from any other source.

11          THE COURT:  That's my understanding.

12          MS. HOPKINS:  That's correct, Your Honor.  I

13  just -- in reviewing what my duties are at my level of

14  appointment, I felt it was prudent to raise the issue with the

15  Court.  I don't disagree.  And it appears that the Court has

16  done a thorough analysis.

17          THE COURT:  All right.  That's fine.  We'll take at

18  least a ten-minute recess and reconvene.  And end wherever is

19  appropriate.

20          MR. SHERRIFF:  Thank you, Your Honor.

21      (Recess.)

22      (The jury entered the courtroom.)

23          THE COURT:  And the government's next witness?  We're

24  back in the presence of the jury.

25          MR. SHERRIFF:  Thank you, Your Honor.  The government

1 | calls Quinn Harrison.
2 | ///
3 | **QUINN HARRISON**,
4 | called as a witness on behalf of the Government, having been
5 | first duly sworn, testified as follows:
6 | THE CLERK:  Please be seated.  Will you please state
7 | your name and spell your first and last name for the record.
8 | THE WITNESS:  Quinn Harrison.  Q-U-I-N-N.
9 | H-A-R-R-I-S-O-N.
10 | THE CLERK:  Thank you.
11 | DIRECT EXAMINATION
12 | BY MR. SHERRIFF:
13 | Q.  Good afternoon, Mr. Harrison.  Where are you employed?
14 | A.  Currently employed at Federal Correctional Institution,
15 | Mendota, California.
16 | Q.  That's a part of the Bureau of Prisons?
17 | A.  Yes.
18 | Q.  All right.  And how long have you been with the Bureau of
19 | Prisons?
20 | A.  Approximately 12 years.
21 | Q.  And where were you prior posted duty?  Briefly.
22 | A.  United States penitentiary Atwater, California.
23 | Q.  From about 2007 to 2014?
24 | A.  Correct.
25 | Q.  And then you've been at FCI Mendota since that time, 2014?

1    A.   Yes.

2    Q.   Okay.  What are your current duties there?

3    A.   I am a correctional systems officer at FCI Mendota, which

4    entails dealing with inmate records, inmate property, the

5    transition of inmates to and from the institution and inmate

6    mail.

7    Q.   All right.

8    A.   And staff mail.

9    Q.   So with respect to your responsibilities with respect to

10   inmate records, you're familiar with the various systems that

11   the Bureau of Prisons uses at Mendota to maintain inmate

12   records?

13   A.   Yes.

14   Q.   And inmate history?

15   A.   Yes.

16   Q.   And with respect to the mail room, you're familiar with

17   the procedures of the mail room and how mail is handled and

18   processed?

19   A.   Yes.

20   Q.   So did you, in fact, regularly work in the mail room at

21   times since 2014?

22   A.   Yes.

23   Q.   All right.  Now, I'm going to show you what's been marked

24   as Exhibit 1.  It's in evidence.  And I'm going to --

25   actually, go to the envelope page.  And this is in your binder

163

1    if you want to -- it may not be in front of your -- is your

2    screen on?

3    A.   Yes.

4    Q.   Oh, it's working.  Good.

5    A.   Yes.

6    Q.   Do you see that envelope?

7    A.   Yes.

8    Q.   What is that address in the upper left corner, the return

9    address?

10   A.   In the top left corner.  The Federal Correctional

11   Institution, Post Office Box 9, Mendota, California, 93640

12   looks like.

13   Q.   And what's located at that address?

14   A.   The Federal Correctional Institution.

15   Q.   That's FCI Mendota?

16   A.   Yes.

17   Q.   Okay.  And do you see how this is marked "legal"?

18   A.   Yes.

19   Q.   Is there a process that is specific when mail is marked

20   "legal" when it's outgoing from the prison?

21   A.   Yes.

22   Q.   Okay.  That you and the Bureau of Prisons follow in

23   processing the mail.

24   A.   Yes.

25   Q.   Okay.  And what -- before I go there.  Let me ask you to

1   take a look at the back side of the envelope.  Do you

2   recognize what's written there?

3   A.   Yes.

4   Q.   Can I have one moment?

5           All right.  And how do you recognize that stamp?

6   A.   That is a stamp we use in the mail room at Mendota.

7   Q.   For what purposes?

8   A.   When there is outgoing legal mail to be handled as legal

9   mail, and it is sealed, we apply that stamp and the day's date

10  on that line.

11  Q.   And when you say "the day's date," that's the date of

12  what?

13  A.   That's the day and date that the mail was handed over to

14  us from the inmate who was giving it to us at the time.

15  Q.   All right.  And is it also the date that it is handed over

16  by the Bureau of Prisons to the US Postal Service, generally

17  speaking?

18  A.   Yes.

19  Q.   All right.  Can you then walk us through the procedures at

20  Mendota -- and I'm referring now to the time period between

21  October of 2015 through August of 2016.  And I'm going to

22  refer you specifically to the dates, for example, of this

23  mailing.  What were the procedures?  Did the procedures

24  change, let me ask you, over that time period or were they

25  consistent?

1   A.   They were consistent.

2   Q.   Okay.  What was the procedure that was implemented, based

3   on your knowledge and work in the department, for handling

4   legal mail?  From the general population.

5   A.   Monday through Friday, excluding federal holidays, there

6   is the opportunity every morning for inmates in the

7   institution, if they want to send out mail to a law office, an

8   attorney, a clerk of the court, a judge, to bring it to us

9   personally.

10  Q.   At what time?

11  A.   It's usually in the morning.  For FCI Mendota, it's

12  approximately between 6:30 and 7:30 in the morning.

13  Q.   All right.  And what was required -- or were there any

14  requirements as to what was on the front of the envelope?

15  A.   Well, by policy, every outgoing mail has to have the

16  individual's name, the individual's register number, the

17  address of the institution.

18  Q.   Okay.  And so if we're looking at the envelope there

19  that's part of Exhibit 1, does that have an inmate's name?

20  A.   Yes.

21  Q.   Cyrus D.A. Braswell?

22  A.   Yes.

23  Q.   And registration number?

24  A.   Yes.

25  Q.   13356-006?

1  A.  Yes.

2  Q.  And are you familiar with how those registration numbers

3  are generated?  Are you -- do they correspond to a Marshal

4  Service number?  Let me ask you that.

5  A.  Yes.  The register number is generated by the US Marshals.

6  Q.  All right.  And that's the number that is used then by the

7  Bureau of Prisons?

8  A.  Yes.

9  Q.  For that person.  And does every person, every inmate have

10  a unique BOP registration number?

11  A.  Yes.

12  Q.  All right.  Let me ask you to take a look at Exhibit 10.

13  It's not in evidence yet.  Is the monitor off?

14       What is Exhibit 10?  You have that in front of you.

15  I'll put it on the screen.  It's also the last exhibit in the

16  binder.  Do you recognize that?

17  A.  Yes.

18  Q.  And what is it?

19  A.  That is a page from the inmate history.  It says "inmate

20  history queries."  That's generated from the database that the

21  Federal Bureau of Prisons uses known as Century.

22  Q.  Is that one of the regular databases that you regularly

23  access and use in the context of your work as a correctional

24  systems officer?

25  A.  Yes.

1    Q.  With respect to records, inmate files.

2    A.  Yes.

3    Q.  All right.  And this -- and so you regularly access that

4    system?

5    A.  Yes.

6    Q.  And does that document, on the upper left, have a -- let

7    me undo that.  Does that have a space for the register -- is

8    it register or registration?

9    A.  Register.

10   Q.  Register.  So does it have a space for the register number

11   for an inmate?

12   A.  Yes.

13   Q.  Okay.  And is it, in fact, the same number that you just

14   saw on the envelope?

15   A.  Yes.

16   Q.  And does it have a space for the inmate name?

17   A.  Yes.

18   Q.  And then is this printout -- by the way, based on your

19   duties, are you authorized and have ability to serve as a

20   custodian of records for inmate history records at Mendota?

21   A.  Yes.

22   Q.  Does this entry consist of a printout of the inmate

23   history for Cyrus Braswell?

24   A.  Yes.

25   Q.  And were those entries -- and it's been redacted to show

1  only certain entries?

2  A.  Yes.

3  Q.  This is an excerpt?

4  A.  Yes.

5  Q.  And were those record entries prepared in the regular

6  course of business and are they prepared in the regular course

7  of business by the Bureau of Prisons?

8  A.  Yes.

9  Q.  And is it also part of the regular course of business of

10 the Bureau of Prisons staff to keep and maintain these record

11 entries?

12 A.  Yes.

13 Q.  And that's part of their duties, in fact?

14 A.  Yes.

15 Q.  And are those entries typically made by staff with

16 knowledge of the entry -- I'm sorry, of the information set

17 forth in each entry?

18 A.  Yes.

19 Q.  And are these records, the entries therein, regarding

20 inmate history made at or around the time of each described

21 entry?

22 A.  Yes.

23 Q.  And, in fact, did you verify, by your review of the

24 Century system, that this, in fact, an accurate representation

25 of the dates that are set forth on there anyway, of Mr.

1   Braswell's history and his registration number?

2   A.  Yes.

3          MR. SHERRIFF:  At this time I'd move in Exhibit 10,

4   Your Honor.

5          THE COURT:  Mr. Braswell, any objection to the

6   admission into evidence of Government's Exhibit 10?

7          And Mr. Braswell has elected not to respond.  Exhibit

8   10 will be admitted without objection and may be published.

9      (Government's Exhibit 10 was received.)

10         MR. SHERRIFF:  Thank you, Your Honor.

11  Q.  Is that going to the -- okay.  So I'm going to ask you,

12  then, Mr. Harrison, to focus in on the top of this inmate

13  history document Exhibit 10.  Right below where it says "page

14  one," what is that?  Written below that.

15  A.  Abbreviation for register number.

16  Q.  What's the number that's written there?

17  A.  13356-006.

18  Q.  And which prisoner -- sorry, which individual inmate --

19  which individual -- let me strike those questions.

20         Which individual at Mendota did that refer to?

21  A.  Braswell.

22  Q.  Who does that correspond to?

23  A.  Braswell.

24  Q.  Mr. Braswell?

25  A.  Yes.

170

1   Q.   And that is, in fact, his registration number?

2   A.   Yes.

3   Q.   Now, looking at Exhibit 1.  You can either flip back or I

4   can put it on the screen for you in just a second.  You see

5   how it has a signature line, looks like it was -- there's a

6   date of October 27, 2015.

7   A.   Yes.

8   Q.   This is on the second page.

9   A.   Uh-huh.

10  Q.   And then there's the mailing, the front of the mailing

11  envelope.  You see that?

12  A.   Yes.

13  Q.   And then the next page is the stamp that you were just

14  testifying to that's put on by the mail room staff?

15  A.   Yes.

16  Q.   All right.  Does that stamp appear to indicate October

17  28th or 29th, 2015?

18  A.   Yes.

19  Q.   Now, can you -- have you reviewed the inmate history and

20  can you determine, based on that, based on your review of

21  Exhibit 10, was Mr. Braswell, in fact, located at Mendota on

22  or about that date?  On that date and the surrounding dates?

23  A.   Yes.

24  Q.   Was he?

25  A.   Yes.

1   Q.   He was?

2   A.   Yes.

3   Q.   So going back to the front of the envelope, you indicated

4   that the inmate's name is required and the registration

5   number.  How is that verified when mailings are going out,

6   when it's legal mail?

7   A.   When legal mail is processed outside of the institution,

8   an individual or an inmate who wants to mail something is

9   required to have his personal ID card on him.  If he does not

10  have that card on him, we will not accept any mail going out.

11  And that ID card has a photo and that register number, and a

12  first and last name.

13  Q.   And when the individual presents the mail, you're saying

14  it's checked against that ID card?

15  A.   Correct.

16  Q.   And is both the name and the registration number checked

17  against the ID card?

18  A.   Yes.

19  Q.   To make sure the individual who's actually providing you

20  the mail to go out is the individual who has his return

21  address on the outside of the envelope?

22  A.   Yes.

23  Q.   Okay.  And then what happens once that's been verified by

24  the ID?

25  A.   Once it's been verified, if the envelope is not already

1    sealed, it is then sealed.  And after, and only after it has

2    been sealed, that stamp is applied and the date written on

3    that blank line.

4    Q.  You're talking about the stamp on the following page?  Or

5    the back side of the envelope.

6    A.  Yes.

7    Q.  Okay.  And then what does the Bureau of Prisons do with

8    the mail at that point?

9    A.  It's prepared for the post office and taken to the post

10   office that day.

11   Q.  To the post office in Mendota, California?

12   A.  Yes.

13   Q.  And where is Mendota located?

14   A.  In Fresno County.

15   Q.  All right.  Now, I'm going to ask you to take a look at

16   Exhibit 2.  And I'm going to ask you to refer -- so this is a

17   document, the first page.  Says "amended motion."  And it's

18   got a received date at the top.  But I'm going to refer you

19   back to the envelope.  And starting with the first -- the

20   front of the envelope.  You see that?

21   A.  Yes.

22   Q.  And again, what's the name of the individual who's the

23   sender on this envelope?

24   A.  It says Mr. Cyrus D.A. Braswell.

25   Q.  And what BOP registration number is associated with that

1   envelope?

2   A.   13356-006.

3   Q.   And whose number is that?

4   A.   That would be Braswell's.

5   Q.   And then the address that's listed there again is the same

6   address for FCI Mendota?

7   A.   Correct.

8   Q.   And this, if you look at the next -- the back side of the

9   next page, there is a stamp there.

10  A.   Yes.

11  Q.   And this is the -- again, is this the same mailing unit

12  stamp at FCI Mendota?

13  A.   Yes.

14  Q.   What's that indicate to you?

15  A.   The stamp indicates that once it has been applied, that

16  particular piece of mail has not been opened or tampered with

17  in any way.

18  Q.   Once that's applied?

19  A.   Correct.

20  Q.   Okay.  And that -- what does the date on there indicate to

21  you?

22  A.   12-17-2015.

23  Q.   And was that -- does that indicate the date it was mailed?

24  A.   Yes.

25  Q.   The date it was received from the individual and also the

Harrison

174

1    date it was mailed?

2    A.  Yes.

3           MR. SHERRIFF:  One moment, Your Honor?

4           THE COURT:  Yes.

5    BY MR. SHERRIFF:

6    Q.  So let me refer you back to Exhibit 10 for a second.  With

7    respect to the date of mailing on Exhibit 2, which you just

8    indicated was about -- I'm sorry.  Did I -- I lost the screen.

9    Is it on?

10          THE CLERK:  There's nothing -- you need to move the

11   document.

12          MR. SHERRIFF:  Oh, there we go.  There we go.  I hit

13   it.  User error.

14   Q.  You said the date of mailing of Exhibit 2 was December

15   17th, 2015 as reflected on the stamp.

16   A.  Yes.

17   Q.  Okay.  Based on your review of the inmate history of

18   Exhibit 10, was Mr. Braswell located at FCI Mendota on that

19   date and surrounding dates?

20   A.  Yes.

21   Q.  All right.  I'm going to ask you to take a look now at

22   Exhibit 3.  And I'm going to refer you back to the front of

23   the envelope that is in evidence as part of Exhibit 3.  You

24   see that envelope?

25   A.  Yes.

1  Q.  All right.  Again, what return address is listed there,
2  what name?
3  A.  Mr. Cyrus D.A. Braswell.
4  Q.  And the registration number?
5  A.  13356-006.
6  Q.  And again, that's Mr. Braswell's registration number at
7  BOP?
8  A.  Yes.
9  Q.  And the address that's below that is the FCI Mendota
10  address?
11  A.  Yes.
12  Q.  And have you reviewed -- or have you reviewed the inmate
13  history, Exhibit 10, for the date of mailing of this document,
14  Exhibit 3?  And I'm referring you now to the back side of that
15  envelope.  You see, there's -- is that the Mendota stamp that
16  you've been testifying about with respect to the other two
17  exhibits?
18  A.  Yes.
19  Q.  All right.  And what is the approximate date of mailing
20  listed on there?  The date of mailing.
21  A.  8-30-2016.
22  Q.  Okay.  Was Mr. Braswell -- so back to my question that I
23  inartfully asked.  Have you reviewed, to determine whether Mr.
24  Braswell was at Mendota on 8-30-16 and surrounding dates?
25  A.  Yes.

1    Q.   And was he?

2    A.   Yes.

3    Q.   And again, based on what you indicated, were the

4    same -- would the same procedures be followed on all of those

5    dates, from -- the October 2015 date through the August 30,

6    2016 date, those three dates, as to the procedures with

7    respect to the requirement of showing the ID card before legal

8    mail could be mailed by an individual?

9    A.   Yes.

10         MR. SHERRIFF:  Nothing further, Your Honor.

11         THE COURT:  Mr. Braswell, any cross-examination of

12   this witness?

13         And Mr. Braswell has elected not to respond.  The

14   witness is excused.  You're free to go, sir.

15         MR. SHERRIFF:  And the government would now call

16   Special Agent Tom Volk, Your Honor.

17                      **THOMAS VOLK**,

18   called as a witness on behalf of the Government, having been

19   first duly sworn, testified as follows:

20         THE CLERK:  Will you please state your name and spell

21   your first and last name for the record.

22         THE WITNESS:  It's Thomas Volk.  T-H-O-M-A-S V-O-L-K.

23                   DIRECT EXAMINATION

24   BY MR. SHERRIFF:

25   Q.   Good afternoon, Agent Volk.

1    A.   Good afternoon.

2    Q.   Where are you employed?

3    A.   I work for Federal Bureau of Investigation.

4    Q.   And for several years, were you based here in Fresno at

5    the FBI?

6    A.   That's correct.

7    Q.   Where are you currently based?

8    A.   Washington D.C.

9    Q.   All right.  And how long were you here in Fresno?

10   A.   From 2015 through just December of 2018, so just a few

11   months ago.

12   Q.   All right.  Prior to joining the FBI, did you have prior

13   federal law enforcement experience?

14   A.   Yes, I did.

15   Q.   And where was that?

16   A.   I was a criminal investigator with the United States

17   Marshal Service for about five years immediately prior to the

18   FBI.

19   Q.   And in that capacity, did you work on threat assessments

20   and address threatening communications?

21   A.   Yes, I did.

22   Q.   Among other duties.

23   A.   Yes.

24   Q.   All right.  And also protective intelligence?

25   A.   That's correct, yes.

1   Q.  And prior to the Marshal Service, did you also have other

2   federal law enforcement experience?

3   A.  Yes.  Prior to that for about four and a half years I was

4   a special agent with the US Secret Service.

5   Q.  Okay.  And then when did you switch to the FBI?

6   A.  That would have been -- the process started in May of

7   2015.

8   Q.  And what are your duties -- or what, at the time you were

9   here in Fresno, what were your duties with respect to -- what

10  types of criminal cases?

11  A.  I worked general violent crime violations, but part of my

12  duties specifically involved violations that happened in

13  federal facilities that were here in our area of

14  responsibility, which is the general Fresno area.

15  Q.  All right.  And at some point did you become involved in

16  an investigation regarding Cyrus Braswell?

17  A.  Yes.

18  Q.  And approximately when was that?

19  A.  That was October, October 23rd, I believe, of 2016 is when

20  I received notification.

21  Q.  And what did you receive notification of generally?

22  A.  I received notification from officers who I was working

23  with at FCI Mendota that they had, in turn, received

24  notification from the US Marshal Service in Anchorage Alaska

25  that Mr. Braswell was sending threatening communications from

1   Mendota to Anchorage, Alaska.

2   Q.  And based on that information, you took steps to further

3   investigate?

4   A.  Yes, I did.

5   Q.  And as part of that investigation, did you go interview

6   Mr. Braswell?

7   A.  I did.

8   Q.  And was that in Mendota?

9   A.  Yes, it was.

10  Q.  And approximately what date was that interview?

11  A.  That was June 29th, 2017.

12  Q.  And you met with him in person?

13  A.  Yes.

14  Q.  And you interviewed him in person?

15  A.  Yes, I did.

16  Q.  Okay.  Do you recognize Mr. Braswell in the courtroom?

17  A.  Yes, I do.

18  Q.  Okay.  Could you identify him by noting the color of an

19  article of clothing he's wearing?

20  A.  Yes.  He's the gentleman sitting at the table over there

21  with the yellow colored shirt on.

22          MR. SHERRIFF:  Could the record reflect the witness

23  has identified the defendant?

24          THE COURT:  It will.

25  BY MR. SHERRIFF:

1   Q.   Now, where is Mendota located?

2   A.   Mendota is located --

3   Q.   Which county?  Let's put it that way.

4   A.   It's in Fresno County.

5   Q.   Here in the Eastern District of California?

6   A.   Yes.

7   Q.   All right.  Now, when you interviewed Mr. Braswell, did

8   you show him -- I'm going to ask you to turn to Exhibit 1.

9   Did you show him Exhibit 1?

10  A.   Yes, I did.

11  Q.   It's a document that's entitled Affidavit for Recusal and

12  it's got a clerk's stamp "Received November 2nd, 2015"?

13  A.   Yes.

14  Q.   Did you ask him about the language that was written at the

15  bottom of page 1 and at the top of page two?

16  A.   Yes, I did.

17  Q.   And did he read that language in front of you?

18  A.   Yes, he did.

19  Q.   How did he read it?

20  A.   The copy that I had, which looked exactly like this, it

21  was just a copy that I had received as an attachment to one of

22  the emails I had mentioned.  I'd taken it and I had

23  highlighted what I saw in the document was threatening

24  language.  And so I had that particular section of it

25  highlighted.  And I turned it as I held it, read it and then

1   showed it to him and asked him to read the language to see if

2   it was familiar to him or if it was language that he used or

3   written himself.

4   Q.  And did he read it out loud?

5   A.  Yes, he did.

6   Q.  And what did he say?

7   A.  He said that he had written it.

8   Q.  He said he recognized it as something he'd written?

9   A.  Yes.

10  Q.  And did you ask whether he intended that language at the

11  top or the bottom of page one and the top of page two as a

12  threat?

13  A.  Yes.  He did indicate that he intended it to be

14  threatening.

15  Q.  And did he indicate who he intended to see it?

16  A.  Yeah.  He said he purposely sent it so it would be seen by

17  Judge Singleton.

18  Q.  All right.  Now, let me ask you:  Did you ask him about

19  this address that's listed after "Singleton" at the top of

20  page two?

21  A.  Yes, I did.

22  Q.  And what did he say about the address?

23  A.  I asked him if that was an actual address or how he had

24  gotten that address.  And he would not disclose to me how he

25  obtained the address.

1   Q.   But he confirmed he wrote that?

2   A.   Yes, he did.

3   Q.   Did you ask him about the signature down there on the

4   signature block?

5   A.   Yes.

6   Q.   What did he say about that?

7   A.   He said that it was his signature.

8   Q.   All right.  Did you ask him about this portion here where

9   he says, "If you don't like the contents of this affidavit,

10             then file charges under 18 Section 876 for mailing

11             threatening communication to a federal official."

12  A.   Yes, I asked him about that.

13  Q.   And what did he say?

14  A.   Well, in the context of me asking him this, I, you know,

15  kind of said, you know, "You're aware that mailing these sorts

16  of things could get you in trouble.  It could be, you know, a

17  new charge or a new federal case."  And he said that he didn't

18  care, that he wanted to be charged.

19  Q.   All right.  Now, let me ask you to take a look at -- by

20  the way, based on your experience with the Marshal Service,

21  are you -- you're familiar with Marshal Service numbers

22  for --

23  A.   Yes.

24  Q.   -- individuals?

25  A.   Yes.

1  Q.  How do those correspond to the registration numbers that

2  BOP uses?

3  A.  They're -- the numbers themselves are assigned to

4  individuals whenever they're processed through the Marshal

5  Service.  And then that number stays with that individual on

6  into the BOP.

7  Q.  It's the same number?

8  A.  It's the same number.

9  Q.  Got it.  Okay.  Let me ask you to take a look at Exhibit

10  3.

11      Now, did you also show Mr. Braswell this document,

12  Exhibit 3.  It's called Affidavit for Recusal.  It's stamped

13  received September 2nd, 2016.

14  A.  Yes, I did.

15  Q.  Now, I want to -- let me clarify that actually.  Because

16  if you look at the proof of service there.  This is right at

17  the end of the document before the envelope.  Do you see that?

18  A.  Yes.

19  Q.  Does that proof of service, does it indicate it's got the

20  name Cyrus Braswell swearing under penalty of perjury as to

21  how it was mailed?

22  A.  Yes.

23  Q.  According to the name written there.  Does it indicate

24  that a copy of this document would have been sent to the Clerk

25  of Court in Anchorage, Alaska?

1    A.   Yes.

2    Q.   And another copy to DA office, is that the address for the

3    US Attorney's Office in Anchorage Alaska?

4    A.   Yes, it is.

5    Q.   All right.   Now, this copy has a clerk's office stamp.

6    When you went to interview Mr. Braswell, do you believe you

7    took a copy that had a stamp "received" by the US Attorney's

8    Office in Alaska?

9    A.   Yes, it was the same document.   The copy I had been

10   forwarded that time was the one with the US Attorney's Office,

11   not the clerk's office.

12   Q.   But it was otherwise essentially the same document?

13   A.   The same document, just one that went a different

14   direction in the same building.

15   Q.   Okay.   Now, when -- so, for example, the text and the

16   other information was the same?

17   A.   Yes.

18   Q.   Okay.   Essentially.   With respect to this Affidavit for

19   Recusal, this one dated "received September 2nd, 2016."   And

20   recognizing that you showed him one that was stamped

21   separately by the US Attorney's Office.   Did Mr. Braswell

22   confirm whether he wrote and prepared this document?

23   A.   Yes.   We reviewed this document, similar to the other one

24   we discussed, and he looked at it.   We -- I had highlighted

25   again the threatening language contained in the document and

1   he said that was what he had written and he had prepared and

2   written that document.

3   Q.  Let's look at a couple of pages there.  So you see on page

4   three.  Is that some of the language that you showed to Mr.

5   Braswell where it says after his release, I will murder any

6   justice or judge he comes into contact with.  And before that,

7   "I will take the life of Federal District Court Judge James

8   Singleton"?

9   A.  Yes.

10  Q.  And he confirmed he had written that?

11  A.  Yes, he did.

12  Q.  How about, on page five, there's additional language there

13  with respect -- and the word "murder"?

14  A.  Yes.

15  Q.  All right.  And how about on page 11.  You see in

16  the -- it looks like it's numbered -- one of the number ones

17  there.  Where it said "I will murder Federal District Court

18  Judge James Singleton."

19  A.  Yes.

20  Q.  Do you see that?

21  A.  Yes, I do.

22  Q.  Is that among the language that you believe you showed to

23  him during the interview?

24  A.  Yes.

25  Q.  And again he confirmed that he wrote that?

1    A.   Yes.

2    Q.   Did Mr. Braswell -- and I'm referring you to page

3    13 -- also, in this document, mention the possibility of

4    charges being filed against him for mailing threatening

5    communications?

6    A.   Yes, he did.

7    Q.   And did you ask -- I apologize if I asked this already.

8    Did you ask about whether he signed the document?

9    A.   Yes.  On the documents that I showed him, I confirmed on

10   each one that had a signature block with a signature that it

11   was his signature.  By showing it to him and asking if it was

12   his signature and he acknowledged that it was.

13   Q.   Okay.  And that is also reflected on the following page,

14   which is the certificate of service?

15   A.   Yes.

16   Q.   Which we reviewed just a little bit ago?

17   A.   Yes.

18   Q.   And does the return address on this mailing also have the

19   same language, same name, registration number and address, I

20   should say, as on Exhibit 1?

21   A.   Yes, it does.

22   Q.   All right.  Now, I'm going to ask you to take a look at

23   Exhibit 2.  What is that document?  It's in evidence.  I'm

24   going to put it on the screen.  What is that document?

25   A.   Title of it is Amended Motion.  It's another threatening

1   communication.

2   Q.  And it's one of the ones you reviewed ultimately in your

3   investigation?

4   A.  Yes, it is.

5   Q.  Okay.  Now, at the time you went to interview Mr. Braswell

6   in -- June of 2017, that was the time period?

7   A.  Yes.

8   Q.  Okay.  You -- did you have this document with you during

9   that interview?

10  A.  No, I did not have this document with me.

11  Q.  So you did not show him Exhibit 2?

12  A.  Correct.

13  Q.  All right.  Now, did Mr. Braswell, during your interview

14  of him, acknowledge sending at least one other threatening

15  communication in addition to Exhibits 1 and 3?

16  A.  Yes.  He did.

17  Q.  So you didn't ask him specifically about 2, but he

18  acknowledged that there was more -- at least one more, other

19  than 1 and 2?  1 and 3.

20  A.  Yes.

21  Q.  Let me go over Exhibit 2.  Are -- does this include

22  similar language to language used -- I'm going to refer you to

23  the part that's titled Affidavit for Recusal.  You see that

24  towards the end?

25  A.  Yes.

1    Q.   Does that have similar language to the Affidavit for

2    Recusal that you reviewed with him at Exhibit 1?

3    A.   Yes, it does.

4    Q.   Appears to be almost word for word as to -- I'm sorry, not

5    word for word throughout, but as to some of the threats are

6    very similar.

7    A.   Yes.

8    Q.   Okay.  And -- so as to the documents you showed Mr.

9    Braswell and asked Mr. Braswell about, did he acknowledge that

10   they were threats?

11   A.   Yes, he did.

12   Q.   And did he acknowledge whether he intentionally included

13   the threats within them?

14   A.   Yes, he did.  Said he knew that -- or he wanted the

15   documents to be forwarded to and be seen by Judge Singleton.

16   He knew what he was saying essentially was a threat.

17   Q.   Did he talk about how he sent them?

18   A.   He said that he prepared them at the law library where he

19   was at and that he put them in the mail.

20   Q.   To be sent where?

21   A.   To be sent from Mendota, California to Alaska.

22   Q.   And did -- I think you indicated he told you that he

23   intended the judge, Judge Singleton, to see the threats?

24   A.   Yes.

25   Q.   Did you -- did he tell you, generally speaking -- well,

1  let me ask it this way:  Did he indicate he was sending the

2  threats because he had -- he believed he'd been improperly

3  sentenced?

4  A.  Yes.  I -- in the context of trying to figure out exactly

5  what was going on, I did ask, you know, what was the basis for

6  doing this.  And he had said that he had a case in front of

7  Judge Singleton and basically felt that he'd been treated

8  unfairly.

9  Q.  And did you ask him what he would do when he returned to

10  Alaska?  Or if he returned to Alaska?

11  A.  Yeah.  He said that his plan was when he completed his

12  sentence, to get out of prison, go to Alaska and kill Judge

13  Singleton.

14  Q.  Did you ask him what he would do if Judge Singleton were

15  right there?

16  A.  Yeah, again, just in the context of trying to vet out and

17  find out, you know, the seriousness of the threat itself.  I

18  asked, you know, if Judge Singleton were sitting there in

19  front of him just like I was, what would he do to the judge?

20  And he looked at me and he said "I'd kill him."

21  Q.  And you were asking those questions to try to get his

22  intent to sending these mailings?

23  A.  Yes.

24         MR. SHERRIFF:  Nothing further, Your Honor.

25         THE COURT:  Mr. Braswell, any cross-examination for

1    this witness?

2           And Mr. Braswell has elected not to respond.  This

3    witness may be excused.  You're free to go, sir.

4           And does the government have any additional witnesses

5    it wishes to call?

6           MS. WITHERS:  We do not, Your Honor.  At this time

7    the government rests.

8           THE COURT:  And Mr. Braswell, I think we're going to

9    take our recess at this time.  And we'll take a matter up

10   outside the jury's presence.

11          Ladies and gentlemen, I read to you the admonition

12   just an hour or so ago.  So I think it's fresh in your mind.

13   Please heed the Court's various admonitions to you regarding

14   discussing the case or anything to do with it with anyone.

15   And certainly the prohibition against doing any research on

16   your own of any kind into the case.  Please heed all of those

17   admonitions.

18          And what I'm going to suggest is that you report back

19   at 8:45 tomorrow morning.  And I anticipate that you will have

20   this case for decision some time during the morning, maybe

21   very quickly in the morning.  Any closing arguments that the

22   parties wish to present as well as the Court's final

23   instructions.  And then we'll send you to the jury room to

24   deliberate.  So I think you'll have the case submitted to you

25   for decision sometime tomorrow morning.  All right?

1      Have a safe trip home.  And we'll see you in the

2 morning at 8:45.  Just go to the jury deliberation room at

3 that time.

4      (The jury left the courtroom.)

5      THE COURT:  And let the record reflect that we are

6 outside the presence of the jury.  And the reason that I

7 decided to recess for the evening at that point is, Mr.

8 Braswell, we've, I think, had a full discussion today about

9 the strategy that you're pursuing.  You've heard from me that

10 I think it's a misguided strategy on your part.  Because I

11 think you could accomplish the retaining of your right to

12 appeal any adverse rulings that I've made in the case and

13 still present a defense to the charges.  You've come to your

14 own conclusion based upon your belief as to what the law is,

15 that that's not the case and that the only way for you to

16 preserve issues for appeal is by refusing to participate in

17 the trial in any way.

18      I've told you that I think that's not a correct

19 interpretation of the law.  I think you could do both.  I've

20 said on the record that it's my belief that you've preserved

21 for appeal already any issue about whether or not you should

22 be allowed to present a defense based upon your claim that the

23 1998 conviction entered against you in Alaska was unlawful and

24 that you were unlawfully imprisoned as a result of that

25 conviction, which Judge Singleton was the judge who entered

1  the judgment and commitment ordered and sentenced you on that
2  conviction.

3        But in addition to me recognizing that you've
4  indicated clearly, you've stated that you don't trust anything
5  that I say.  And that's fine.  That's up to you.  But you've
6  also heard Ms. Hopkins, Assistant Federal Defender,
7  experienced criminal defense practitioner, and you've heard
8  her weigh in on and express the notion that as far as she's
9  concerned, the strategy you're pursuing is so misguided and so
10 incorrect that in her mind, she even starts to question your
11 competency.  Now, I've said what I have to say about that.  I
12 am -- I have no concerns about your competency whatsoever.

13       I want to add a footnote just in case you didn't
14 know, it may make no difference to you.  I suspect it makes no
15 difference to you.  But for the better part of 17 years before
16 I was a judge, I was a criminal defense attorney.  That's how
17 I made my living.  And I made that living primarily defending
18 people charged of federal criminal offenses in both trial and
19 appellate courts.  Again, probably makes no difference to you.
20 I know you don't trust me.  But I think you're making a
21 mistake.  I've made it pretty clear I think you're making a
22 mistake.

23       But all that being said, when we come back in the
24 morning, I am going to ask you if you wish to present any
25 testimony or any other evidence in your defense.  And if,

1    after thinking it over overnight, you decide to change

2    strategy or modify your strategy, it's not too late for you to

3    do so.  You could, for instance, elect to testify in your own

4    defense.  You have a right to testify in your own defense if

5    you elect to do so.  You also have a right to remain silent

6    and need not present any evidence.

7            But those are decisions for you to make.  I just -- I

8    didn't want to rush you into a decision, even though you've

9    made it clear what your current state of mind and your current

10   frame of mind is.  I just wanted to give you overnight to take

11   one last shot at thinking about whether that's really the

12   strategy you want to pursue.  Because I will ask you in the

13   morning if you wish to present a defense and whether you wish

14   to testify on your own behalf.

15           So we'll do that first thing in the morning, see what

16   Mr. Braswell wishes to do.  And then we'll take it from there.

17   I do want to start at 8:30 because sometime later tonight

18   we'll have a set of final proposed -- the Court's final

19   instructions on counsel table, both tables.  So -- what time

20   can you open the courtroom, Jami?

21           THE CLERK:  Oh, I'm here at 7:30.

22           THE COURT:  So Jami will open the courtroom first

23   thing, 7:30.  The instructions will be out here.  If Mr.

24   Braswell is up in the holding cell, perhaps one of the deputy

25   marshals could grab his copy.  We'll make sure there's no

194

1   staple or clasp in it.  It will be labeled Final Jury

2   Instructions.

3          And I'll give you some time in the morning to take a

4   look at it.  And sometime between 8:30 and 8:45, if there's

5   any objections to the final instructions that I've prepared,

6   I'll take those objections on the record so that we're ready

7   to go.  All right?

8          Have a nice night.  See you tomorrow morning.

9      (The proceedings were concluded at 4:30 p.m.)

10

11          I, KAREN HOOVEN, Official Reporter, do hereby certify

12   that the foregoing transcript as true and correct.

13

14   DATED:  30th of July, 2020          /s/  Karen Hooven____
                                         KAREN HOOVEN, RMR-CRR
15

16

17

18

19

20

21

22

23

24

25